UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>  vs.<br><br>ROBERT PFAFF,<br><br>       Defendant. | 08 CR 239 (RMB)<br><br>**DECLARATION OF EDWARD W. SWANSON IN SUPPORT OF UMDA'S SUBMISSION REGARDING PROTECTIVE ORDER** |

Edward W. Swanson hereby declares:

1)  I am a partner of the firm of Swanson, McNamara & Haller LLP. I represent United Micronesia Development Association, Inc. ("UMDA"). I make this declaration of my own personal knowledge and could and would testify competently as to its contents.

2)  Attached hereto as **Exhibit A** is a true and correct copy of the Opposition to Plaintiffs' Motion to Compel Discovery from GET Realty Trust, KCT Irrevocable Trust, Thomas Sorenson, filed on June 13, 2008 in the matter of *UMDA, et al. v. Pfaff, et al.*, Superior Court for the United States Commonwealth of the Northern Mariana Islands Case No. 07-0152.

3)  Attached hereto as **Exhibit B** is a true and correct copy of Robert Pfaff's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion to Compel, filed on June 15, 2008 in *UMDA v. Pfaff.*

/ / /

/ / /

/ / /

/ / /

/ / /

4)     I recently participated in a telephonic meet and confer session with AUSA Stanley Okula and defense counsel David C. Scheper.  During that conversation, Mr. Okula indicated that the government has no objection to Pfaff producing to UMDA copies of any criminal discovery produced to the United States Attorney's Office by persons or entities other than UMDA, if the Court in this action were to permit Pfaff to use such documents in the civil matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 20, 2008 in San Francisco, CA.

Edward W. Swanson

# EXHIBIT A

1    Thompson Law Office, LLC
     Colin M. Thompson, Esq.
2    J.E. Tenorio Building
     PMB 917 Box 10001
3    Saipan, Mariana Islands 96950
     Telephone: (670) 233-0777
4    Facsimile:  (670) 233-0776

5    *Attorneys for Defendant Trustee of GET Realty Trust and KCT Irrevocable Trust*

6
                        IN THE SUPERIOR COURT
7                            FOR THE
                COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
8

9    **UNITED MICRONESIA DEVELOPMENT,**       )    **CIVIL ACTION NO. 07-0152**
     **ASSOCIATION, INC., and UMDA LAOLAO LLC,**  )
10                                            )
                                              )
11                **Plaintiffs,**             )    **OPPOSITION TO PLAINTIFFS'**
                                              )    **MOTION TO COMPEL DISCOVERY**
12            **vs.**                         )    **FROM GET REALTY TRUST, KCT**
                                              )    **IRREVOCABLE TRUST, THOMAS**
13   **ROBERT PFAFF, et. al.**                )    **SORENSON**
                                              )
14                                            )    **Date:**
                                              )    **Time:**
15                **Defendants.**             )    **Judge: Robert C. Naraja**
16   _____      )

17

18          COMES NOW Defendant Trustee of GET Realty Trust ("GET") and KCT Irrevocable Trust

19   ("KCT") (collectively the "trusts") and respectfully submits this Opposition to the Plaintiffs' Motion to

20   Compel:

21

22

23

24

25

                                              1

# **INTRODUCTION**

The Plaintiffs demand supplemental discovery from GET, KCT, and Thomas Sorenson, the former trustee for both trusts, in the form of (1) documents from the trusts, and (2) answers to deposition questions posed to Sorenson. The Plaintiffs cast the issue as a conflict between good and evil. In reality, there are two fairly ordinary disagreements concerning the permitted scope of discovery that the parties have not been able to resolve themselves. Despite good faith efforts to settle the conflict, the parties will need the assistance of the Court to decide these two issues.

In order to place the two discovery disputes in context, the Court should understand the background. First, and perhaps most telling, Plaintiffs move to compel discovery from three parties *dismissed* from the action by this Court's Order on April 4, 2008. In that same Order, this Court ordered Plaintiffs to amend their First Amended Complaint to name, among other things, the proper parties, including the trustee of the trusts instead of the trusts themselves. The Court held that the trusts, as opposed to the current trustee, are improper parties to litigation. For over two months, Plaintiffs have failed to amend the Complaint as ordered by the Court. Nevertheless, the successor trustee to the dismissed trusts has been fully compliant with the trusts' discovery obligations, producing all non-confidential documents just days following the Court's Order. The former trustee of the trusts, Mr.Sorenson, has also complied; he has been deposed *three times*.

Second, the parties do not agree on the scope of discovery of confidential records and information, like bank account numbers. Although GET then a party to the action, filed a motion for protective order in November, 2007, the Court preferred that the parties work out a confidentiality agreement before issuing a court-mandated protective order. As a result, GET's motion, on file for seven months, has yet to be fully considered. In its motion, GET sought the Court's guidance on the very issues about which the Plaintiffs now complain. But pursuant to the Court's request in February, 2008,

the parties have tried to negotiate appropriate terms of an over-arching confidentiality agreement among all parties. By and large those efforts have been successful; the parties are within essentially one term of agreement: whether documents must be produced in entirely un-redacted form, or whether certain documents should be produced redacting sensitive personal and financial information, such as account numbers and social security numbers.

The Plaintiffs are demanding production of all information in un-redacted form, including sensitive information like account numbers. The Defendants oppose the production of such sensitive information, and in the era of identity theft and electronic fraud, the Defendants are legitimately averse to gratuitously disclosing private financial information especially to UMDA and it lawyers, who have repeatedly issued press releases and made public pronouncements about the litigation. The production of such sensitive personal and financial information was among the concerns identified in GET's November 2007 motion for a protective order. Significantly, the Court has already agreed with GET on that issue, ruling in its April 4, 2008 Order (at page 9) that confidential information, like social security numbers and bank account numbers, should be redacted from documents. In spite of this, the Plaintiffs will not agree to a confidentiality agreement that includes such protections.

Nonetheless, the trusts have attempted to keep discovery on track. To provide a fair production of documents prior to the Rule 30(b)(6) depositions of the trusts, even after the trusts had been dismissed as parties, the Defendants tried to produce records to the Plaintiffs with confidential information redacted. The Defendants stipulated that this was without prejudice to the Plaintiffs' right to object to the redactions and to seek whatever relief they deemed appropriate from the Court at a later date. At least the procedure offered by Defendants would provide the Plaintiffs with whatever substantive information the documents contained for use at the depositions. The Plaintiffs would have none of them. The Court should know that the Plaintiffs rejected these terms, and would not accept the documents, literally

3

1  depriving themselves of the records they now demand and which they claim have been withheld from
2  them.

3      All of the rhetoric in the Plaintiffs' motion about the inability to take "meaningful depositions"
4  (Motion at 4-5) fails to acknowledge these facts. It was the Plaintiffs who elected to proceed with
5  depositions while purposefully depriving themselves of records they contend go to the "heart" of their
6  case. They did so because the maintenance of the dispute serves the Plaintiffs, whereas production of the
7  documents would not. In 16 pages of text in their memorandum, there is ample focus on the disability
8  occasioned by the lack of the documents. There is not one line, however, particularizing a question the
9  Plaintiffs hoped to ask but could not because they did not have bank account numbers. When a party
10 prefers having a dispute about documents to actually having the documents, it's time for the Court's
11 assistance. If the Court would memorialize again its finding that sensitive and confidential information,
12 such as social security and account numbers, should be redacted from documents, it would remove this
13 contrived impediment to discovery and allow the case to proceed.
14

15     Third, the other discovery dispute concerns the relevant time period for which documents should
16 be produced. The Plaintiffs wish to discover confidential records and information covering all time
17 periods up to the present. The Defendants believe discovery of confidential information should be
18 limited to the relevant time period, which in this case is no later than April of 2005. Accordingly, during
19 the depositions at issue, defense counsel objected to certain questions seeking confidential information
20 outside the relevant time frame. Thereafter, the Defendants filed a Motion for Protective Order on the
21 question of the relevant time period. The issue and argument is framed by the Defendants' Motion for
22 Protective Order (May 30, 2008), which points and authorities the Defendants incorporate herein in
23 opposition to the Plaintiffs' Motion to Compel.
24

25

# ARGUMENT

## A. The Current Posture of Discovery

The Plaintiffs' mischaracterization of the current state of discovery compels an objective examination of the record. After the Plaintiffs filed the first amended complaint on May 15, 2007, the Plaintiffs moved for a preliminary injunction and Defendants moved for partial summary judgment. Those motions were not heard until October 30, 31 and November 1, 2007, followed by a Court order on November 11, 2007. Within a few days, Defendants filed their motions for a protective order regarding discovery, for a Rule 16 conference and for a Rule 26 conference. In August and September, 2007, the Defendants filed motions to dismiss, which were not heard until February 19, 2008. The motions regarding parameters for discovery and the Rule 16 and Rule 26 conferences were also scheduled to be heard on February 19, 2008. (*See* Feb. 25, 2008 Stipulation and Order).

The Court did not grant or deny Defendants' motions for a Rule 16 and Rule 26 conferences, but issued an order on April 4, 2008, regarding the motions to dismiss and to a limited degree regarding the discovery issues. In lieu of ruling on the motions for protective orders, the Court urged counsel for *all parties* to agree on terms of a confidentiality agreement. (April 4, 2008 Order at 9, 10). Despite the order that such an undertaking be among counsel for *all parties*, Plaintiffs attempted to negotiate different terms of different confidentiality agreements with different parties. (*See, e.g,* The Declaration of Colin M. Thompson, Esq. filed in support of this opposition (hereinafter "Decl. Thompson") ¶ 3; Exhibit A). Almost immediately following the Court's Order of April 4, 2008, the trustee for GET produced the trust's non-confidential documents to Plaintiffs on April 7, 2008, and KCT produced its non-confidential documents to plaintiffs on April 10 and April 11, 2008, several days in advance of the dates of the scheduled Rule 30(b)(6) depositions for those trusts. The productions were subject to

supplementation after agreement by counsel for *all* parties on a confidentiality agreement as directed by the Court's order of April 4, 2008.

In its April 4 Order, the Court also approved a deposition schedule that included a deposition of: Paul Dingee on March 27, 2008; Thomas Sorenson on April 16, 2008; Sasquatch on April 18, 2008; and Robert Pfaff on April 21, 2008. Despite this order, Plaintiffs unilaterally and inexplicably – without authorization from the Court or notice to parties other than Sasquatch – cancelled the Sasquatch deposition. As for Sorenson, the former trustee of GET and KCT, he consented to testify pursuant to Rule 30(b)(6) as the designee for the trusts. Sorenson is, however, elderly and he faces significant health issues (including memory impairment). He consented to the designation upon the condition (among others) that he be permitted to sit for the depositions on sequential days and be finished with his testimony.[1] (*See* Decl. Thompson ¶ 4; Exhibit B). He was not willing or capable of returning, on multiple subsequent occasions, to be subjected to the stress and demands of depositions.

Plaintiffs scheduled the Rule 30(b)(6) deposition of GET for April 14, 2008, and KCT for April 15, 2008, yet inexplicably failed to give notice of the deposition to all of the parties. Hours before the GET deposition was to begin – and after GET and KCT had undertaken extensive time and expense preparing Sorenson as the witness – defendant Deloitte emailed its objection to **UMDA's failure** to provide it with notice of the depositions. Knowing Sorenson had provided conditions to his consent, and unable to subject the witness to repeated depositions if the parties who did not receive notice sought another deposition session with Sorenson, GET and KCT were forced to suspend those depositions until

---

[1] The trusts filed motions contesting that a trust is not a proper party to a lawsuit, which motions were granted by the Court on April 4, 2008, when it dismissed the trusts as parties and instructed the Plaintiffs to amend the complaint to name the proper parties, the trustee for each trust previously named as a defendant. As noted, the Plaintiffs have failed to comply with the Court's order of April 4, 2008, to amend the complaint. Because the trusts are not legal entities and proper parties to a lawsuit, the trusts objected to Rule 30(b)(6) depositions. However, the Court ruled: "As for the challenged depositions of GET and KCT on Rule 30(b)(6) reasons, the Court orders these defendants to comply with discovery and deposition requests." (April 4, 2008 Order at 10).

UMDA provided the required notice to all of the parties, the most basic of procedural requirements. The trusts' counsel offered two separate sequences of three days for the GET, KCT and Sorenson depositions in May. Plaintiffs refused that offer to deal with its failure to provide notice, and instead scheduled an emergency hearing with the Court.

Following the emergency hearing on April 14, 2008, at 11:30 p.m. Florida time, with some parties appearing in person and other parties appearing by telephone, the Court held that all parties (including Deloitte) had failed to receive sufficient notice for the Rule 30(b)(6) depositions, but because the Sorenson deposition was included in the Court's April 4, 2008 order, the parties had sufficient notice of the April 16, 2008 deposition of Sorenson as an individual.[2] The Court further ordered the Rule 30(b)(6) depositions of GET and KCT to be rescheduled for May.

The Court asked UMDA's lawyer to prepare a proposed order and circulate it for approval to all parties. In the proposed order prepared by UMDA's counsel, the Plaintiffs identified the trusts' Rule 30(b)(6) designee as Sorenson, notwithstanding that the entity is obligated by rule to designate its representative.[3] (*See* Proposed Order filed by plaintiffs on April 18, 2008). The Defendants objected, but UMDA's counsel refused to correct the language of the proposed order. (Decl. Thompson ¶ 5; Exhibit C). Instead, Plaintiffs counsel sent a letter to the Court with a proposed order naming Sorenson as the Rule 30(b)(6) designee. (*Id.*). It was the Plaintiffs, then, who designated Sorenson as the Rule 30(b)(6) witness for GET and KCT by way of the language UMDA inserted, over Defendants' objection, in the proposed order. The Court signed the proposed order as submitted by the Plaintiffs, which

---

[2] The Sorenson deposition was taken pursuant to Com.R.Civ.P. 45, with a voluntary waiver by Sorenson of service requirements, because the Court dismissed him as a party in his individual capacity on April 4, 2008, for lack of jurisdiction over him. As such, there is no basis for the plaintiffs to move to compel discovery from him.

[3] Pursuant to Com.R.Civ.P. 30(b)(6), an "organization... shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf... " at a deposition. See *Operative Plasterers' & Cement Masons' Intn'l*

included the reference to Sorenson as the representative for the trusts. As the depositions were no longer sequential, Sorenson withdrew his consent to serve as designee of the trusts pursuant to Rule 30(b)(6). The Trusts were forced to submit a motion to reconsider the language included in the proposed order specifying Sorenson as the designee witness. (*See* Defendants' Motion for Reconsideration filed on May 2, 2008).

The Court denied the Defendants' motion, and Sorenson traveled to Florida (he was living in Wisconsin) and appeared to testify for the trusts on May 15 and 16, 2008, against his physician's advice. (*See* Decl. Thompson ¶ 4; Exhibit B). In advance of those depositions, the parties scheduled a face-to-face meet and confer session to negotiate terms of a confidentiality agreement. (Decl. Thompson ¶ 6; Exhibit D). The Plaintiffs refused to participate in those negotiations. (Decl. Thompson ¶ 7-8; Ex. "E"). Once the Court *again* instructed the Plaintiffs to undertake such negotiations on May 12, 2008, the parties resumed their discussions and got to within one term of agreement. The Defendants offered to provide the Plaintiffs with the confidential discovery in the redacted form, pursuant to the Court's April 4, 2008 Order. Again, the Defendants stipulated this would be without prejudice to Plaintiffs' right to object and to seek relief from the Court in the future. The Plaintiffs flatly rejected the opportunity to obtain the confidential documents for use in the Rule 30(b)(6) depositions of GET and KCT. (Decl. Thompson ¶ 9; Exhibit F; *see also* Decl. Thompson ¶ 8, Exhibit E at 2-3).

UMDA's counsel's conduct should be viewed within the prism of the overall strategy UMDA has employed since the beginning of the litigation in March 2007. With all of UMDA's allegations of cheating, fraud, and obstruction on the part of the Defendants, it is worth noting that UMDA has yet to provide a shred of evidence to support its claims  With all of UMDA's protestations about delays in

---

*Ass'n v. Benjamin*, 144 F.R.D. 87, 89 (N.D.Ind. 1992)(stating that a Rule 30(b)(6) notice of deposition was improper for, among other reasons, because it named a specific individual).

discovery, UMDA has yet to produce to a single Defendant in this action a piece of paper discovery. It is mind-boggling that UMDA can bring this action, rife with allegations of unlawful misappropriation of money from it in furtherance of some grandiose fraud scheme in which the trusts are alleged to have participated, yet be unwilling (and apparently unable) to back it up with production of documents supporting the allegations. While denying any such production to Defendants, the trusts are advised that UMDA has produced boxes of documents to the United States government, allegedly relevant to transactions involving UMDA, Pfaff and the trusts, and those documents suggest that UMDA will not be able to prove the central allegations in the First Amended Complaint--that "Defendant Pfaff and his co-conspirators took assets belonging to Plaintiffs," FAC ¶ 107, and that Pfaff and others "effectively converted the assets and resources of the corporation to their own uses at the expense of the Plaintiffs." *Id.* at ¶ 118.

## B. The Plaintiffs' Refusal to Accept Documents

The documents the Plaintiffs seek were made available to them. The Defendants tried to produce them for the depositions pursuant to the court-ordered negotiations on a confidentiality agreement. The Plaintiffs refused, citing the dispute over redaction of account numbers. The Defendants suggested the Plaintiffs take the records with redactions, subject to whatever might later be clarified from the Court's Order of April 4, 2008 as the proper disposition of redacted information. The Plaintiffs again refused. They did not refrain from taking depositions, however. They proceeded with depositions, claiming all the while to be hindered by the lack of documents that they, ironically, refused to take.

The parties have met and conferred multiple times on discovery issues. On each occasion, the Plaintiffs have refused to agree to a confidentiality agreement consistent with privacy concerns of the trusts raised in its Motion for a Protective Order in November, 2007, and already endorsed by the Court. In particular, the Plaintiffs have perpetually refused to agree to redaction of confidential information like bank account numbers, information the Court concluded should not be disclosed. (*See* April 4, 2008

Order of the Court at 9). The Plaintiffs refute that the Court endorsed redaction of confidential information for discovery purposes. The Plaintiffs contend that redaction is only for protection of information when documents are introduced into the record. (Motion at 4-5).

On page ten, the Court's Order does, as the Plaintiffs suggest, sanction redaction of confidential information before documents are "introduced." (*Id.* at 10). This is in a section of the Order devoted to the request that the proceedings be sealed from the public. The Plaintiffs use this context to disparage defense counsel's honesty and good faith. (Motion at 5). The Plaintiffs state that it is "frivolous" to argue that this countenances a redaction of information for discovery purposes. (Motion at 4). The relevant finding of the Court, however, is on page nine, where the Court specifically addresses discovery. There, talking about the scope of discovery, the Court states that "personal information such as social security numbers, *banking information*, and *other such personal and private information* should certainly be redacted from any documents." (*Id.* at 9, emphasis added). The finding is too readily identified, its plain meaning too obvious, for the Plaintiffs' mischaracterization of the Order to be deliberate. Nonetheless, no amount of beseeching has convinced the Plaintiffs to stop misconstruing the Court's language in negotiations over the confidentiality agreement or now, in a motion to the Court.

## C. The Court Should Enter a Confidentiality Order

The Court asked the parties to stipulate to a confidentiality agreement but recognized that, ultimately, it may have to decide the matter. (April 4, 2008 Order at 10). For this reason, the Court invited the parties to file motions for the Court to decide. (*Id.*) The Defendants have made their best attempt to resolve this dispute to no avail. Accordingly, the Defendants ask that the Court deny the Plaintiffs' Motion to Compel production of documents containing information the Court has already deemed worthy of redaction. This will allow the parties to submit additional papers, if necessary, for the Court to consider in formulating and issuing a confidentiality order.

### D. **The Court Should Enter a Protective Order Concerning the Relevant Time Period**

The Plaintiffs also demand an Order compelling the Defendants to answer deposition questions concerning the Defendants' bank accounts, finances, and affairs <u>post-dating</u> the relevant time period. (Motion at 7-13). The Defendants properly objected to these questions, and the deponent testified to matters arising before April of 2005. The Defendants then moved for a Protective Order. The issue and points and authorities supporting the need for a protective order are set forth fully in the Defendants' Motion for Protective Order and memoranda in support thereof. The Defendants incorporate those points and authorities herein by reference in opposition to the Plaintiffs' motion.

The Plaintiffs' litany of grievances detailing the Defendants' so-called attempts to "derail" discovery (Motion at 7-9) amounts to two pages of text characterizing the defense as bad actors. None of it is material to the legal issue at hand. Because of this, the Defendants would prefer to ignore it. Lest the invective be credited for lack of comment, however, the Defendants have the following observation. Dealing with the Plaintiffs is like dealing with a bigot. There has been no meeting of the minds on any issue because, to the Plaintiffs, the Defendants are so inherently abominable that every act is fraudulent, every concern is contrived, and every statement is deceitful. Countering each grievance would only waste the Court's time with tits and tats over immaterial things. Instead, the Court might gain some insight from knowing that the Plaintiffs have not confronted one discovery dispute without claiming cheating, one disagreement of fact without alleging dishonesty, or one procedural disagreement without attacking counsel's privilege to practice law. It is a method of operation that is hindering the efficient resolution of the dispute.

### E. **The Court Should Deny the Demand for Additional Testimony on Point du Hoc**

In addition to demanding testimony on matters outside the relevant time period, the Plaintiffs appear to demand additional testimony from Sorenson on the matter of Point du Hoc. (Motion at 11). The Plaintiffs must have prepared the motion without reviewing the relevant transcript. Plaintiffs asked several pages of questions about Point du Hoc and received unabated responses from the witness, (*See*

11

Decl. Thompson ¶ 10; Exhibit G), irrespective of the instruction by counsel lifted out of context and used as a basis of their motion.

Sorenson was testifying on behalf of GET on specific topics enumerated by the Plaintiffs, which did not include Point du Hoc. He was not called to provide testimony on Point du Hoc, nor was he authorized by Point du Hoc to provide such testimony. Point du Hoc was not represented at the deposition. Nevertheless, Plaintiffs asked the witness several questions on Point du Hoc to which the witness responded. Midway through Plaintiff's examination regarding Point du Hoc, counsel issued his instruction that inquiry regarding Point du Hoc was not appropriate for the Rule 30(b)(6) deposition of GET Realty Trust. After additional colloquy by counsel, which was not included in plaintiff's motion, plaintiff resumed its examination of the witness regarding Point du Hoc, unabated, until plaintiff's counsel exhausted all of his questions on the topic and switched to another. (*Id.*). The witness was allowed to and did respond to each potentially relevant question on Point du Hoc and to questions which could potentially lead to discoverable evidence. Plaintiffs were in no way limited in their inquiry of the witness on Point du Hoc. Moreover, plaintiffs were in no way deprived of the discovery they sought when they noticed the deposition of GET Realty Trust, and more. In addition, Sorenson had testified at a separate deposition as an individual, where plaintiff's had the opportunity to examine the same witness on topics outside those designated for the Rule 30(b)(6) deposition of GET Realty Trust. Accordingly, the Plaintiffs' attempt to suggest they have been deprived of an opportunity to examine the witness at length and unabated regarding Point du Hoc is inconsistent with the plain truth, manifested in the very transcript of the witness's testimony on which they rely by citing to it in incomplete fashion.

**F.  The Court Should Deny the Demand for Testimony on Privileged Matters**

The last matter on which the Plaintiffs demand testimony concerns communications between counsel and the witness. The Plaintiffs asked the witness "without telling me the content," did you "have any discussion with [your lawyer] regarding [subject x]." (Motion at 12). Defense counsel objected and pointed out that the substance of the communication is privileged. This offends the Plaintiffs because

12

they suggest that, so long as the question does not call for disclosure of the content, they are entitled to know about the communication. The argument is a mystery. The Plaintiffs acknowledge that they are not entitled to know what lawyer and client discussed, but then they demand to know what was discussed. The Plaintiff's might just as well have asked: "Don't disclose what you talked about; but did you talk about [subject x]."

The Plaintiffs complain that they were entitled to ask because it "was relevant to Sorenson's preparation to testify as the 30(b)(6) witness for KCT." (Motion at 12). This has not been established. To follow this line of inquiry, the proper question to the witness would have been "what did you do to prepare." If the proper questions had been asked, and had the witness ultimately testified as a designee using information communicated to him via a lawyer, then there might be a question about discoverability. No such foundation was (or could have been) laid through Plaintiff's attempts at questions. Absent such a foundation even had it been possible, however, inquiring into the substance of an attorney-client communication is impermissible.

### G. The Court Should Disregard Argument Concerning Production of Documents from Others

Finally, the Plaintiffs argue about, but do not request any discernable relief from, the alleged withholding of documents by a co-defendant, Robert Pfaff. (Motion at 6). In particular, the Plaintiffs devote a distinct section of the Motion to suggesting that it "is likely" that Pfaff is withholding important records concerning the trusts. (*Id.*) The Plaintiffs go from speculating about what Pfaff is "likely" doing to, in the same paragraph, stating quite decisively, "In this way, GET, KCT, and Pfaff have managed to conceal nearly all information about the trusts." (*Id.* at 7). It is emblematic of the problem. Without any legitimate basis, the Plaintiffs will aver just about anything concerning the Defendants and defense counsel. The Defendants acknowledge that the Plaintiffs claim they were defrauded. Indeed, the Plaintiffs have sued 26 Defendants for fraud, all without alleging *a single misrepresentation*. Certainly, the belief that one has been defrauded causes offense. Accordingly, the Defendants do not expect amicability from the Plaintiffs. They merely suggest that the Plaintiffs not continuously act mistreated by

1  the inconvenience of actually having to prove a case and conduct discovery, discovery that must run both

2  ways.

3                                              **CONCLUSION**

4          For all the foregoing reasons, Defendant Trustee of the GET Realty Trust and KCT Irrevocable

5  Trust respectfully requests that this Court enter an Order denying the Plaintiffs' Motion to Compel.

6          Dated this __13th__ day of June 2008.

7

8

9                                                    _____
                                                           /s/
10                                               **COLIN M. THOMPSON- F0221**
                                                 Thompson Law Office, LLC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

1 | **Colin M. Thompson, Esq.**
THOMPSON LAW OFFICE, LLC
2 | J.E. Tenorio Building
PMB 917 P.O. Box 10001
3 | Saipan, Mariana Islands 96950
Telephone: (670) 233-0777
4 | Facsimile: (670) 233 0776

5 | **OVERLAND BORENSTEIN SCHEPER & KIM LLP**
MARK A. BORENSTEIN (admitted *pro hac vice*)
6 | mborenstein@obsklaw.com
300 South Grand Avenue, Suite 2750
7 | Los Angeles, CA 90071-3144
Telephone:    (213) 613-4655
8 | Facsimile:    (213) 613-4656

9 | **Attorneys for Robert Pfaff**

10 |

11 | **SUPERIOR COURT OF THE**

12 | **COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

13 |

14 | UNITED MICRONESIA DEVELOPMENT
ASSOCIATION, INC., and UMDA LAOLAO
LLC,

15 |

16 |      Plaintiffs,

17 |     v.

18 | ROBERT PFAFF, et al,

19 |     Defendants.

20 |

CASE NO. 07-0152

**ROBERT PFAFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION (1) TO COMPEL DOCUMENTS RELATING TO PFAFF'S ENTITIES, (2) TO COMPEL ANSWERS TO DEPOSITION QUESTIONS, AND (3) TO PROHIBIT PFAFF FROM OBTAINING DISCOVERY FROM PLAINTIFFS; DECLARATION OF MARK A. BORENSTEIN IN SUPPORT THEREOF**

21
22
23
24
25
26
27
28

1

## **TABLE OF CONTENTS**

2   I.    INTRODUCTION................................................................. 1

3   II.   PROCEDURAL HISTORY .................................................... 3

4         A.    Origins of UMDA's Claims .......................................... 3

5         B.    UMDA's Allegations Against Mr. Pfaff ............................ 4

6               1.    UMDA's Complaint Articulates No Details of the Alleged
                      Misconduct.................................................... 4

7               2.    UMDA's Business Records Reveal That UMDA's Claims Have No

8                     Merit........................................................ 5

9         C.    UMDA Capitalizes on the Criminal Investigations ................. 7

10              1.    The Stein Indictment ......................................... 8

11              2.    The Pfaff Indictment ......................................... 9

12              3.    The Attorney General's Investigation ......................... 10

13  III.  LEGAL ANALYSIS ........................................................ 11

14        A.    Standards Governing Assertion of the Fifth Amendment............ 11

15        B.    UMDA's Questions Unequivocally Raise Subjects Protected by the
                Privilege ...................................................... 12

16              1.    Purported Misappropriation of UMDA Shares .................... 13

17              2.    Purported Misappropriated Corporate Opportunities............. 15

18              3.    Transactions Specifically Mentioned by Prosecuting Authorities .... 15

19              4.    Entities Specifically Mentioned in By Prosecuting Authorities ...... 16

20        C.    UMDA's Attempt to Misuse The Collective Entity Doctrine Is Unavailing.......... 17

21              1.    The Collective Entity Rule Does Not Apply to Individuals ...... 17

22              2.    UMDA Has Not Requested Documents From Mr. Pfaff as a

23                    Custodian.................................................... 20

24        D.    UMDA Effort to Thwart Obviously Relevant Document Production Is
                Completely Unfounded and Unsupported by Any Authority .......... 21

25  IV.   CONCLUSION ............................................................ 24

26

27

28

## I.    INTRODUCTION

Plaintiff United Micronesia Development Association, Inc.'s ("UMDA") motion to compel is premised on two deceptions, both concerning what UMDA and its lawyers have *failed* to tell the Court...First, UMDA challenges Defendant Robert Pfaff's Fifth Amendment privilege, arguing that there is no basis for the invocation as to hundreds of deposition questions and many document requests, but concealed the details of the CNMI Attorney General's criminal investigation into the exact same transactions as UMDA challenges in this case. UMDA also ignored the specific allegations in the two indictments pending against Mr. Pfaff in the Southern District of New York. Even a cursory examination of the allegations in these three proceedings demonstrate that UMDA's motion is beyond baseless. Indeed, the federal judge in one of the criminal cases in New York, when considering the Fifth Amendment's application to related civil cases, stated that the criminal defendants "would be crazy" if they did not invoke the Fifth Amendment privilege, and if the defendants did not, "their lawyers would be guilty of malpractice." *See Klamath Strategic Investment Fund v. United States,* M-85 (LAK) (S.D.N.Y, July 24, 2006) at 16:24-17:5 (Judge Kaplan), attached to the Declaration of Mark A. Borenstein, at Ex. I.

UMDA's failure to even mention the criminal proceedings facing Mr. Pfaff is quite telling. At every other opportunity in this case, UMDA has waved the indictments as evidence of Mr. Pfaff's wrongdoing concerning UMDA and co-Plaintiff UMDA LaoLao, LLC (the "LLC"). UMDA's histrionics have sought to create the impression that Mr. Pfaff and his family and business associates are bad people who must have done something wrong concerning UMDA. In fact, UMDA's strategy has been to introduce a litany of innocuous – or at times completely fabricated – alleged acts by Mr. Pfaff, and then use the criminal proceedings as "evidence" of civil tort liability.[1]

But UMDA cannot have it both ways. UMDA cannot reference the indictments in the criminal cases (which are not evidence, of course) to support its unfounded allegations, and then

---

[1] Significantly, there is no claim in the criminal indictments that UMDA or anyone other than the IRS, lost even a penny or was damaged in any way.

1  pretend them away when it seeks discovery from Mr. Pfaff. Having trumpeted the criminal

2  indictments at every turn and having worked with the Attorney General to manufacture a very real

3  and tangible risk of criminal prosecution in the CNMI, UMDA cannot now assert in good faith

4  that the information relevant to that investigation is not subject to the Fifth Amendment privilege.

5  To the contrary, UMDA's (and its counsel's) conduct should be sanctioned for wasting the Court's

6  and parties' time and money under Rule 37(a)[2]

7      Second, UMDA has failed to disclose to the Court that the very documents UMDA's so-

8  called "protective order" seeks to shield from disclosure were produced by UMDA to the US

9  Attorney's office in NY, and they show that UMDA's claims are wholly meritless. And UMDA's

10  lawyers and directors know it.[3]

11      The central contention in UMDA's first amended complaint that purportedly justifies

12  relief against Mr. Pfaff and wide ranging discovery by UMDA into years of private business and

13  banking transactions is the claim that Mr. Pfaff converted or misappropriated UMDA property

14  and money that was later used to buy UMDA stock and invest in the LLC. UMDA has steadfastly

15  refused to provide any information supporting these allegations of theft and conversion; indeed, it

16  has completely refused to identify precisely what money and property Mr. Pfaff allegedly

17  improperly took! Without this proof, UMDA has no case: it matters not how or in what way Mr.

18  Pfaff acquired, used or transferred his money and property among different bank accounts or

19  _____

20  [2] UMDA's assertion that Mr. Pfaff cannot assert the privilege concerning documents in his

21  possession that relate to certain entities is also unfounded. The "collective entity doctrine" cited by
   UMDA applies only when the document request or subpoena seeks documents from a current

22  custodian of records, which are held in his official capacity as a representative of the entity.
   UMDA has not even attempted to serve such a subpoena on Mr. Pfaff as custodian, but instead

23  seeks papers held by him in his personal capacity. Indeed, UMDA has sent document requests to
   the actual custodians of records for at least some of the entities in question.

24
   [3] UMDA's request for a court order allowing UMDA completely to shirk its discovery obligations,

25  and thereby preventing Mr. Pfaff from defending, is wholly unsupported by any case, statute or
   rule. *See e.g* Wright and Miller, 8 *Federal Practice & Procedure* § 2018 n. 46 (2008)(citing

26  cases)(to foreclose a criminal defendant "from litigating an issue properly in the case, merely for
   claiming the constitutional privilege certainly makes the resort to the privilege too 'costly' [and it]

27  is difficult to believe that sanctions of this kind can be defended.")

28

2

1 entities, if UMDA cannot or will not identify and produce evidence of the UMDA property

2 actually taken. By seeking relief from its own discovery obligations which now formally require

3 UMDA to describe what was allegedly taken by Mr. Pfaff and his family, UMDA seeks to

4 continue misusing the Saipan litigation.[4]

5       While UMDA's complaint is devoid of any specific factual claims, UMDA's lawyers and

6 directors identified three specific transactions, the so called "CNB note," the purchase of 35,000

7 shares of UMDA stock and the investment in the LLC, at the November 2007 preliminary

8 injunction hearing before Judge Lizama, As shown below, the documents UMDA and its lawyers

9 provided to the United States Attorney show that each of these claims is completely baseless.

10 Indeed, since the documents must have been reviewed by UMDA's lawyers before they were

11 produced to the government, the questioning by UMDA's lawyers at the injunction hearing likely

12 induced knowingly false testimony and violated Rule 11.

13       By granting a protective order, the Court will allow UMDA to perpetuate its deception.

14 Irrespective of Mr. Pfaff's Fifth Amendment rights, the very documents already produced in New

15 York, must now be produced in Saipan.

16 **II.    PROCEDURAL HISTORY**

17     **A.    Origins of UMDA's Claims**

18       In 2004, UMDA formed the LLC as an investment vehicle to purchase shares of a

19 corporation that operated a golf course located in the Commonwealth of the Northern Mariana

20 Islands ("CNMI"). (First Amended Complaint ("FAC") ¶¶ 60-64.)[5] UMDA invited other investors

21 _____

22 [4] UMDA's strategy may be to use Mr. Pfaff's proper invocation of the Fifth Amendment, to

23 request the Court to draw negative inferences in UMDA's favor. Before finding that UMDA is
unfairly disadvantaged by the privilege, the Court will need to consider a myriad of issues

24 including whether the information UMDA seeks is available elsewhere. Most of the information
sought is already in UMDA's possession, but any information it lacks can be obtained from third

25 parties, like former UMDA CEO Michael Grandinetti, and former UMDA President Peter Sinclair

26 (individuals whose alleged wrongdoing is expressly defined in UMDA's complaint, but who are
curiously omitted from the list of defendants). According to UMDA's directors, both Grandinetti

27 and Sinclair are "cooperating" with UMDA.

28 [5] Although the First Amended Complaint has been dismissed, UMDA has so far refused to file a
(footnote continued)

1   to purchase an interest in the LLC, and Mr. Pfaff – who was a director at the time – solicited funds

2   for the investment from business associates and entities. (*Id.*, see also ¶ 58.) In addition, several

3   other UMDA board members also invested in the LLC. (*See* FAC Ex. A.) After the LLC sold its

4   primary asset, a minority interest in the LaoLao Golf Course, and essentially doubled its members'

5   investment, UMDA decided to keep the profits (and principal) from the majority of the members

6   for itself. (*See generally* FAC.)

7        **B.**   **UMDA's Allegations Against Mr. Pfaff**

8           *1.*    *UMDA's Complaint Articulates No Details of the Alleged Misconduct*

9         Since UMDA's complaint is merely a creature of opportunism, and not a genuine request

10   for relief, it fails to articulate any details of Mr. Pfaff's wrongful conduct, and none of the

11   discovery conducted by UMDA has yet revealed any wrongdoing. Rather, UMDA brought the

12   instant case, asserting a variety of unspecified wrongs by Mr. Pfaff and others allegedly working

13   in concert with him. For example, UMDA claims that in 1996, Mr. Pfaff used payments he

14   received for providing UMDA tax advice through his former employer, KPMG,[6] along with

15   "subsequent questionable transactions," to "fraudulently obtain[] stock in UMDA." (FAC ¶¶ 53-

16   58.) Then Mr. Pfaff allegedly "used UMDA... to engage in a number of sophisticated transactions

17   apparently designed to hide illicit gains through, among other means, acquiring interests in

18   UMDA and related entities." (FAC ¶ 55.) The primary allegation of wrongdoing is in paragraph

19   118 of the FAC where UMDA alleges that Mr. Pfaff and others "effectively converted the assets

20   and resources of the corporation to their own uses at the expense of the Plaintiffs." Despite the

21   length of UMDA's 166 paragraph First Amended Complaint, these few paragraphs are the only

22   specific allegations in the entire complaint of Mr. Pfaff's alleged improper appropriation of

23   UMDA's property; there are no specific facts alleged concerning what UMDA property was taken

24      _____

25   second amended complaint. Defendants have prepared and will file a motion to dismiss the action
   under Rule 41. Until then, the First Amended Complaint is cited herein.

26   [6] UMDA has thus far been unable to explain how it was injured by the tax strategy called "ZENS"

27   Mr. Pfaff purported recommended, or even how any payments made to professionals were
   improper. The tax transaction has *never* been challenged by the IRS.

28

                                    4

1    by Mr. Pfaff.[7]

2          At the preliminary injunction hearing, UMDA's directors purported to explain in detail the

3    alleged misconduct that is *not specified in* it's the First Amended Complaint. Specifically, UMDA

4    Directors Russell Snow, Eduardo Calvo, Joshua Koshiba and Jose Lifoifoi identified three

5    supposed tortious acts by Mr. Pfaff: (1) the taking by Mr. Pfaff's children's trusts of UMDA's

6    corporate opportunity to buy 100% of the Lao Lao Golf Course, (2) the misappropriation

7    UMDA's corporate opportunity to refinance a $10 million loan from City National Bank to

8    UMDA, and (3) the purchase of 35,000 UMDA shares by the KCT Irrevocable Trust, whose

9    beneficiaries are Mr. Pfaff's children, allegedly in violation of UMDA's stockholder preemptive

10    rights. Significantly, other UMDA directors, including Calvo, Peter Sinclair, Michael Grandinetti,

11    Tony Gannigiyan and Snow participated in the investments on the same terms as Mr. Pfaff or the

12    trusts. Other directors also purchased UMDA stock the same manner as KCT.

13          **2.**    ***UMDA's Business Records Reveal That UMDA's Claims Have No Merit***

14          At the November 2007 preliminary injunction hearing, UMDA produced nothing to

15    substantiate the oral claims made by the UMDA directors, and has not produced any evidence

16    since then. Nor could it, because the documentary evidence *disproves* that Mr. Pfaff or anyone

17    related to him improperly took any corporate opportunities or acquired UMDA stock. UMDA

18    knows full well that this is the case, as it produced those exonerating documents to the United

19    States Attorney in connection with the criminal cases pending in New York.

20          Since the contentions in the two criminal cases overlap with and relate to UMDA's claims,

21    UMDA produced thousands of pages of documents to the U.S. Attorney's Office in New York in

22    response to a government subpoena. Mr. Pfaff's lawyers received these documents as part of the

23    government's criminal discovery obligations. Because an interim protective order does not permit

24    counsel to produce the documents for the Court's review that expressly contradict UMDA's factual

25    _____

26    [7] UMDA accuses Mr. Pfaff of "transferring assets" to "conceal tortious and/or illegal conduct

27    and/or to evade taxes," but fails to describe any of the tortious or illegal conduct alleged. In any
event, Mr. Pfaff's alleged efforts to "evade taxes" himself cannot be a cause of injury to UMDA.

28

1 contentions, counsel offers the following information derived from the documents and urge the

2 Court to order UMDA to produce the documents forthwith.

3      The records UMDA has in its possession, and which its counsel must have reviewed

4 prior to production to the government, demonstrate that all of the specific contentions so far raised

5 are utterly baseless. For example, UMDA is well aware that the purchase of the LLC interest could

6 not possibly be a basis for any claim that Mr. Pfaff or his family usurped UMDA's corporate

7 opportunity. Not only did the UMDA Board expressly agree that it was too risky for UMDA

8 itself to buy 100% of the Lao Lao Golf Course at its November 2004 Board meeting, the Board

9 voted to allow UMDA board members and other shareholders (as well as others recommended by

10 the board members) to invest in the LLC – on a motion by Calvo that was seconded by Lifoifoi.

11 Calvo, along with Snow, Gannigiyan and Jones (a friend of Lifoifoi), invested in the LLC. When

12 the sale of the golf course was completed, UMDA did not hesitate to distribute the full share of the

13 initial investment and profits to these individuals. At the same time, UMDA, as the LLC's

14 manager, refused to distribute either the initial investment or profits to GET Realty Trust and other

15 off-island LLC investors. Surely, if GET usurped a corporate opportunity that should have been

16 reserved to UMDA, so did Calvo, Snow, Gannigiyan and Jones.  Tellingly, UMDA has failed to

17 bring any claims against these individuals.

18      UMDA's documents are equally fatal to its allegations regarding the refinance the loan

19 from City National Bank ("CNB"). The directors at the preliminary injunction hearing testified

20 that UMDA should have been able to buy back the $10 million loan from CNB at a 70% discount

21 and capture the savings. They complained that a group of investors, including UMDA's chairman

22 and CEO, Michael Grandinetti, its president, Peter Sinclair, Mr. Pfaff and others, managed to buy

23 the loan at a discount, instead of UMDA. However, the documents that UMDA produced to the

24 government, but refuses to produce here, establish that (1) although UMDA attempted to borrow

25 the $7 million necessary to purchase the note, no traditional lenders would make the loan, (2) all

26 of the UMDA directors, including Lifoifoi, Snow, Calvo, Koshiba and Gannigiyan, were offered

27 the chance to participate in the buyout of the CNB loan, (3) Gannigiyan actually loaned

28 Grandinetti $250,000 so Grandinetti could participate in the CNB loan buyout, and (4) before

1    Grandinetti approved any refinancing of the loan, he insisted that UMDA be paid $750,000 as part

2    of the transaction – a sum that UMDA otherwise had no legal right to receive.

3             UMDA's directors also testified that the KCT Irrevocable Trust acted improperly when

4    it purchased 35,000 shares of UMDA in 2001.  At the preliminary injunction hearing, the UMDA

5    directors seemed to contend that either UMDA was never paid for the 35,000 shares, or that KCT

6    should not have been able to buy the 35,000 shares because of preemptive rights in UMDA

7    Articles of Incorporation which purportedly prohibited the purchase of the stock. UMDA's

8    business records completely refute the claim, in three ways. First, they show that UMDA was

9    actually paid in full for these shares, at a record high price of $34.79 per share. Second, UMDA's

10   Board of Directors – in a motion by Koshiba and seconded by Gannigiyan – approved in 2000 a

11   plan fashioned by UMDA's corporate counsel to allow UMDA to hold shares in trust and then re-

12   sell them to interested investors, so as to avoid the preemptive rights provisions of the Articles of

13   Incorporation – a procedure that was followed when KCT purchased its shares in 2001. The same

14   procedure was seemingly later followed by other UMDA directors, including Calvo and

15   Koshiba, who also purchased UMDA stock.

16           It is unclear whether the directors who testified at the preliminary injunction were aware

17   that UMDA's own documents completely undercut its claims in this action. Perhaps they were

18   aware of the documents and evidence, and simply lied under oath. Or perhaps UMDA's counsel

19   deliberately concealed these documents from its clients in an effort to bolster the preliminary

20   injunction testimony. In either event, the documents that establish these facts refute UMDA's

21   shameful allegations, and must be produced in this action, just as they were to the U.S. Attorney.

22           **C.     UMDA Capitalizes on the Criminal Investigations**

23           With no actual evidence that Mr. Pfaff did anything to injure UMDA – or even that

24   UMDA suffered any detriment at all – UMDA could only misappropriate the LLC investment by

25   capitalizing on a criminal prosecution against Mr. Pfaff that is currently pending in the Southern

26   District of New York. Hoping that Mr. Pfaff would be unable to defend himself while facing both

27   a civil suit and criminal prosecution in New York, UMDA seized the moment to assert numerous

28   claims against Mr. Pfaff and numerous entities with which he has allegedly been associated. As

7

1    revealed in the First Amended Complaint, UMDA's legal strategy is to create a laundry list of

2    unrelated actions, allegedly taken by Mr. Pfaff and by others who are not under his control, and

3    then reference the indictment as "evidence" that Mr. Pfaff somehow injured UMDA. (*See, e.g.,*

4    FAC ¶¶ 88-90 (UMDA's effort to appropriate the investment in the LLC because Mr. Pfaff

5    allegedly committed unspecified and unrelated "illegal activities").)

6           *1.    **The Stein Indictment***

7          Mr. Pfaff is currently a defendant in *United States v. Stein*, a criminal prosecution premised

8    on a forty-six count, seventy-page criminal indictment currently pending in the United States

9    District Court for the Southern District of New York. (Borenstein Decl. Ex. A (hereinafter "Stein

10    Indictment").) The superseding indictment alleges criminal violations of federal law relating to

11    tax strategies for individual clients with the assistance of foreign and domestic banks. (*See*

12    *generally,* Stein Indictment.) In addition, the US Attorney in New York has stated the

13    investigation is on-going. Mr. Pfaff has pleaded not guilty and vigorously disputes the charges.

14          The Stein Indictment alleges, among other things, that Mr. Pfaff entered into a conspiracy,

15    with *inter alia*, John Larson and David Amir Makov, both of whom are defendants in UMDA

16    action, and with KPMG, Mr. Pfaff's former employer. (*See, e.g.,* Stein Indictment at ¶¶ 1, 13, 25-

17    40.) Moreover, Michael Grandinetti, former CEO of UMDA, is on the government's witness list.

18    According to a UMDA director, Grandinetti "entered a guilty plea with regard to Pfaff-related

19    activities and is now a cooperating witness with the government against Pfaff and his associates."

20    (*See* Lifoifoi Decl. Supp. Mot. Temp. Rest. Order dated 5/20/2007 at ¶ 3; *see also* FAC ¶ 57.)

21          Moreover, UMDA received a subpoena from the grand jury in connection with the Stein

22    prosecution, generally seeking information relating to Mr. Pfaff and any "trust in which Mr. Pfaff

23    had/has an interest and/or has any aspect of control." (*See* Borenstein Decl. Ex. B (hereinafter

24    "Subpoena").) In addition to this general request, the Subpoena seeks information relating to any

25    emails between former UMDA CEO Grandinetti and Mr. Pfaff (and the trusts identified above), as

26    well as any "banking or financial records relating to Robert Pfaff." *Id.* In addition to seeking

27    information about Mr. Pfaff, the Subpoena requests documents relating to other entities and

28    persons named in UMDA's complaint, including John Larson and Jaime Romero-Salas. *Id.*

1    Mr. Pfaff's alleged activities with Grandinetti and Romero Salas concerning UMDA are

2  the subject of the government's Federal Evidence Rule 404(b) submission to the federal criminal

3  court in New York, claiming that these activities constitute evidence of other crimes and wrongs

4  under that rule. (Borenstein Decl. Ex. C at 2-5.) Indeed, UMDA's complaint notes that it is

5  predicated on the Rule 404(b) briefing. *See* FAC ¶ 52. While the trial court in *Stein* has

6  preliminarily ruled that Mr. Pfaff's alleged activities in Saipan are not admissible under Rule

7  404(b), the ruling is without prejudice to a new request at trial. (*See* Borenstein Decl. Ex. D at 11.)

8            *2.    The Pfaff Indictment*

9    In addition to the Stein Indictment, the grand jury has issued an indictment accusing Mr.

10  Pfaff of alleged inaccuracies in his personal tax returns (*See generally* Borenstein Decl. Ex. E

11  (hereinafter "Pfaff Indictment)"). The Pfaff Indictment alleges a conspiracy among, *inter alia*,

12        •"Saipan Company," described as an investor "in various investment activities in Saipan
              and elsewhere in Micronesia, including the purchase and sale of
13              telecommunication, airline, and other assets," which is UMDA (Pfaff Indictment
              ¶ 6)
14
        •"Saipan Co-conspirator-1," described as "a resident of Saipan, a certified public
15              accountant, and a senior officer of the [Saipan Company]," who is Michael
              Grandinetti, UMDA's former chief executive officer (*Id.*)
16
        •"Saipan Co-Conspirator-3," described as "a senior officer of" UMDA, who is Peter
17              Sinclair, UMDA's former President (*Id.* ¶ 8)

18        •"Philippines Company," described as "a small construction company located in or
              around Manila, the Philippines," which is obviously Sussex General Contracting
19              ("Sussex") (*Id.* ¶ 9)

20        •"Philippines Co-conspirator," described as a citizen and resident of the Philippines and
              the owner of "Philippines Company," who is Jaime Romero-Salas. (*Id.*)
21
     The Pfaff Indictment generally accuses Mr. Pfaff and several co-conspirators, including
22
   Grandinetti, Sinclair, Salas, Sussex and others of concealing income from the IRS. (*See, e.g.,* Pfaff
23
   Indictment ¶¶ 11-16.) It alleges that Mr. Pfaff obtained fees from transactions with UMDA and
24
   other taxpayers, while concealing these fees from his employer, KPMG. (*Id.* at 18, 19(a).) The
25
   Pfaff Indictment alleges that Mr. Pfaff also cooperated with Grandinetti and others to "defraud"
26
   UMDA, and to cause that fee income "to be sent from bank accounts in the United States and
27
   CNMI to bank accounts in Manila, Philippines" which were controlled by Romero-Salas. (*Id.* ¶

28

                                                9

1    19-19(e).) Mr. Pfaff is accused of working with Grandinetti and Romero-Salas "to create a series

2    of phony documents [to disguise] fee income [as] a series of loans made to Mr. Pfaff by [Romero-

3    Salas and his company Sussex]." (*Id.* ¶ 21.) The indictment alleges that, as part of Mr. Pfaff's

4    illegal activities, he used an entity known as "W.S. Acquisition Corp." (*Id.*¶¶ 5, 33(jj).)

5        According to the Pfaff Indictment, this scheme culminated in Mr. Pfaff's purchase of

6    35,000 shares of UMDA stock, using Sussex as a nominee purchaser, which shares were allegedly

7    transferred to "a trust [or trusts] Mr. Pfaff had created for his children." (*Id.*¶ 22-30, *see also* ¶ 17.)

8    The trustee was "Mr. Pfaff's brother-in-law," Thomas Sorenson. (*Id.*¶¶ 19-21.)

9            *3.    The Attorney General's Investigation*

10        On December 13, 2007, the CNMI Attorney General initiated an investigation into "certain

11    transactions" between Mr. Pfaff and UMDA. (*See generally* Borenstein Decl. Ex. G ("Attorney

12    General Letter").) The Attorney General made it clear that its inquiry was to enable it to

13    "investigate and prosecution violations of Commonwealth law." (*Id.* at 1.) Unlike the New York

14    indictments, which relate primarily to alleged violations of United States tax laws, the Attorney

15    General Letter tracks nearly perfectly with UMDA's allegations in this case.

16        The Attorney General alleged that "certain former UMDA directors, officers, agents and

17    consultants may have unlawfully acquired shares in UMDA and unlawfully taken funds and

18    business opportunities belonging to UMDA." (*Id.*.) As a result, the Attorney General requested

19    documents relating a wide area of topics, including (1) UMDA's investment in the LLC and

20    decision to invite others to invest, (2) the formation and structure of the LLC and (3) any of the so-

21    called "Pfaff Parties," a list of entities who are also defendants in UMDA's civil action and about

22    whom Mr. Pfaff was asked questions at his deposition, including: KCT Irrevocable Trust, GET

23    Realty Trust, Paul Dingee, Davina Limited, Monte Perucho Ivestiduras, LLC, Sasquatch II,

24    Rothschild Trust Guernsey Limited, Concorde Trust, Robert Pfaff, John Larson, Amir Makov,

25    Robert Bigelow, Thomas Sorenson, Raymond McCall and Angela Irizarry. (*Id.* at 2.) The criminal

26    inquiry is also focused on communications relating to Grandinetti and Sinclair, the efforts to

27    remove UMDA as manager of the LLC, the purchase or sale of UMDA's shares from 1999 to the

28    present, including to Mr. Pfaff or any "trust…related to, owned by or controlled by" Mr. Pfaff, the

1   issuance of dividends to UMDA shareholders, the disposition of UMDA's cable assets and Sussex

2   and Romero-Salas. (*Id.* at 1-3.) Finally, the Attorney General clarified that its interest in the

3   aforementioned was prompted in part by its role as a shareholder of UMDA. (*Id.* at 1.)

4   **III.    LEGAL ANALYSIS**

5       **A.    Standards Governing Assertion of the Fifth Amendment**

6          In the civil context, the invocation of the privilege is limited to those circumstances in

7   which the person invoking the privilege reasonably believes that his disclosures could be used in a

8   criminal prosecution, or could lead to other evidence that could be used in that manner. *See Ohio*

9   *v. Reiner*, 532 U.S. 17, 20-21 (2001); *see also U.S. v. Bodwell*, 66 F.3d 1000, 1001 (9th Cir. 1995).

10  Accordingly, the privilege protects against disclosures that would not only be directly potentially

11  incriminating, but also against those that could provide an indirect link to incriminating evidence.

12  *Id.*; *U.S. v. Hubbell*, 530 U.S. 27, 38 (2000)("Compelled testimony that communicates information

13  that may 'lead to incriminating evidence' is privileged even if the information itself is not

14  inculpatory.")(*citing Doe v. U.S.*, 487 U.S. 210, 208, n. 6 (1998)).

15         The Fifth Amendment privilege against self-incrimination extends not only to answers that

16  would in themselves support conviction, but also to those which would furnish a link in chain of

17  evidence needed to prosecute claimant. *Reiner*, 532 U.S. at 20-21. Thus, it is not merely an

18  admission of guilt of a crime, or of a probative fact which, with others, may aid in establishing

19  guilt, that may be withheld; the privilege to remain silent may also be validly asserted where the

20  answer to a question would be likely to provide a lead or clue to a source of evidence of such

21  crime, and thus furnish a means of securing one or some of the "links in the chain of evidence"

22  required for federal prosecution of the witness. *Counselman v. Hitchcock*, 142 U.S. 547 (1982);

23  *U.S. v. Sharp*, 920 F.2d 1167 (4th Cir. 1990); *U.S. v. Rendahl*, 746 F.2d 553 (9th Cir. 1984); *U.S.*

24  *v. Powe*, 591 F.2d 833 (D.C. Cir. 1978).

25         The burden on a witness to establish his or her right to refuse to answer does not depend

26  upon "likelihood," but rather only upon the "possibility[,] of prosecution." *Doe by & Through*

27

28

11

1  *Rudy-Glanzer v. Glanzer*, 232 F. 3d 1258, 1263 (9th Cir. 2000).[8] The witness has considerable

2  latitude in deciding when to stop responding to questions, in order to avoid placing him in the

3  dilemma where invoking the privilege too soon could be contempt of court while invoking it too

4  late could constitute waiver. Thus, "granted that the area of the question is within the Fifth

5  Amendment, short of being ridiculous, it would appear wiser to let the witness pick the point

6  beyond which he will not go." *Shendal v. U.S.*, 312 F.2d 564, 566 (9th Cir. 1963). In deference to

7  this standard, "an assertion of privilege should not be overridden unless it is "perfectly clear ... that

8  the witness is mistaken, and that the answer(s) cannot possibly tend to incriminate." *Hoffman v.*

9  *U.S.*, 341 U.S. 479 (1951). Where, as here, an investigation continues and its precise contours are

10  unknown, the scope of the privilege is especially wide.

11  **B.    UMDA's Questions Unequivocally Raise Subjects Protected by the Privilege**

12  UMDA's motion identifies only 18 questions posed to Mr. Pfaff in deposition, and claims

13  without argument that they seek nothing more than clearly "innocuous and basic" information, to

14  which the Fifth Amendment does not apply.[9]  (*See* UMDA Mot. at 11-12.) In contrast, UMDA's

15  "Appendix" lists a total of *331* individual questions, and UMDA appears to request an order

16  overruling Mr. Pfaff's privilege for each of them. (*Compare* UMDA's Appendix *with* UMDA

17  Mot. at 9-10.)

18  The only way the privilege can be asserted is on a question-by-question basis. *See Bodwell*,

19  66 F.3d at 1001. UMDA's slipshod approach is apparently designed to require the Court and Mr.

20  Pfaff to individually address *331* questions individually, without a clue as to why UMDA believes

21

22  [8] *See also* ; *see, also, U.S. v. Castro,* 129 F.3d 226 (1st Cir. 1997), *In re Flat Glass Antitrust Litigation*, 385 F.3d 350 (3d Cir. 2004; *U.S. v. Sharp*, 920 F.2d 1167 (4th Cir. 1990), *U.S. v.*

23  *Whittington*, 786 F.2d 644 (5th Cir. 1986); *U.S. v. Mack*, 159 F.3d 208 (6th Cir. 1998); *In re Corrugated Container Antitrust Litigation*, 661 F.2d 1145 (7th Cir. 1981); *U.S. v. Bowling*, 239

24  F.3d 973, 977 (8th Cir. 2001); *U.S. v. Nunez*, 668 F.2d 1116 (10th Cir. 1981); *U.S. v. Caldwell*,

25  543 F.2d 1333 (D.C. Cir. 1974).

26  [9] UMDA failed even to mention the other objections asserted by counsel to many of the questions. The failure to challenge the specific objections to the questions should result in sustaining the

27  objections. Hence, even if the Fifth Amendment privilege is overruled, Mr. Pfaff would still not be required to respond to the many objectionable questions.

28

1   the privilege assertion is objectionable. Although Mr. Pfaff embraces his burden of establishing

2   the propriety of any privilege he asserts, counsel submits that this approach is not an appropriate

3   use of resources where UMDA has failed to offer anything beyond its own self serving claims to

4   support its challenge to Mr. Pfaff's assertion of the privilege. UMDA must do more than highlight

5   18 questions, out of 331, and expect the Court and Mr. Pfaff to search for the basis for UMDA's

6   objection concerning the other 313 questions.

7         Mr. Pfaff has collected all 331 questions identified by UMDA, and organized them

8   topically in Table 1.[10] (*See* Borenstein Decl. Ex. H. (hereinafter ("Table 1").) Once organized

9   topically, the potentially incriminating nature of the questions posed is clear. UMDA might claim

10  that even these 18 questions are "basic and innocuous." However, there is no exception to the Fifth

11  Amendment for "basic" information -- such information remains privileged if it is potentially

12  incriminating – and a review of the questions listed in the motion, organized topically with the

13  remaining questions listed in UMDA's Appendix, make it clear that answering even these

14  preliminary questions raise the possibility of providing a link in the chain of evidence supporting a

15  prosecution.

16         *1.     Purported Misappropriation of UMDA Shares*

17         For example, UMDA posed 148 questions concerning its allegation that Mr. Pfaff

18  somehow misappropriated UMDA shares. (*See* Table 1 at § I.A.) These questions – along with all

19  the foundational questions leading up to these ultimate questions – go to the heart of the criminal

20  charges faced by Mr. Pfaff.

21         First, the Stein Indictment alleges a conspiracy involving, among others, Mr. Pfaff, Makov

22  and Larson, three of the same alleged co-conspirators UMDA asked about. Any question

23  concerning the relationship between Mr. Pfaff and Makov or Larson relates to the heart of the

24  criminal case and concerns the first element in a conspiracy charge-- concerted action among the

25

26  [10] UMDA's Appendix excludes 134 additional questions to which Mr. Pfaff interposed the Fifth
    Amendment privilege. UMDA apparently concedes that privilege was properly invoked in

27  response to these questions. Also, UMDA lists questions in its Motion that are not included in the
    Appendix. (*See* Mot. at 9-10, questions 10-15.)

28

1   conspirators. *U.S. v. Jimenez Recio*, 537 U.S. 270, 274 (2003)(the essence of a conspiracy is "an

2   agreement to commit an unlawful act"). Moreover, the Government's Rule 404(b) motion seeks to

3   introduce evidence of Grandinetti and Romero-Salas working in concert with Mr. Pfaff, and for

4   the same reason, even "basic" information about their relationship with Mr. Pfaff is potentially

5   incriminating, or could lead to incriminating evidence. Second, the Pfaff Indictment alleges that

6   Mr. Pfaff's acquisition of UMDA shares was part of a criminal enterprise with Grandinetti and

7   Sinclair to "defraud" UMDA by obtaining its shares. (Pfaff Indictment ¶ 21-30.) Third, the

8   Attorney General Letter alleges that Mr. Pfaff may have obtained shares of UMDA illegally, both

9   explicitly and by seeking documents relating to all purchases and sale of shares since 1999,

10  including specifically to Mr. Pfaff. (Attorney General Letter at 1-2.) As if more were needed, the

11  Attorney General Letter expressly seeks communications relating to all four of these individuals:

12  Grandinetti, Sinclair, Larson and Makov. (*Id.*)

13      A related line of questions seeks information about a variety of entities that UMDA

14  appears to believe were the unlawful recipients of the UMDA shares Mr. Pfaff allegedly "stole."

15  (Table 1 at § I.B.) Chief among these are KCT and GET, along with their trustee at the time,

16  Thomas Sorenson. (Table 1 at § I.B.1.) The potentially incriminating nature of these questions is

17  obvious, as these trusts are expressly mentioned as targets of investigation in both criminal

18  proceedings in New York. (*See* Subpoena and Pfaff Indictment at ¶¶ *17*, 22-30.) The Attorney

19  General Letter also seeks information relating to these trusts, and their relationship with Mr. Pfaff,

20  in connection with a criminal prosecution. (Attorney General Letter at 1-2.)

21      UMDA's additional questions asked Mr. Pfaff to admit to providing UMDA shares to

22  other entities, including: (1) First Court Ltd, (2) Global Leadership Consulting, Inc., (3) Keysdale

23  Ventures, LLP and its manager, Tapia America, Ltd., (4) Raymond McCall and his law firm and

24  his wife Angela Irizzary, (5) Morley, Inc., (6) Norskanvest, LLC and (7) Bonnie Sorenson, (8)

25  Concorde Trust and (9) Paul Dingee. (Table 1 § I.B.2-10.)[11] According to UMDA's questioning,

26  _____

27  [11] UMDA also asked whether Mr. Pfaff has any documents relating to these entities, as well as
    several other entities. (*See, e.g.*, Appendix at Nos. 69-84.) Such queries are clearly subject to the
28  (footnote continued)

14

1    when read in light of the Pfaff Indictment and the Attorney General Letter, these entities are the

2    alleged recipients of "stolen goods," and Mr. Pfaff's testimony concerning these entities could

3    result in further evidence that Mr. Pfaff himself was involved in the "theft."

4    **2.    *Purported Misappropriated Corporate Opportunities***

5    In addition to alleging that Mr. Pfaff misappropriated its shares, UMDA also alleges that

6    Mr. Pfaff misappropriated UMDA's corporate opportunities. Two such opportunities were

7    identified in at the preliminary injunction hearing and were also raised at the deposition: (1) an

8    alleged opportunity to renegotiate a note held by City National Bank, and (2) the opportunity to

9    invest in the LLC. (*See* Table 1 §§ II-III.) Without any further inquiry, it is apparent that any

10   questions on these topics could reveal potentially incriminating information, as the Attorney

11   General Letter makes it clear that it is investigating criminal misappropriation of UMDA's

12   corporate opportunities. (Attorney General Letter at 1.)

13   In addition, the CNB note contentions involve Mr. Pfaff, Grandinetti, Sinclair and

14   Romero-Salas, all subjects of the Rule 404(b) evidence and the Subpoena, as well as the subject of

15   the Pfaff Indictment. (*Id.,* Subpoena and Pfaff Indictment ¶ 21.) Similarly, the formation and

16   operation of the LLC, including any efforts to remove UMDA as manager of the LLC, (Table 1 §

17   II.A-C) are expressly referenced in the Attorney General Letter.[12]

18   **3.    *Transactions Specifically Mentioned by Prosecuting Authorities***

19   UMDA also posed questions concerning Mr. Pfaff's purported illegal receipt of "side fees"

20   for offering tax advice – a subject which is cornerstone of the allegations contained in the Pfaff

21   Indictment. (*Compare* Table 1 at § IV.A.2 *with* Pfaff Indictment 11-19(a).) The side fees are also

22   _____

23   Fifth Amendment privilege. *See, e.g., Curcio v. United States,* 354 US 118, 128 (1957). *Armstrong

24   v. Guccione,* 470 F.3d 89, 100 (2d Cir. 2006).

[12] UMDA also posed a series of questions concerning investments in the LLC made by GET
25   Realty Trust, KCT Irrevocable Trust, Robert Bigelow, Sasquatch II and Rothschild Trust
     Guernsey Limited. (Table 1 § II.C.) These queries seek potentially incriminating information not
26   only because they relate to transactions which the Attorney General Letter posits are criminal, but
     also because these entities are specifically mentioned in the Attorney General Letter as possible
27   criminal co-conspirators of Mr. Pfaff. (*See* Attorney General Letter at 2.)

28

15

1   an element of the government's Rule 404(b) submission. (Borenstein Decl. Ex. C at 2-5.).

2   Similarly, UMDA's questions concerning the disposition of its cable assets are evocative of the

3   Attorney General's inquiry into that same topic. (*Compare* Table 1 at § IV.A.1 *with* Attorney

4   General Letter at 3.) UMDA's questions obviously seek potentially incriminating information.

5             **4.**      ***Entities Specifically Mentioned By Prosecuting Authorities***

6        While the foregoing queries seek information relating to purportedly criminal transactions,

7   the UMDA's remaining questions seek information about entities that are alleged co-conspirators

8   or participants in those transactions. For example, UMDA poses questions about Avenida LLC

9   and Chestnut LLC, entities that UMDA alleges participated with WS Investment Trust, the former

10   name of GET. (Table 1 § IV.B.2-3.) Similar queries are posed regarding Morley, Inc. and Point du

11   Hoc Irrevocable Trust. (Table 1 § IV.B.4-5.) As the Pfaff Indictment and the Attorney General

12   Letter both allege that GET was used by Mr. Pfaff for criminal transactions, Mr. Pfaff's invocation

13   of the privilege was appropriate.[13]

14        Similarly, UMDA seeks information regarding Davina Limited, KPMG and WS

15   Acquisition Corp. (Table 1 § IV.B.6-8.) All of these entities are related to either the Attorney

16   General Letter and included as a so-called "Pfaff Party" therein (Attorney General Letter at 2), or

17   are specific co-defendants or co-conspirators in *Stein,* (Stein Indictment ¶¶ 1-2 (discussing

18   KPMG)).[14]

19

---

20 [13] UMDA also posed a series of questions involving Pfaff's service on the UMDA Board of

21 Directors' Audit Committee. (Table 1 § V.A.) UMDA's questions here are designed to show that Pfaff deliberately obstructed the Audit Committee's investigatory function so that he could

22 continue with his purportedly illegal schemes. As the entire line of questions is premised on the theory that Mr. Pfaff used the audit committee to hide his alleged criminal acts, these questions

23 clearly seek information that is privileged by the Fifth Amendment.

24 [14] The final series of questions ask about Mr. Pfaff's state of mind regarding the indictments and

25 investigations made against him and seek core Fifth Amendment testimony. (Table 1 § V.B.) At a minimum, such queries also seek information protected by the attorney-client privilege and/or

26 work product doctrine. UMDA also complains that Mr. Pfaff refused to answer a single question on the advice of counsel. The question asked: "This was part of your effort to launder tax shelter

27 fees that you had accumulated, correct?" This question, which is merely a bald face assertion that Mr. Pfaff has committed a crime, is nothing more than harassment, and counsel was well within

28 (footnote continued)

1    **C.    UMDA's Attempt to Misuse The Collective Entity Doctrine Is Unavailing**

2    UMDA also moves for an order compelling Mr. Pfaff to produce documents relating to a

3    variety of entities, including several defendants in this civil case. (*See, e.g.,* UMDA Mot. at 3-4.)

4    Mr. Pfaff asserted his Fifth Amendment privilege in response to these requests, as the production

5    of documents relating to these entities would require Mr. Pfaff to admit that such documents exist,

6    are in Mr. Pfaff's possession and control, and are authentic. *See, e.g., Hubbell*, 530 U.S. at 36.

7    These types of admissions implicitly communicate statements of fact that may lead to potentially

8    incriminating evidence. *See id.* at 36-38.

9    UMDA does not dispute that production of the documents sought in its requests are

10   potentially incriminating. Rather, UMDA's sole objection is that the documents are exempt from

11   Fifth Amendment protection under the "collective entity doctrine," which bars an entity or its

12   custodian of records from asserting the Fifth Amendment. Here, however, UMDA does not seek to

13   compel the production of documents from any entity, and does not seek documents held by Mr.

14   Pfaff in any capacity as custodian of records. To the contrary, UMDA served a request on Mr.

15   Pfaff as an individual, and individuals *may* assert the Fifth Amendment and refuse to produce

16   documents when that production would be potentially incriminating.

17   *1.    The Collective Entity Rule Does Not Apply to Individuals*

18   As the United States Supreme Court held in *Braswell v. U.S.*, 487 U.S. 99 (1988), a

19   "custodian of corporate records may [not] resist a subpoena for such records on the ground that the

20   act of production would incriminate him." The rule, as originally articulated in *Hale v. Henkel*,

21   201 U.S. 43 (1906) depended on the "visitorial powers" of the state to investigate corporations,

22   and finding that in light of such powers, the production of corporate records cannot be privileged.

23

24   ───────────────

25   his rights to instruct the witness not to answer. *See* Com. R. Civ. P. 30(d)(3) (instruction not to
     answer proper when the deposition "is being conducted in bad faith or in such manner as
     unreasonably to annoy, embarrass, or oppress the deponent or party.") To the extent Rule 30
26   requires an immediate suspension of the deposition, and request for a protective order, a failure to
     do so is, at best, a harmless error, where the question is so obviously improper. *See, e.g., U.S. ex
27   rel. Tiesinga v. Dianon Systems, Inc.*, 240 F.R.D. 40 (D. Conn. 2006).

28

1    *Braswell*, 487 U.S. at 107-108. However, later cases "jettisoned" this argument and instead found

2    that a custodian of records holds those records in a "representative capacity." *Id.* Therefore, if the

3    agent were permitted to assert the privilege, he would be doing so on behalf of the entity he

4    represented, not himself. *Id.* Since only individuals have a Fifth Amendment right, the Court held,

5    such an assertion would be improper. *Id.*

6    But *Braswell* is clear to note that the foregoing applies only when the "subpoena is

7    addressed to the corporation [or] to the individual *in his capacity* as custodian." *Id.* at 108-109.

8    "[A]rtificial entities such as corporations may act only through their agents, and a custodian's

9    assumption of his representative capacity leads to certain obligations, including the duty to

10   produce corporate records." *Id.* at 110. Because the custodian "does not hold them in his private

11   capacity [he] is not therefore protected against their production." *Id.* at 111 n.4. The Court is

12   careful to point out that the status of the holder of the records is the essential element to the rule.

13   *Id.* at 112 n. 5. The custodian's status as an agent for the corporation is so crucial to the analysis

14   that the Court in *Braswell* holds that the Government can "make no evidentiary use of the

15   'individual act' against the individual." *Id.* at 118.

16   The obvious thrust of *Braswell* is that the production of documents by an entity is not

17   privileged, even if the production might incriminate the custodian of records for the corporation.

18   However, *Braswell* is equally clear that documents held by an individual *in his personal capacity*

19   remain subject to a privilege objection. *See, e.g., Bellis v. U.S.*, 417 U.S. 85, 93 (1974)(for the rule

20   to apply, "it must be fair to say that the records demanded are the records of the organization

21   rather than those of the individual").

22   This was made clear in a number of cases addressing subpoenas and document requests

23   sent to a former agent of an entity. The leading case is *In re Three Grand Jury Subpoenas Duces*

24   *Tecum Dated January 29, 1999*, 191 F.3d 173 (2d Cir. 1999). There, three former officers of a

25   corporation received a subpoena seeking documents in the officers' care "that were created during

26   the course of, or in connection with [their] employment at [the corporation]." *Id.* at 175. The

27   officers asserted their Fifth Amendment privilege, and the government moved to compel. *Id.* On

28   appeal, the Second Circuit began its analysis along the same lines as *Braswell*, and noted that

1  *Braswell*'s holding "relied on the fact that the individual subpoenaed held the collective entity's

2  records in a 'representative capacity,' rendering 'his personal privilege against compulsory self-

3  incrimination … inapplicable.'" *Id.* at 178 (*citing Braswell,* 487 U.S. at 108, alterations in

4  original)

5      However, a former employee is no longer a representative of the corporation, and therefore

6  the rule does not apply. "Once the officer leaves the company's employ, … he no longer acts as a

7  corporate representative but functions in an individual capacity in his possession of corporate

8  records." *Id.* (*citing In re Grand Jury Subpoena Duces Tecum Dated June 13 1983 and June 22,*

9  *1983,* 722 F.2d 981 (2d Cir. 1983)). This holding is compelled by *Braswell,* which "was

10 predicated on the rationale that corporate custodians hold and produce documents *in a*

11 *representational capacity* and that when a corporate custodian produces subpoenaed corporate

12 records, at bottom, the corporation produces the documents subpoenaed." *Id.* In stark contrast,

13 "once the agency relationship terminates, the former employee is no longer an agent of the

14 corporation and is not a custodian of the corporate records." *Id.* As a result, when "such an

15 individual produces records in his possession he cannot be acting in anything other than his

16 personal capacity. In no sense can it be said, as Braswell requires, that 'the corporation produced

17 the records subpoenaed." *Id.*

18     Nor is the Second Circuit alone in this holding.[15] In *U.S. v. McLaughlin,* 126 F.3d 130, 133

19

---

20 [15] The Second Circuit recognized in *In re Three Grand Jury Subpoenas* that the Eleventh Circuit

21 and D.C Circuit have "split" on the applicability of *Braswell* to former employees. The Second
   Circuit finds these cases unpersuasive, and for good reason. The Eleventh Circuit premised its

22 holding that *Braswell* would apply to former employees on a footnote from a prior Supreme Court
   case, but the cited footnote provides no support for the Eleventh Circuit's conclusion. *In re Grand*

23 *Jury Subpoena (Paul),* 957 F.2d 807, 811 (11th Cir. 1992). Rather, the footnote discusses the
   dissolution of a partnership, and notes that, even after dissolution, the partnership has ongoing

24 responsibilities under state law, and therefore, the custodian of a dissolved entity must still
   respond to document subpoenas. *See Bellis v. U.S.,* 417 U.S. 85, 96 n. 3 (1974). The situation

25 described in *Bellis,* i.e., the duties of a present custodian of an inactive entity, is obviously

26 different than the situation in Paul, i.e., the duties of a former custodian for an active entity. See
   also *In re Grand Jury Subpoena,* 784 F.2d 857 (6th Cir. 1986)(cited with approval by *Paul,* but

27 noting that the putative custodian had a present relationship with the entity). Moreover, *Paul*
   seems premised on the belief that the "corporate nature" of the documents compels their

28 (footnote continued)

1    n. 2 (3d Cir. 1997), the Third Circuit noted that "a former employee, for example, who produces

2    purloined corporate documents is obviously not within the scope of the *Braswell* rule." The Ninth

3    Circuit is in accord, holding that "the collective entity rule…does not apply to a former employee

4    of a collective entity who is no longer acting on behalf of [the] collective entity." *In re Grand Jury*

5    *Proceedings,* 71 F.3d 723, 724 (9th Cir. 1995).

6               **2.**      **UMDA Has Not Requested Documents From Mr. *Pfaff* as a Custodian**

7           Having conceded that the production of the documents requested by Mr. Pfaff could be

8    incriminating under *Hubbell*, UMDA argues instead that its requests fall under the collective

9    entity rule. They do not. Rather, it is clear that the document request was directed to Mr. Pfaff as

10   an individual. (O'Connor Decl. Ex. 5 at 1.) The request instructs Mr. Pfaff, not any entity, to

11   produce documents. Moreover, it is clear that the documents requested pertain to Mr. Pfaff

12   personally, not as a custodian of records. For example, the request seeks (1) Mr. Pfaff's personal

13   bank records (Reqs. 4-7), (2) documents and communications between Mr. Pfaff individually and

14   a variety of persons and entities (Reqs. 8-19), and (3) documents relating to Mr. Pfaff's retention

15   of counsel as an individual (Reqs. 22-24.) The hallmark of a document request falling under the

16   "collective entity rule" is that the request is directed to the corporation or entity, and that the

17   documents sought are the entity's documents, yet UMDA's request here is nothing less than a

18   personal request to Mr. Pfaff.

19          As many of the entities UMDA seeks information about are parties to the litigation, the

20   proper procedure is for UMDA to serve those parties with document requests under Rule 34, and

21   if necessary, take the 30(b)(6) deposition of those entities if it has questions about those

22   documents to ask of the entity. To the extent an entity is not a party, UMDA must serve that entity

23

24   ───────────────────

25   production, whereas *Braswell* held that the "representative capacity" of the agent is the deciding
     factor. The case arising out of the D.C. Circuit is equally distinguishable, as the documents sought

26   there were possessed by the government. *See In re Sealed Case*, 950 F.2d 736, 740 (D.C. Cir.
     1991). Obviously, government documents, unlike entity documents, cannot be confused for

27   personal documents which are immune from production.

28

1 with a document and/or deposition subpoena under Rule 45. However, UMDA cannot use the

2 "collective entity doctrine" to obtain such documents or testimony – which UMDA admits would

3 be potentially incriminating – from Mr. Pfaff directly, especially where, as here, to do so would

4 implicate significant jurisdictional issues since it is likely none of the custodians are in Saipan.

5     **D.**    **UMDA Effort to Thwart Obviously Relevant Document Production Is**

6           **Completely Unfounded and Unsupported by Any Authority**

7       UMDA claims that Mr. Pfaff has forfeited his right to conduct discovery of UMDA,

8 because he has, according to UMDA, improperly asserted his Fifth Amendment right to be free

9 from self-incrimination. Tellingly, although UMDA cites ten cases that allegedly support this

10 theory, *not a single one* has ever excused a plaintiff from responding to properly propounded

11 discovery requests by a defendant asserting the Fifth Amendment.

12       The analysis must begin with the CNMI civil procedure rules, which are patterned after the

13 Federal Rules of Civil Procedure. Thereunder, "litigants do not have a right to discovery of

14 privileged matters," as Rule 26 specifically excludes privileged information from discovery. *See*

15 *U.S. v. Certain Real Property and Premises Known As: 4003-4005 5th Ave., Brooklyn, NY*, 55

16 F.3d 78, 82-83 (2d Cir. 1995)("*Certain Real Property*"); *SEC v. Graystone Nash, Inc.,* 25 F.3d

17 187, 190-191 (3d Cir. 1994); *see also* Com. R. Civ. P. 26(b)(1) ("Parties may obtain discovery

18 regarding any matter, *not privileged*"). As the Ninth Circuit noted, "the Rules of *Civil* Procedure

19 recognize an appropriate role for the exercise of this privilege, and a refusal to respond to

20 discovery under such invocation cannot justify the imposition of penalties." *Glanzer*, 232 F.3d at

21 1265 (emphasis in original); *see also Wehling v. Columbia Broadcast System,* 608 F.2d 1084,

22 1086-1087 (5th Cir. 1980) (noting that the Rules "contain specific language exempting privileged

23 information" and that "no provision in the federal discovery rules … authorizes a court to impose

24 sanctions on a party who resists discovery by asserting a valid claim of privilege").

25       Thus, UMDA has no right to any *sanction* for Mr. Pfaff's proper assertion of the Fifth

26 Amendment. Rather, judges in some jurisdictions are permitted to take certain limited steps to

27 "balance the interests of the party claiming protection against self-incrimination and the

28 adversary's entitlement to equitable treatment." *See, e.g., Graystone Nash*, 25 F.3d at 192.

1   Typically, this balancing takes the form of a limitation on the evidence the privilege-asserting

2   party may present at trial or take the form of an adverse inference at trial. *Id.*; *but see* Cal. Evid.

3   Code § 913(a)(neither the court nor counsel may comment upon the fact a witness has claimed a

4   privilege).

5          No case cited by UMDA holds that a defendant asserting a privilege is barred from

6   conducting discovery of the plaintiff. Instead, UMDA cites district court authorities from the

7   1980's, such as *SEC v. Cymaticolor Corp.,* 106 F.R.D. 545, 549 (S.D.N.Y. 1985), and *SEC v.*

8   *Benson*, 657 F. Supp. 1122, 1129 (1987), which appear to bar an asserting party's presentation of

9   evidence, *after discovery ended,* to the fact finder. However, UMDA deceives the Court by

10  conveniently neglecting to reveal that both cases have been expressly repudiated. In *SEC v.*

11  *Graystone Nash*, 25 F.3d at 191, the Third Circuit held that "a complete bar to presenting any

12  evidence, from any source, that would in all practical effect amount to the entry of an adverse

13  judgment, *would be an inappropriate sanction.*" (emphasis added). The Third Circuit specifically

14  lists both *Cymaticolor* and *Benson* as poorly reasoned and not "satisfactory" because they run

15  afoul of this rule.[16] *Id.* at 193. Similarly, the Second Circuit's opinion in *Certain Real Property*

16  further rejects decisions that "automatically enter[] judgment against the party that invoked the

17  Fifth Amendment or has precluded that party from presenting any evidence whatsoever." 55 F.3d

18  at 85 n. 8. As a consequence, UMDA's reliance on 20 year old, selectively cited cases, including

19  *Cymaticolor* and *Benson*, is misplaced; the result in those two cases could not be reached today by

20  that same court under binding Second Circuit precedent, or by the other circuits.[17] *See also* Wright

21

22  [16] As *Graystone Nash* noted, the holding in *Benson* appears motivated by defendant's unrelated

23  discovery abuses, not a proper invocation of the Fifth Amendment. *Graystone Nash*, 25 F.3d at
    192.

24
    [17] For example, the Ninth Circuit cites with approval the holding in *SEC v. Graystone Nash. See,*

25  *e.g., Glanzer*, 232 F.3d at 1265 ("Because the privilege is constitutionally based, the detriment to
    the party asserting it should be no more than is necessary to prevent unfair and unnecessary

26  prejudice to the other side"). UMDA ignores this authority and instead cites *SEC v. Colello*, 139
    F.3d 674, 677 (9th Cir. 1998), which held only that an adverse inference was permissible, and

27  offers no support for UMDA's contention that Mr. Pfaff has forfeited his right to discovery.

28

22

1   and Miller, 8 *Federal Practice & Procedure* § 2018 n. 46 (2008)(citing cases) (precluding party

2   invoking privilege from defending is improper sanction).

3          Here, UMDA's motion seeking immunity from discovery requests the same impermissible

4   sanction that is expressly rejected by *Graystone Nash* and *Certain Real Property*. By barring Mr.

5   Pfaff from conducting any discovery of UMDA at all, UMDA effectively prevents Mr. Pfaff from

6   putting on *any* defense, and imposes what is essentially a default judgment. Thus, UMDA does not

7   seek to "level the playing field" but instead to "tilt it strongly in favor of" UMDA. *Graystone*

8   *Nash*, 25 F.3d at 193.

9          Nor do UMDA's remaining authorities offer any support for so sweeping a remedy. For

10  example, the court in *Centennial Life Insurance Co. v. Nappi*, 956 F. Supp. 222 (1997), refused to

11  allow a defendant -- who had asserted the privilege and also failed to conduct *any* discovery before

12  plaintiff moved for summary judgment -- to *re-open* discovery to respond to the motion.

13  *Centennial* thus concerns the timing of discovery, not with the litigant's fundamental right to

14  obtain the evidence in the first place. Moreover, like *Centennial*, UMDA's other authorities,

15  including *SEC v. Grossman*, 887 F. Supp. 649, 660 (S.D.N.Y. 1995) and *Kroger Co. v. Am-Hi*,

16  *Inc.*, 2006 WL 2572124 (2006), limit the preclusion of evidence and testimony to those topics

17  expressly encompassed by the asserted privilege. In other words, these cases hold that a defendant

18  may not simultaneously contend that certain information in defendant's possession is privileged,

19  yet at the same time use that same information in its own case. Obviously, that is not the case here,

20  where Mr. Pfaff seeks information *in Plaintiff's possession*. *See, e.g., S.E.C. v. Merrill Scott &*

21  *Associates, Ltd.*, 505 F.Supp.2d 1193, 1211 (D. Utah 2007)("defendant is not precluded from

22  remaining silent and, at the same time, testing the government's proof and offering evidence (other

23  than his last-minute testimony) to rebut such proof"); *S.E.C. v. Rehtorik*, 135 F.R.D. 204, 206

24  (M.D. Fla. 1991)("The defendant has a legitimate right, free of court imposed restrictions, to

25  attack plaintiff's case by means of evidence other than his own privileged testimony."); *SEC v.*

26  *Thomas*, 116 F.R.D. 230, 234 n. 16 (D. Utah 1987)(same). *See also Certain Real Property*, 55

27  F.3d at 85 n. 8 (noting with approval circuit decisions overturning district court orders precluding

28  parties from presenting any evidence whatsoever); *Traficant v. Commissioner*, 884 F.2d 258, 265

23

1 (6th Cir. 1989) (reversing trial court's order preventing defendant from exploring the contents and

2 significance of plaintiff's evidence).

3       UMDA also cites authorities concerning the assertion of the privilege followed by a self-

4 interested waiver – *see SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997) – or the assertion

5 of the privilege over matters on which the defendant bears the burden of proof – *see In re Moses*,

6 792 F. Supp. 529 (E.D. Mich. 1992). Neither situation is present here. Mr. Pfaff has consistently

7 asserted his Fifth Amendment right and has not attempted to waive it at an opportune time to gain

8 an unfair advantage over UMDA. Nor has Mr. Pfaff asserted the privilege over any matters on

9 which he bears the burden of proof. UMDA, not Mr. Pfaff, is the plaintiff in this case. Mr. Pfaff

10 needs to prove nothing at trial; rather, UMDA carries the burden of proof. Thus, Mr. Pfaff is not

11 "using the privilege as a sword" as claimed by plaintiff. To the contrary, it is UMDA that seeks to

12 use Mr. Pfaff's assertion of the privilege as an excuse to evade discovery. In any event, in neither

13 case did the Court deny the party asserting the privilege to conduct discovery or present evidence.

14 *In re Moses* did not involve discovery at all and *Softpoint* expressly permitted the presentation of

15 other evidence by the party invoking the privilege. *See SEC v. Softpoint, Inc.*, 958 F. Supp. at 859.

16 Even if Mr. Pfaff had invoked the Fifth Amendment improperly, the CNMI rules provide certain

17 remedies to UMDA – none of which contemplate a complete exemption from discovery. Rather

18 than attempting to vindicate the clear policy of Rule 26 that all *non-privileged* materials be

19 disclosed, UMDA turns this notion on its head by seeking actively to conceal documents which

20 are not subject to any privilege and are admittedly relevant – indeed, they likely foreclose any

21 relief to UMDA. Although UMDA attempts to disguise its motion as one designed to "level the

22 playing field" and "ensure fairness to all parties," UMDA's motion is in reality a vehicle for

23 avoiding production of documents that surely must undercut its unsupportable claims.

24 Accordingly, UMDA's objection to Mr. Pfaff's document requests should be overruled.

25 **IV.    CONCLUSION**

26       For all of the forgoing reasons, UMDA's motion to compel and for a protective order

27 should be rejected. Under Rule 37(a)(4), UMDA and its counsel should be ordered to pay Mr.

28 Pfaff fees and costs in responding to the motion.

1   DATED: June 15, 2008              Respectfully submitted,

2                         OVERLAND BORENSTEIN SCHEPER & KIM LLP

3

4                         /s/ Mark A. Borenstein
                           MARK A. BORENSTEIN, ESQ.

5                         Attorney for Defendant Robert Pfaff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28