UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>-against-<br><br>ROBERT PFAFF,<br><br>        Defendant. | CASE NO. 08 CR 239 RMB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ROBERT PFAFF'S MOTION FOR A BILL OF PARTICULARS**<br><br>Hearing Date: September 23, 2008<br>Time:          10:00 a.m. |

**I.    INTRODUCTION**

Despite its 38 pages and 99 paragraphs, the government's <u>Klein</u> conspiracy indictment is almost silent on the basis for two central allegations of the prosecution's theory:

(1)    What transactions between 1993 and 2003 were "tax shelter transactions" that "defrauded the IRS" and exactly what was fraudulent about those transactions? (Ind. ¶ 12.)

(2)    What transactions between 1993 and 2003 were designed "to defraud the CNMI tax authorities" and in what way? (Ind. ¶ 15.)

The indictment makes blanket references to "certain tax shelters" (Ind. ¶¶ 12, 13, 17) and mentions the names of two alleged tax shelters. (Ind. ¶ 33 (a)-(i).) But the only words describing these alleged illegal tax shelters and what makes them fraudulent appear in paragraph 18 which, in its entirety, says only:

> 18.    Among the tax shelter transactions that were designed, marketed, and implemented by ROBERT PFAFF, the defendant, and his co-conspirators, and which resulted in the payment of fee income to PFAFF and others were: (i) transactions involving the Saipan Company in its capacity as a CNMI corporate taxpayer seeking to eliminate or reduce millions of dollars of its tax obligations; (ii) transactions in which the Saipan Company or one of its shareholders advanced funds to finance certain transactions that did not involve the Saipan Company as a taxpayer; (iii) transactions in which PFAFF provided tax services and advice on behalf of KPMG while simultaneously and secretly agreeing with his co-conspirators to share in the profits generated through the implementation of the transactions; and (iv) transactions in which

>DeGiorgio, PFAFF and their co-conspirators enlisted HVB or its predecessor bank to provide purported financing or otherwise participate.

In order to defend himself against these broad allegations, Mr. Pfaff is entitled to know at a minimum which transactions the government alleges are illegal and what exactly made them illegal under the Internal Revenue Code provisions in effect at the time. Mr. Pfaff is also entitled to know which transactions the government alleges are illegal under the laws of the CNMI, and in what way did they "defraud the CNMI tax authorities"? Because the indictment glosses over this essential information, Mr. Pfaff finds himself in the unusual position of complaining that a 38-page, two-count indictment requires a supplemental bill of particulars. Yet without an indication of what statements or tax positions were fraudulent, and how and under which taxing authorities, he is unable to focus his defense on what the government actually believes makes the transactions "fraudulent tax shelters."[1]

In a typical fraud case (of which tax evasion and a Klein conspiracy are species), the government alleges which statements are false and what the truth is. Here, the government makes no such allegations at all regarding the "tax shelters." In fact, it does not even allege that the IRS or the CNMI challenged or disallowed any of the tax positions by "the Saipan Company" or "its shareholders." There is nothing in the indictment indicating where the dispute is about these "transactions." Thus, a key subset of the indictment's core allegations remains a mystery.

For that reason, Mr. Pfaff respectfully requests that the Court exercise its discretion to order that the government provide a bill of particulars identifying each transaction being challenged, what is fraudulent or otherwise inappropriate about them, which statements are fraudulent, and what the actual truth is.

---

[1] In contrast to the allegations about Mr. Pfaff's alleged failure to report various income items at the appropriate time – which are the subject of the vast majority of the indictment's paragraphs, and are summarized in paragraph 17 – the allegations about tax shelters are generalized and unclear.

2

## II. A BILL OF PARTICULARS IS APPROPRIATE

### A. A Bill Of Particulars May Be Used To Clarify The Government's Allegations

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars to enable him "to identify with sufficient particularity the nature of the charges in order to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Brotnovsky, 820 F.2d 572, 574 (2d Cir. 1987). The defendant must show that the charges of the indictment "are so general that they do not advise of the specific acts of which he is accused." United States v. Savin, 2001, U.S. Dist. LEXIS 2445, at * 5 (S.D.N.Y. March 13, 2001). The court should consider "the complexity of the offense, the clarity of the indictment, and the degree of discovery otherwise available to the defendants." United States v. Walker, 922 F. Supp. 732, 739 (N.D.N.Y. 1996) (citations omitted). The decision of whether or not to grant a bill of particulars is within the sound discretion of the district court. United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988). "In exercising that discretion, the court must examine the totality of the information available to the defendant – through the indictment, affirmations, and general pre-trial discovery – and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." United States v. Bin Laden, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000).

### B. The Government Has Not Alleged Which Tax Shelters Are Illegal And Why

After many years of government investigation, neither the indictment nor any other materials describe how the tax shelters at issue are illegal. The only description of these allegedly illegal tax shelters is generalized and inadequate in several respects.

First, the tax shelter allegations refer to four sets of multiple "transactions" without specifying the date, participants, or subject matters. The first set of transactions (the allegation is plural) is generically described as:

3

> (i) <u>transactions</u> involving the Saipan Company in its capacity as CNMI corporate taxpayer seeking to eliminate or reduce millions of dollars of its tax obligations;

Of course, this allegation by itself does not allege anything fraudulent, since a corporate taxpayer has the right (some would say the obligation to its shareholders) to try to reduce or eliminate tax liabilities as appropriate. Which transactions is the case about? What makes them allegedly fraudulent? Is it an IRS Code-based concern? Is it based on CNMI law? Is it the application of judicial doctrines like the economic substance or step transaction doctrines? Are there falsehoods on the Saipan Company's tax returns? Which returns and which lines? Assuming that the government intends to prove up its "illegal tax shelter" allegations, Mr. Pfaff should not have to wait until opening statement to learn the government's theories.

Second, the indictment again alleges multiple transactions to finance other "certain transactions" that do not involve the Saipan Company:

> (ii) <u>transactions</u> in which the Saipan Company or one of its shareholders advanced funds to finance certain transactions that did not involve the Saipan Company as a taxpayer;

This allegation is even more vague that the previous allegation. It appears to allege an entirely different set of transactions than the tax-beneficial transactions in the earlier category. The actual allegation does not say that these transactions were tax-driven or tax shelters, although the broad introductory language says that they are:

> Among the tax shelter transactions that were designed, marketed, and implemented by ROBERT PFAFF, the defendant, and his co-conspirators, and which resulted in the payment of fee income to PFAFF and others were: . . .

The third set of allegations has the same deficiencies, as they do not specify whether they are the same transactions or different ones as alleged earlier, what is fraudulent about them, and what the truth is.

> (iii) <u>transactions</u> in which PFAFF provided tax services and advice on behalf of KPMG while simultaneously and secretly agreeing with his

4

>co-conspirators to share in the profits generated through the
>implementation of the transactions;

It may be that all subsection (iii) intends to allege is that there was an agreement to "share in the profits" from the (unspecified) transactions previously alleged, but the indictment does not say this, and rather alleges additional separate transactions. One simply cannot tell.

The fourth set of allegations presents the same questions:

>(iv) <u>transactions</u> in which DeGiorgio, PFAFF and their co-conspirators enlisted HVB or its predecessor bank to provide purported financing or otherwise participate.

Are the HVB-financed transactions the same ones alleged above? Or is it a subset? Or different transactions? And is there anything fraudulent about the HVB financing? The indictment refers to "purported financing," which seems to suggest that HVB "or its predecessor bank" did not provide financing to these unnamed transactions, but perhaps claimed that it did – maybe this is where the factual dispute is. As the Court can see, however, it is more or less guesswork to assess what the transactions really are, why the government alleges that they caused illegal tax shelter fee income, and what exactly was fraudulent about them.

Finally, the indictment does reference two transactions in passing, the "MRG transaction" (Ind. ¶¶ 33 (a)-(d)) and the "Arizona transaction" (Ind. ¶¶ 33 (f)-(i)), in the overt acts section of the indictment. But it never specifies whether these tax shelters are alleged to be unlawful – or why, or under which taxing authority.

### C. Evidence Of These Transactions Was Excluded From The <u>Stein</u> Case Because It Was Unclear Why They Were Improper

As the Court knows, Mr. Pfaff faces indictment in the big KPMG tax shelter case before Judge Kaplan, <u>United States v. Stein, et al.</u>, 05 Cr. 888 (LAK). But the Court may not be aware that the government sought to introduce some – or maybe all? – of the allegations in this case as Evidence Rule 404(b) conduct in that case. Judge Kaplan denied that application after briefing and a hearing in which the prosecutor was unable to explain exactly what was improper about transactions

5

that the government menacingly calls "illegal" or "phony" "tax shelters." In <u>Stein</u>, the government was unable to explain with any detail why the transactions at issue were illegal or relevant:

> THE COURT: I seem to have this recollection that Justice Holmes or Learned Hand or one of those memorable figures once said something like this, that everybody has a duty to pay the taxes that are justly owed and that everybody also has the right to so arrange his or her affairs as to minimize the tax that is due and owing. Fair statement?
>
> MR. OKULA: Very fair, your honor.
>
> THE COURT: Okay. So?
>
> MR. OKULA: It's not applicable in this situation because you cannot insert somebody who is not a bona fide participant in the transaction.
>
> THE COURT: What provision of the code says that?
>
> MR. OKULA: I don't have the case law in front of me here, your Honor. I don't think there's a section in the code, but I think that you cannot have just a nominee or a straw person. I'd be happy to, in the wake of the hearing, find the cases and submit that to you, your Honor. But this is a person who made no decisions, offered no money for the transaction, and was depicted in the paperwork as being an entrepreneur.[2]

Scheper Decl. ¶ 2, Exh. A at 16. The government went further, arguing that it was not even obligated to identify to the jury which transactions were at issue, or why they were illegal, in order to obtain a valid conviction:

> THE COURT: Now, in order for you, assuming that your theory holds together, to have this make sense to anybody, and by anybody, of course, I mean the jury, don't you have to explain the whole transaction and the relevant tax law to the jury?
>
> MR. OKULA: I don't think so, for the following reason, your Honor. I think that to have the jury instructed if the law is as we believe it is, that you have to be a bona fide, legitimate participant in the transaction in order for the tax play to work, that simply an instruction by the Court with respect to that topic and the testimony of the person that they were simply

---

[2] AUSA Okula later stated: "…I'm reminded by one of my colleagues of a provision in Section 357 of the Code that basically says in Section B that if there was not a bona fide business purpose in the transaction, then 357(c) cannot be applied." Scheper Decl. ¶ 2, Exh. A at 49. Other than this brief allusion to a "bona fide business purpose," AUSA Okula was unable to explain – in specific terms – how the tax shelters were illegal and how the government intended to prove this.

6

> a straw person, together with, for instance, the credit memo describing the transaction and the testimony of DeGiorgio, is all we're going to have to introduce. So I don't think there has to be a lengthy exegesis on 351 and 357(c). It simply has to be that because the tax play involved dropping with a foreign person this tax and you have to be a legitimate participant in the transaction in order for the tax play to work, simply an economic substance type of charge, which I believe underlies this type of transaction and this type of fraud, would be enough.

Scheper Decl. ¶ 2, Exh. A at 18. In denying the government's motion to introduce the tax shelters under Rule 404(b), the court stated that the government "offered only imprecise explanations of why the uncharged transactions were fraudulent and cursory assertions of alleged similarities." United States v. Stein, 521 F. Supp. 2d 266, 270 (S.D.N.Y. 2007). The government has yet – even in this case – to explain what transactions are at issue and how they allegedly are improper.

### D. Ordering A Bill Of Particulars Would Be An Appropriate Exercise Of The Court's Discretion

Of course, requiring a bill of particulars is entirely within the Court's discretion. Here it is necessary to enable Mr. Pfaff to understand which transactions allegedly are improper and why and under what authority. He cannot even assess whether the government's Rule 16 discovery production is complete without knowing what the allegations are. This concern is particularly important in this case, where the government has reached back all the way to 1993 to allege otherwise out-of statute conduct in a conspiracy. Similarly, Mr. Pfaff cannot assess what evidence is part of the primary case against him and which is Rule 404(b) evidence.

Second Circuit authority strongly supports a bill of particulars in this type of situation. For example, in United States v. Brotnovsky, 820 F.2d 572 (2d Cir. 1987), the defendants were charged with submitting false claims of burglary losses to government agencies. Id. at 574. The government, however, refused to specify which burglaries were fabricated and which documents were falsified. Id. Thus, the defendants "were forced to establish their innocence by proving that eight of the burglaries put before the jury, which even the Government was uncertain were fake, actually

7

occurred." Id. Without a bill of particulars, the charges were shrouded in mystery and the defendants were unable to prepare for trial. Consequently, the Second Circuit reversed the defendants' convictions, finding that the district court abused its discretion by failing to order a bill of particulars. Id.

Perhaps in response to Brotnovsky, district courts have shown a willingness to order the government in fraud cases to identify which statements are fraudulent and why. See United States v. Nachamie, 91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000) (granting a bill of particulars in a fraud prosecution, stating that "the Government should adopt [the defendant's] suggestion to identify in which the five possible ways the item or entry is allegedly false"); United States v. Savin, 2001 U.S. Dist. LEXIS 2445, at *10 (S.D.N.Y. March 13, 2001) (indictment's reference to unspecified "intercompany transfers" unfairly forced the defendants to guess which of the numerous transactions were alleged to have been improper); United States v. King, 1995 U.S. Dist. LEXIS 4222, at *2 (S.D.N.Y. April 4, 1995) (granting a bill of particulars in a fraud prosecution, noting that "defendant should know what false representation the government claims he made, and how they were fraudulent"). Similarly, the indictment in this case fails to apprise Mr. Pfaff which transactions are alleged to have been unlawful – and why they were fraudulent. Without this information, he is forced to confront a limitless universe of information and will be unable to prepare an adequate defense.

## III. CONCLUSION

Mr. Pfaff respectfully requests that the Court order that the government provide a bill of particulars identifying each transaction being challenged, what is fraudulent or otherwise inappropriate about it, which statements are fraudulent, and what the actual truth is.

Dated: August 18, 2008                                Respectfully submitted,

                                                        /S/
                                                      David C. Scheper (DCS 0072)
                                                      Overland Borenstein Scheper & Kim LLP
                                                      One Bunker Hill
                                                      601 W. Fifth Street, 12th Floor
                                                      Los Angeles, CA 90071
                                                      (213) 613-4655