# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  -against-<br><br>ROBERT PFAFF,<br><br>        Defendant. | CASE NO. 08 CR 239 RMB<br><br>**DECLARATION OF DAVID C. SCHEPER IN SUPPORT OF DEFENDANT ROBERT PFAFF'S MOTIONS FOR A CHANGE OF VENUE AND FOR A BILL OF PARTICULARS**<br><br>**Hearing Date:  September 23, 2008**<br>**Time:**         **10:00 a.m.** |

I, David C. Scheper, declare as follows:

1.     I am an attorney, licensed to practice law with the courts of the State of California.  I am an attorney at Overland Borenstein Scheper & Kim LLP, counsel of record for defendant Robert Pfaff.  I have personal knowledge of the facts stated herein, unless otherwise indicated, and could and would testify to such facts.

2.     Attached hereto as Exhibit A is a true and correct copy of the transcript of the oral argument in the case United States v. Stein et al., 05 Cr. 888 (LAK) which occurred on May 8, 2007.

3.     Attached hereto as Exhibit B is a true and correct copy of the Affidavit of Service of a civil subpoena served on Domenick DeGiorgio in Cold Spring Harbor, New York.

4.      Attached hereto as Exhibit C are true and correct copies of excerpts of the transcripts of an interview of Mr. Pfaff by the IRS which took place in Denver, Colorado on June 12-13, 2003.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed in Los Angeles, California, this 18th day of August 2008.

                                        /S/
                                        David C. Scheper

# EXHIBIT A

# Part 1

758WsteC.txt

1

758Wste1
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   UNITED STATES OF AMERICA,
3
4              v.                              05 Cr. 888 (LAK)
4
5   JEFFREY STEIN, JOHN LANNING,
5   RICHARD SMITH, JEFFREY
6   EISCHEID, PHILIP WIESNER, JOHN
6   LARSON, ROBERT PFAFF, RAYMOND
7   RUBLE, MARK WATSON, DAVID AMIR
7   MAKOV, LARRY DELAP, STEVEN
8   GREMMINGER, GREGG RITCHIE,
8   RANDY BICKHAM, CAROL WARLEY,
9   CARL HASTING, RICHARD
9   ROSENTHAL, DAVID GREENBERG,
10
10              Defendants.
11
11  ------------------------------x
12
12                                            May 8, 2007
13                                            2:45 p.m.
13
14  Before:
14
15                      HON. LEWIS A. KAPLAN,
15
16                                            District Judge
16
17
17                          APPEARANCES
18
18  MICHAEL J. GARCIA
19        United States Attorney for the
19        Southern District of New York
20  BY:   STANLEY OKULA
20        JOHN HILLEBRECHT
21        RITA GLAVIN
21        Assistant United States Attorneys
22
22  RICHARD SPEARS KIBBE & ORBE LLP
23        Attorneys for Defendant Stein
23  BY:   DAVID SPEARS
24        CRAIG MARGOLIS
25

            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                          2

758Wste1
1                      APPEARANCES (cont'd)
2
3   AKIN GUMP STRAUSS HAUER & FELD LLP
3         Attorneys for Defendant Lanning
4   BY:   MICHAEL MADIGAN
4         ROBERT H. HOTZ, JR.
5
5   KOSTELANETZ & FINK, LLP
6         Attorneys for Defendant Smith

                        Page 1

```
                          758WsteC.txt
 6    BY:  CAROLINE RULE
 7         FRAN OBEID
 7
 8    JOSEPH DiBLASI
 8         Attorney for Defendant Eischeid
 9
 9    DePETRIS & BACHRACH, LLP
10         Attorneys for Defendant Wiesner
10    BY:  RONALD DePETRIS
11         MARION BACHRACH
11
12    LATHAM & WATKINS
12         Attorneys for Defendant Larson
13    BY:  STEVEN M. BAUER
13
14    OVERLAND BORENSTEIN SCHEPER & KIM
14         Attorneys for Defendant Pfaff
15    BY:  DAVID C. SCHEPER
15
16    HOFFINGER STERN & ROSS, LLP
16         Attorneys for Defendant Ruble
17    BY:  SUSAN HOFFINGER
17
18    KOBRE & KIM, LLP
18         Attorneys for Defendant Watson
19    BY:  MICHAEL S. KIM
19         LEIF T. SIMONSON
20
20    KIRKLAND & ELLIS, LLP
21         Attorneys for Defendant Makov
21    BY:  JAY P. LEFKOWITZ
22         ANDREW M. GENSER
22
23    LANKLER SIFFERT & WOHL, LLP
23         Attorneys for Defendant Delap
24    BY:  JOHN R. WING
24         -and-
25    DIANE D. PARKER
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                      3

      758Wste1
 1                    APPEARANCES (cont'd)
 2    DOAR, RIECK & MACK
 2         Attorneys for Defendant Gremminger
 3    BY:  JOHN F. KALEY
 4    ARGUEDAS, CASSMAN & HEADLEY, LLP
 4         Attorneys for Defendant Ritchie
 5    BY:  CRISTINA C. ARGUEDAS
 5         TED W. CASSMAN
 6         -and-
 6         ANN C. MOORMAN
 7         MICHAEL W. ANDERSON
 7
 8    DUANE MORRIS, LLP
 8         Attorneys for Defendant Bickham
 9    BY:  GEORGE D. NIESPOLO
 9
10    BRYAN CAVE
10         Attorneys for Defendant Warley
11    BY:  JAMES R. DeVITA
11
                           Page 2
```

758WsteC.txt

```
12            LITMAN, ASCHE & GIOIELLA, LLP
12                 Attorneys for Defendant Hasting
13            BY:  RUSSELL M. GIOIELLA
13
14            HAFETZ & NECHELES
14                 Attorneys for Defendant Rosenthal
15            BY:  SUSAN R. NECHELES
16            GOODWIN PROCTER,LLP
16                 Attorneys for Defendant Greenberg
17            BY:  DAVID B. PITOFSKY
18
19
20
21
22
23
24
25
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    4

758Wste1
```
 1                 (Case called)
 2                 THE COURT:  The first thing I wanted to take up before
 3            we get to the motion is the government's database proposal,
 4            which I take it you've all agreed on now.  Right?
 5                 MR. HILLEBRECHT:  I believe that's correct, your
 6            Honor.
 7                 THE COURT:  So I know there was some reference from
 8            the government at some point to wanting my approval.  But my
 9            approval is not necessary for this, is it?
10                 MR. HILLEBRECHT:  As long as the Court has no
11            objection.
12                 THE COURT:  I'm certainly not objecting to it.
13                 MR. HILLEBRECHT:  And, your Honor, did you receive our
14            letter of this afternoon?
15                 THE COURT:  I did.  And I noticed the 16 weeks, and
16            we'll see what happens to the trial date.  But I'm not making
17            promises.
18                 Okay.  The way I would like to organize the discussion
19            of the government's 404(b) motion is to do it topically, rather
20            than to simply listen to a bunch of set speeches.  And the way
21            we'll do it is I'll indicate the topic and then I'll hear from
22            the government and I'll hear from the defense, subject by
23            subject.  So let's begin with the UMDA, Sands, Scandia and
24            Somer evidence, which I take, I hope correctly, to rid more or
25            less the same sorts of issues on both sides.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    5

758Wste1
```
 1                 Mr. Okula.
 2                 MR. OKULA:  Thank you, your Honor.  Good afternoon.
 3                 Just at the outset, your Honor, I'd like to point out,
 4            sort of reevaluate how best we can present and in a streamlined
 5            fashioned, if approved by the Court, we are attempting to pick
 6            our spots, I think, in a little more refined manner.  So we're
 7            going to set aside and essentially withdraw the Scandia-related
 8            matter.  So we're going to stick to the Somer Leasing and Sands
 9            transaction as the first topic.
10                 THE COURT:  Does that totally moot any questions
11            regarding Norwegian depositions?
12                 MR. OKULA:  No.
```
                            Page 3

758WsteC.txt

13          THE COURT:  It doesn't, okay.  Go ahead.
14          MR. OKULA:  Your Honor, this case involves in
15    substantial part the existence of bona fide loans underlying
16    the tax shelter transaction, starting first with the Somer
17    Leasing transaction.  The Somer Leasing transaction involves an
18    endeavor by Mr. Pfaff to enlist a nonresident alien, a person
19    who had no legitimate entrepreneurial reason to be in the
20    transaction other than to act as a straw person, a foreign
21    person, to absorb the tax at the end of the transaction.
22          We will be able to prove through the testimony of that
23    straw person that he was enlisted by Mr. Pfaff.  In fact, he
24    was sent a letter by Mr. Pfaff essentially telling him you are
25    the owner of this company.  This company will take out a loan
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

6

758Wste1
1     from HVB.  Here are the terms of the loan, here is where the
2     funding is coming from, and, by the way, you'll get $25,000 at
3     the end of the transaction.
4          There will also be testimony from Mr. DeGiorgio, who
5     is going to be a government witness, a cooperating witness, who
6     was involved with Mr. Pfaff in structuring this Somer Leasing
7     transaction, and he will testify that the person who was
8     enlisted to be the NRA, the Philippines person, Mr. Romero
9     Salas, was not a bona fide participant in the transaction and
10    that the tax play, at the heart of the transaction, ended up
11    with that person having the gain, but because he was a foreign
12    person, no tax was paid at the end of the transaction.
13          So, I think, your Honor, the clear relevance of the
14    admissibility of this proof is that it involves a loan that is
15    not bona fide, that was not taken out legitimately by this NRA.
16    The NRA was inserted into the transaction.  He's not a
17    legitimate participant in the transaction, and the transaction
18    is a fraud.  It involved Mr. Pfaff enlisting that person and
19    dealing with that person and getting fees at the end of the day
20    from that transaction.
21          THE COURT:  Take it in smaller steps.  What makes that
22    a fraud?
23          MR. OKULA:  Because if you enlist a foreign person who
24    is simply a puppet, who is not a genuine participant in the
25    transaction, who has no true entrepreneurial reason for being
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

7

758Wste1
1     in the transaction, and who is falsely depicted in some of the
2     deal documents as being entrepreneurial, a participant in the
3     transaction, that is, that he is in it for investment purposes,
4     that he thinks that these leases that the basis gets
5     transferred with were a good investment, that's in your
6     write-up at the bank, and it's false.
7          THE COURT:  It's in what write-up at the bank?
8          MR. OKULA:  The credit memo at the bank, in order to
9     get the loan approved from HVB to this straw person, depicts
10    this straw person --
11          THE COURT:  Was the loan made to the straw person, or
12    was it made to the entity?
13          MR. OKULA:  It was made to the entity.  But it's a
14    single-member LLC, so it has to describe who the person behind
15    the entity is.  And it describes him as a legitimate
16    businessman involved in entrepreneurial efforts.  He thinks
17    these leases are a good investment.

                              Page 4

**EXHIBIT  A  PAGE  6**

758WsteC.txt
```
18          THE COURT: Was the person not a legitimate business
19   person? I mean, I understand you call it a straw.
20          MR. OKULA: Not for the purpose that they depicted him
21   in the write-up, your Honor.
22          THE COURT: That wasn't exactly my question.
23          MR. OKULA: He was a business person, yes.
24          THE COURT: Okay.
25          MR. OKULA: But he had no knowledge of the ins and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    8

758Wste1
```
1    outs of the transaction. He had no say in the ins and outs of
2    the transaction. He was simply sent paperwork, which he signed
3    without review, after it was forwarded to him where people
4    simply said sign this and you will get a fee at the end of the
5    day.
6           THE COURT: I'm going to portray a lot of ignorance of
7    tax law here this afternoon, I'm very well aware of that. I
8    deliberately decided not to practice tax law, and I'm now
9    convinced that was probably a good idea. But don't nominees
10   participate in transactions purely as nominees all the time,
11   throughout the economy, including transactions that are
12   relevant to getting one sort of tax treatment versus another
13   kind of tax treatment?
14          MR. OKULA: I think as a general principle, in a
15   vacuum, the answer to that is yes, your Honor. But I think in
16   our case here, it's the equivalent of looking at a phone book
17   of a foreign country, dialing up that person's number and
18   saying, I want you to end up with this gain at the end of the
19   day and we'll pay you a little fee, will you participate.
20          THE COURT: You're talking to a first year law
21   student, for all practical purposes, on the issue of the tax
22   law. Take me through it one step at a time, exactly what
23   happened and which steps violate which provisions of the
24   Internal Revenue Code.
25          MR. OKULA: The way that it was set up.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                    9

758Wste1
```
1           THE COURT: Because I confess, I read your brief, and
2    it was a very erudite discussion of all sorts of Rule 404(b)
3    cases and a lot of adjectives, and at the end of it I didn't
4    know exactly what the transactions were or why you claim they
5    were bad.
6           MR. OKULA: The Somer Leasing transaction went in the
7    following manner. A loan was established at HVB. Mr. Pfaff
8    met with the taxpayer, a California businessman, who needed a
9    tax loss. Mr. Pfaff sat down with Mr. DeGiorgio and discussed
10   ideas about how they were going to create a tax loss for this
11   California businessman. They decided they were going to use
12   this transaction, it's called a 357(c) transaction, which
13   is a section of the Internal Revenue Code that was used as the
14   play here.
15          THE COURT: What does 357(c) say?
16          MR. OKULA: 357(c) essentially establishes that when
17   there is a, well, if I continue my conversation, your Honor,
18   I'll describe how it came into play.
19          THE COURT: Okay.
20          MR. OKULA: Mr. Pfaff designed this deal. What they
21   needed was a nominee, a person who can absorb the tax loss at
22   the end of the day, because what they were going to do was
```
                            Page 5

EXHIBIT __A__ PAGE __1__

758WsteC.txt

23  transfer the basis and leave the gain with one person while
24  creating a loss that could be used by the California
25  businessman.  They did it in the following manner.  They had an
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

10

758Wste1

1   entity created in New York.  Mr. Pfaff took care of creating
2   the entity in New York, unbeknownst to the Philippine national.
3   The single-member LLC was created, and Mr. Pfaff arranged for a
4   half million dollars of financing to be sent to this entity.
5           THE COURT:  This is the loan?
6           MR. OKULA:  No, not the loan.  It's just an initial
7   fee that had to be paid for HVB to get the transaction started.
8           THE COURT:  Where did the half million dollars come
9   from?
10          MR. OKULA:  It came from an account in Guam that was
11  controlled by a coconspirator named Stuart Moisen who Mr. Pfaff
12  enlisted to send the money to Somer Leasing.
13          THE COURT:  So Moisen sends a half million dollars to
14  HVB as a loan application fee?
15          MR. OKULA:  As part of the initial funding of the
16  transaction, yes, your Honor.  It's part of the loan
17  application, yes.
18          THE COURT:  So it's a fee to HVB.
19          MR. OKULA:  Yes.
20          THE COURT:  All right.
21          MR. OKULA:  The deal is structured as a purported
22  30-year loan by HVB in the amount of $25 million that is made
23  to this entity, Somer Leasing LLC.  After the loan is put into
24  place, and Somer Leasing --
25          THE COURT:  Is this a nonrecourse loan or something?
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

11

758Wste1

1           MR. OKULA:  It is.  There's recourse.
2           THE COURT:  Against Somer Leasing?
3           MR. OKULA:  Correct.
4           THE COURT:  Okay.
5           MR. OKULA:  The money is then, let me just back up a
6   second.  The 30-year loan, Pfaff tells the Philippine national,
7   he basically informs him you're the owner now of Somer Leasing
8   LLC.  $500,000 has been sent to HVB as an initial funding of
9   the transaction.  And he describes certain steps or certain
10  paperwork that would have to be signed after it was forwarded
11  to him by the New York lawyer.  The deal is structured in the
12  following manner.
13          A $25 million loan is given to Somer Leasing, and
14  Somer Leasing is then going to use 1 million of that to
15  purchase certain leases.  They're equipment leases that
16  Mr. Pfaff had arranged to be purchased from an equipment
17  leasing company called Somerset Capital.  The bank documents
18  required essentially full collateralization of the loan, so
19  only 1 million of the 25 million was used to purchase the
20  leases.  24 million stayed at HVB, and the leases that were
21  purchased by Somer Leasing were used to secure the rest of the
22  loan, to keep HVB collateralized.
23          At that point, the U.S. taxpayer who wants the tax
24  loss --
25          THE COURT:  Before we get there, what happens to the
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

Page 6

EXHIBIT  A  PAGE  8

758wsteC.txt

12

758Wste1
1  24 million at this point?
2          MR. OKULA:  It had to be kept at an account at HVB in
3  New York.
4          THE COURT:  So the leases are not securing the 25
5  million, they're securing the 1 million?
6          MR. OKULA:  The $1 million, correct.
7          THE COURT:  Now what?
8          MR. OKULA:  United States taxpayer who wants the loss
9  then purchases the lease portfolio from Somer Leasing LLC.  He
10 pays $1.6 million to Somer Leasing; 1 million of that goes back
11 to HVB to keep it fully collateralized now, and 600,000 stays
12 in Somer Leasing and it's distributed among the coconspirators
13 as their various fees.
14         The tax play here is that the U.S. taxpayer becomes a
15 co-obligor on the loan.
16         THE COURT:  Which happens how?
17         MR. OKULA:  What happens is when they, as part of the
18 deal, when they purchase the leases from Somer Leasing LLC,
19 they sign on with HVB as a co-obligor on the loan.  Now,
20 because Somer Leasing is transferring property, that is the
21 lease portfolio, and also getting some shares of the entities
22 set up by the United States taxpayer to take part in this
23 transaction, the U.S. company, the taxpayer, through his
24 entity, gets the same basis --
25         THE COURT:  Back up.  Where and when does the U.S.
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

13

758Wste1
1  taxpayer set up an entity, and how does it participate in the
2  transaction?
3          MR. OKULA:  They set up the entity at the outset of
4  the transaction, and they wait for these initial steps to take
5  place until they are told that they have to pay the
6  consideration to Somer Leasing in order to get the leases.
7          THE COURT:  So, is it correct that it's the taxpayer's
8  entity, not the taxpayer --
9          MR. OKULA:  That's correct.
10         THE COURT:  -- that buys the leases and becomes
11 co-obligor?
12         MR. OKULA:  That's correct.  And it gives preferred
13 shares in its new company to Somer Leasing, in addition to the
14 $1.6 million.
15         Now, one thing I didn't point out earlier, your Honor,
16 although they paid at the outset $1 million for the lease, the
17 leased equipment --
18         THE COURT:  Somer Leasing paid?
19         MR. OKULA:  That's right.
20         There was a $6 million basis in that property, because
21 there was $5.8 million of debt connected with those leases,
22 that the leasing company sold.
23         THE COURT:  Wait a second.  The leasing company is
24 selling leases?
25         MR. OKULA:  Correct.  That are encumbered by debt.
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

14

758Wste1
1          THE COURT:  By how much?
2          MR. OKULA:  $5.8 million.
3          THE COURT:  So Somer is paying a million dollars plus

Page 7

EXHIBIT __A__ PAGE __9__

758WsteC.txt
4  the assumption of the liability?
5      MR. OKULA:  That's correct.
6      THE COURT:  So Somer's basis in the leases is now 6.8
7  million?
8      MR. OKULA:  Correct.
9      THE COURT:  All right.
10     MR. OKULA:  Now, when the U.S. company pays the
11 consideration for the leases, it gets the basis that Somer had
12 in the leases.  And that's under Section 351 of the Internal
13 Revenue Code.  And this is where Section 357(c) comes in,
14 because Section 357(c) provides that when a company assumes
15 indebtedness or when the U.S. company assumes the indebtedness
16 of Somer, Somer has to recognize a gain equal to the amount by
17 which the debt, that is the $25 million, exceeds the basis in
18 the leases.  So it's about a 17 or $18 million difference.
19     The write-up at HVB in connection with this basically
20 says that the Philippine national, who is Somer, is then going
21 to have to recognize the $18 million gain at this point in the
22 transaction, but because the person is a foreign person, not
23 subject to U.S. tax, there's no taxpayer in the transaction.
24     Now, what happens is the U.S. company gets to take the
25 full amount of the indebtedness as its basis in the lease; that
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

758Wste1
1  is, the $25 million.  So even though there's a debt attached of
2  about $5.8 million to the leases, it gets $25 million in basis
3  in the lease, which they then depreciate, they get to use for
4  corporate purposes as losses in their entity.
5      THE COURT:  I'm sorry.  I thought you told me a few
6  minutes ago that the U.S. entity gets Somer's $6.8 million
7  basis and the leases under 351.
8      MR. OKULA:  They do, but when 357(c) kicks in and the
9  gain has to be recognized by the transferor of the property,
10 357(c) also provides then that the transferee has to have a
11 basis in the amount of the obligation, which is the $25
12 million.
13     So implicit in all this is the notion that you have a
14 legitimate business person in the Philippines, a foreign
15 person, taking part in this transaction, and the proof that we
16 are prepared to introduce is this person had no interest in the
17 transaction.  They were simply enlisted to lend their name to
18 the transaction in exchange for a $25,000 fee.  They made no
19 decisions.  All the decisions were made for it.  And all of the
20 steps were prearranged and orchestrated in advance.  So there's
21 this $18 million loss that is never recognized, and we submit
22 that that is a fraud, a fraud because the person is not a
23 legitimate participant in the transaction, and implicit in sort
24 of a good deal going forward is the presence of someone who is
25 a legitimate participant in the transaction.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

758Wste1
1      THE COURT:  I seem to have this recollection that
2  Justice Holmes or Learned Hand or one of those memorable
3  figures once said something like this, that everybody has a
4  duty to pay the taxes that are justly owed and that everybody
5  also has the right to so arrange his or her affairs as to
6  minimize the tax that is due and owing.  Fair statement?
7      MR. OKULA:  Very fair, your Honor.
8      THE COURT:  Okay.  So?

Page 8

758WsteC.txt

```
 9          MR. OKULA:  It's not applicable in this situation
10  because you cannot insert somebody who is not a bona fide
11  participant in the transaction.
12          THE COURT:  What provision of the code says that?
13          MR. OKULA:  I don't have the case law in front of me
14  here, your Honor.  I don't think there's a section in the code,
15  but I think that you cannot have just a nominee or a straw
16  person.  I'd be happy to, in the wake of the hearing, find the
17  cases and submit that to you, your Honor.  But this is a person
18  who made no decisions, offered no money for the transaction,
19  and was depicted in the paperwork as being an entrepreneur.
20          THE COURT:  Let's get to that.  Depicted in exactly
21  what paperwork and by whom?
22          MR. OKULA:  Depicted in the paperwork at HVB in order
23  to give rise to the loan and depicted in the opinion letter
24  given by the law firm to HVB for their issuance or their
25  participation in the transaction.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              17

758Wste1
```
 1          THE COURT:  What law firm?
 2          MR. OKULA:  Shearman & Sterling.
 3          THE COURT:  Now, the paperwork at HVB, who wrote it?
 4          MR. OKULA:  DeGiorgio.  He wrote the credit memo up.
 5          THE COURT:  And what's he going to say about why he
 6  wrote it the way he wrote it?
 7          MR. OKULA:  He's going to say that he wrote it up
 8  because he sat down with Mr. Pfaff and structured this
 9  transaction in order to create simply a tax loss for the
10  california businessman who owned the United States company, and
11  he will testify that the person in the Philippines was a straw
12  person who had no legitimate participation in the transaction,
13  wasn't contacted, wasn't spoken to.  They didn't expect him to
14  provide legitimate funding himself, and he knew the person was
15  a bogus participant in the transaction.
16          Notwithstanding that, in the credit memo, the credit
17  request, dated March 1998, when writing it up, DeGiorgio
18  describes Somer Leasing by saying it's "in the business of
19  making equity investments in newly created businesses,
20  acquiring income-producing assets and making other financial
21  investments.  For each transaction or investment in which the
22  owner of Somer participates, he establishes a new entity with
23  no other creditors, business transactions or obligations."  And
24  he goes on to describe a little bit more about the owner and
25  his legitimate entrepreneurial intent to bring into the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              18

758Wste1
```
 1  transaction.  It's all false.  It's all false.
 2          Mr. Romero Salas, who is the Philippine national, will
 3  testify that he was not spoken to before any of this was set
 4  up, that he made no decisions about this, he didn't hold any
 5  leases, he didn't know about any leases, he didn't know about
 6  any investment.  And all he did was, he was promised $25,000,
 7  and he took $25,000 at the end of the day.  And this is a
 8  person, by the way, with respect to some of the other proof
 9  that we are seeking to admit, whose bank account was employed
10  in order to filter off-shore some of the fees that the
11  participants received and did not report to the IRS.
12          THE COURT:  Now, in order for you, assuming that your
13  theory holds together, to have this make sense to anybody, and
```

                            Page 9

758WsteC.txt

14    by anybody, of course, I mean the jury, don't you have to
15    explain the whole transaction and the relevant tax law to the
16    jury?
17            MR. OKULA:  I don't think so, for the following
18    reason, your Honor.  I think that to have the jury instructed
19    if the law is as we believe it is, that you have to be a bona
20    fide, legitimate participant in the transaction in order for
21    the tax play to work, that simply an instruction by the Court
22    with respect to that topic and the testimony of the person that
23    they were simply a straw person, together with, for instance,
24    the credit memo describing the transaction and the testimony of
25    DeGiorgio, is all we're going to have to introduce.  So I don't
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    19

      758Wste1
1     think there has to be a lengthy exegesis on 351 and 357(c).  It
2     simply has to be that because the tax play involved dropping
3     with a foreign person this tax and you have to be a legitimate
4     participant in the transaction in order for the tax play to
5     work, simply an economic substance type of charge, which I
6     believe underlies this type of transaction and this type of
7     fraud, would be enough.
8             THE COURT:  What about the other one, the UMDA Sands?
9             MR. OKULA:  Sands also involved a fraudulent loan for
10    what was depicted as a loan, but none of the participants
11    expected the loan to be, and let me just take it from step one,
12    your Honor.
13            THE COURT:  When you say fraudulent loan, what do you
14    mean, that someone lied in order to procure the loan?
15            MR. OKULA:  No.  I got ahead of myself.  I'll walk
16    your Honor through it.
17            A promoter of the Sands tax shelter, a man named Roy
18    Hahn, he worked with Raymond Ruble in putting together Sands,
19    and Sands was depicted as an ability to create low-cost
20    financing for the entity participating in the transaction.
21            What happened in Sands is that an individual that
22    Mr. Pfaff was familiar with a man named Michael Grandinetti,
23    who is a key official at a company called the United Micronesia
24    Development Association, which is a Saipan-based company.
25    Moisen and Pfaff learned that UMDA was about to receive a big
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    20

      758Wste1
1     dividend in an amount of about $13 million, and they had to
2     address the tax consequences of that.  Pfaff and Moisen
3     approached Grandinetti with Roy Hahn and said, Here is this
4     transaction, it's called Sands.  And what it will let you do is
5     essentially you pay a fee to us and we set up the transaction
6     and we will make available to you this low-cost financing from
7     Deutschebank, and it's all basically smoke and mirrors.  There
8     is no legitimate loan that is made available to them.
9             Going into the transactions, Grandinetti, all he
10    wanted was to get rid of the taxes and had no true intent in
11    taking out the loan.  And he will testify to that, that he was
12    approached by Hahn and Pfaff and they pitched this deal, which
13    supposedly involved our ability as a company, UMDA, to take out
14    a big loan, but I had no intent to take out a loan, we didn't
15    need a loan, we needed a tax loss, and through the tax play at
16    issue there, it essentially made the dividend go away.  It
17    created a big loss through a transfer basis.
18            Grandinetti got what he wanted and paid the fees to

                               Page 10

EXHIBIT __A__ PAGE __12__

758WsteC.txt

```
19   Pfaff and Moisen and Hahn, and then they approached him and
20   said, well, in order for this to work, in order for it to be
21   consistent with the code, you have to say that you have a
22   business purpose for engaging in this transaction, that you
23   really want the loan to use for financing for your company.
24          THE COURT:  This is another case where the gain winds
25   up with another nonresident alien, right?
```

              SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                      21

758Wste1

```
1          MR. OKULA:  No, your Honor.
2          THE COURT:  Okay.  Go ahead.
3          MR. OKULA:  And the essential fraud at issue in Sands
4    is there was no legitimate business purpose for UMDA to take
5    out the loan.  Notwithstanding that, Grandinetti signed
6    paperwork and engaged in discussions where he agreed falsely to
7    represent, to the promoters of the transaction, that there was
8    a legitimate business purpose behind the loan; that is, to use
9    it for financing of UMDA's activities.  And after they got
10   their tax loss through the tax play there, there was no drawing
11   down of the funds at all.  The loan was never issued.  It was
12   never used, and in all the Sands transactions we're not
13   charging any other ones, but there's no coincidence that in
14   five or six other transactions that Mr. Ruble was involved in
15   which depict the financing or the ability to get financing,
16   nobody takes out the loan.  But everybody is forced to say as a
17   condition of getting in the door, in order to make the tax play
18   work, that they are engaging in the transaction because they
19   want the ability to use the low-cost financing.
20          Now in these two instances that we have been talking
21   about up to now, we have got Pfaff implicated in the first one
22   Ruble implicated in the second.
23          (Continued on next page)
24
25
```

              SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                      22

7580steA

```
1          THE COURT:  Anybody else among the defendants in this
2    case?
3          MR. OKULA:  No, your Honor.
4          THE COURT:  What is your answer to the argument that
5    even if you are right as to Pfaff in the one case and Ruble in
6    the other, the potential spillover here, not just in the normal
7    sense of prejudicial spillover but in the sense of consumption
8    of time and everything else, is unfairly prejudicial to
9    everything else?
10          MR. OKULA:  I think, short answer to that, your Honor,
11   is it presents in any multiple defendant case, the fact that
12   some defendants engage in more criminal conduct or significant
13   amount of additional other activity, I think could be dealt
14   with -- and the courts recognize up and down -- could be dealt
15   with with a limiting instruction.  And with respect to the
16   usage of time, your Honor --
17          THE COURT:  You got a case with a six or eight month
18   trial and 18 defendants where that was upheld?
19          MR. OKULA:  I have not looked into it up to this date,
20   your Honor, but I would be happy to look into it and get your
21   Honor authority with respect to that, with respect to that
22   point, to the extent it exists.  And I believe it does.
23          THE COURT:  Okay.  Let me hear from defense on these
```

                        Page 11

758WsteC.txt

24  two transactions.
25      MR. OKULA:  Just before, may I add one more point with
            SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

                                                              23

7580steA
1   respect to the Sands transaction.  The Sands transaction is
2   tied in in an important way with another part of 404(b) proof.
3   That is the receipt or payment to Ruble of unreported fees that
4   is at the same time, in 1996, when he is writing the opinion
5   letter, he is receiving payments from the promoter of the
6   transaction.
7       THE COURT:  I understand that.  Thank you.
8
9       MR. SCHEPER:  David Scheper for Mr. Pfaff.
10      When I think we all first assembled back sometime in
11  the fall of 2005, one of the first things I heard from your
12  Honor was the phrase, "boil it down."  And we are 20 or so
13  months later, having your Honor preside over a hearing where
14  the government's reaction was to boil it up.  With respect to
15  the --
16      THE COURT:  Frankly, you know, I have read these
17  fairly lengthy papers.  And I have read a lot of case law about
18  404(b) that I pretty much knew and heard a lot of rhetoric and
19  read a lot of rhetoric.  And what I'm really interested in,
20  today, is the facts and what any of this evidence really
21  suggests.  The rest of it I can do in my sleep.
22      THE WITNESS:  Well, I think the fact, one of the facts
23  is that, as your Honor has sort of alluded to with respect to
24  summer leasing, showing that this was a criminal transaction
25  involves a lot more than just somebody coming in and saying, I
            SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

                                                              24

7580steA
1   served improperly as a nominee.
2       I think what that requires, your Honor, in a trial,
3   whether it is United States v. Robert Pfaff, or United States
4   v. Stein, et al, to show that this was a criminal conduct and
5   bad acts would require the law firms that have been identified.
6   Sherman & Sterling is one law firm.  There was a US taxpayer
7   who we're told had a meeting with Mr. Pfaff where his reasons
8   for entering into a transaction were identified.  Well, he is
9   not in the 404(b) notice, and he is not a witness.  But that
10  taxpayer, and I'll represent to your Honor, had advisors,
11  accountants, lawyers, who guided that US taxpayer through the
12  thicket of the summer leasing transaction.  And then, your
13  Honor, there -- there was the transaction, heavily lawyered, by
14  a lot of sides.
15      THE COURT:  Do you agree with Mr. Okula that if a
16  foreign nominee who basically had nothing to do with this
17  transaction other than to collect a fee was plugged into this
18  and to wind up being the person to whom the gain for income was
19  taxable, that that is improper.
20      MR. SCHEPER:  If that person, your Honor, was a liar
21  and a fraudster and perpetrated a fraud on US taxing
22  authorities or, in turn, on Philippine taxing authorities, that
23  person would have a problem.  Whether any US taxpayer or --
24      THE COURT:  That was not my question.
25      My question was if that person was, as portrayed by
            SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

                                                              25

                        Page 12

758WsteC.txt

7580steA
1   the government, basically, a puppet whose only role in this
2   transaction was to make sure that the taxable income wound up
3   with somebody who was not subject to US income tax while US
4   taxpayers got the benefit, if that is all true, and if that
5   person was plugged in there for that reason, do you have any
6   doubt that there is something wrong with it?
7           MR. SCHEPER:  Oh, I think it begs the question, your
8   Honor, under the law of agency and principle as to whether that
9   person fraudulently portrayed that person's status here.  And I
10  don't think you'll find, whether -- hopefully, it is in a
11  separate case, never, but you won't find that there was any
12  disguising of what -- or certainly that was visible to
13  Mr. Pfaff as to what this person was.  He was a nonresident
14  alien.  And whether or not that person lied to taxing
15  authorities or to Philippine authorities, your Honor, it is not
16  the answer to whether that person was a bogus or fraudulent
17  nominee.  But, to your Honor's other question --
18          THE COURT:  But I thought the government's proffer on
19  this, essentially, is that Pfaff and Georgio cooked this whole
20  thing up, that they found the nonresident alien, and that
21  Georgio then proceeded to misrepresent the transaction to the
22  bank.
23          MR. SCHEPER:  Well, your Honor, of course I can't
24  argue evidence with your Honor because Mr. Okula is proffering
25  what somebody might say if that person were called in a trial.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              26

7580steA
1   So for me to niggle over whether I could impeach that or not, I
2   think representation that DeGiorgio would come into court and,
3   in the course of a direct examination, talk about summer
4   leasing, and maybe about his own winking and nodding in the
5   credit memo, I mean I get nowhere arguing whether he would or
6   wouldn't say that, or whether that is credible.  What I can
7   speak to your Honor, is whether --
8           THE COURT:  But what would be helpful for you to speak
9   to, instead of something else all together, is that if a trier
10  of fact were told by DeGiorgio that this is the way it went
11  down and believed him, do we agree that there was misconduct
12  here?
13          THE WITNESS:  If a jury believed Di Giorgio's
14  admission that DeGiorgio wrote up a false credit memo that the
15  jury could properly conclude DeGiorgio engaged in misconduct,
16  to be sure.
17          THE COURT:  If the jury believed that, if DeGiorgio
18  wrote up the false credit memo as part of a scheme that
19  involved Pfaff, and that part of the scheme that produced the
20  false credit memo also involved Pfaff and DeGiorgio or one or
21  the other or somebody in concert with them lining up a
22  nonresident alien to take the taxable income which would never
23  be tax paid income, would the jury be entitled to conclude that
24  the whole tax treatment and transaction was basically a sham
25  and that Pfaff was culpable in it?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              27

7580steA
1           MR. SCHEPER:  Well, if somebody said Pfaff is
2   culpable, a jury is entitled to that.  That question, still,
3   your Honor, is --
4           THE COURT:  Look, we're not getting anywhere, and I
                        Page 13

758WsteC.txt
```
 5   don't mean to give you a hard time.  But I don't think you
 6   are -- maybe I'm not being explicit enough.  But I thought my
 7   concern was indicated by my comment or question to Mr. Okula
 8   about Justice Holmes or whatever.  There are millions of people
 9   around the country with -- perfectly, legitimately, and
10   lawfully, and properly arranging their affairs in such a way as
11   to avoid paying income tax.  And it is fine.  And the question
12   I ask Mr. Okula, is what provision of the Code what provision
13   of law says that if you plug in a nonresident alien as a
14   puppet, it is illegal.  And he has at least promised to give me
15   authority on that.
16              So what I'm trying to get from you in the last ten
17   minutes is do you agree with that.
18              MR. SCHEPER:  I don't agree that the facts here lend
19   themselves to a fraudulent use of a puppet by Mr. Pfaff.
20              I think what the facts here, and what a trial here
21   would show, is that whether the Philippine was or was not a
22   puppet, is a complicated question under the law.  But I will
23   say, your Honor, if he says, I -- and I don't think a witness
24   can actually say:  I was a puppet.  But --
25              THE COURT:  Depends on who is pulling the strings,
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

7580steA
```
 1   doesn't it?
 2              MR. SCHEPER:  I guess so.
 3              And but, actually, I think I take your Honor's point,
 4   that there may well be something that would require some
 5   explaining about that.  And my point is that for a jury to get
 6   the full picture about whether a 351 or 357(c) violation
 7   occurred, it would need to get the whole story from all of the
 8   players.  And that is bank, and it's auditors, it's
 9   accountants, it is US taxpayer, it is US taxpayer's advisor.
10   And to parachute that set of proofs into this case is, I think,
11   your Honor alluded to --
12              THE COURT:  Look, I find that really absolutely
13   incredible.  And totally consistent with the impression I came
14   to after wading through all of these papers.  The government
15   did, in these papers, such a once over lightly that I ended the
16   whole thing having no idea what the evidence is, or why it is
17   relevant.  And the only thing I got from defendants' papers is
18   that everything that ever happened that related to taxes in
19   America is in the case.  If I allow the 404(b) evidence --
20   forget about why it is there.  And I feel that I actually knew
21   much more about this before the motion was made.  I mean I
22   don't believe the claims of incredible complexity from the
23   defendants because they are overdrawn and unsubstantiated at
24   this point, anymore than I believe the government's over
25   simplistic view.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

7580steA
```
 1              I'm looking for help.
 2              MR. SCHEPER:  No, your Honor.  And, to that point, I
 3   was not talking about complexity so much as I was talking about
 4   length of time.
 5              THE COURT:  No, I don't believe that either.  I mean I
 6   don't know what to believe.
 7              MR. SCHEPER:  Well, what I think you can know, is that
 8   the three witnesses that -- that the government has identified
 9   who all agree were not witnesses to the charged conduct in the
```

Page 14

758WsteC.txt

10  indictment, are named Moisen, Grandinetti, and Salas. And all
11  we know, your Honor, is that they're included on a witness
12  list. And then it is as if, well, by having them on the
13  witness list, I can then say that their description of one or
14  more of these pockets of additional uncharged conduct --
15        THE COURT: The government has said to me in substance
16  that Salas, the nonresident alien nominee is going to come in
17  here and say, I was recruited into this transaction that I had
18  never heard of, had no use for, had no interest in, and agreed
19  to sign papers that would be put in front of me for a $25,000
20  fee.
21        Am I essentially right, Mr. Okula?
22        MR. OKULA: Yes, your Honor.
23        THE COURT: Okay.
24        Now, if those are the facts, give me one good reason
25  why it isn't probative of willful misbehavior by Pfaff and
          SOUTHERN DISTRICT REPORTERS, P.C.
              (212) 805-0300

                                                  30

7580steA
DeGiorgio.
1
2        MR. SCHEPER: I think, your Honor, it is. Logically,
3  it bears logical relevance. If believed.
4        I can't stand here and say, if believed, such
5  testimony is not logically relevant. My point is, I think it
6  is going to be a bigger trial within the trial, just as to
7  Mr. Pfaff. And I think there is seven other defendants who
8  have 404(b) exposure under the government's notices, just as to
9  Mr. Pfaff. It is going to take a lot of time -- and I'm
10  confident we'll do it -- to persuade that it doesn't show a bad
11  heart or a bad intent for Mr. Pfaff, that what it says about
12  other people's conduct may be a different question.
13        But I'm just talking, your Honor, against the
14  backdrop of this trial, all three of those witnesses, with
15  their multiple day, multiple hour interviews, every word they
16  uttered --
17        THE COURT: I'm sorry. What interviews are you
18  talking about?
19        MR. SCHEPER: I'm talking about the 3500 material of
20  those three witnesses. Every word they uttered is uncharged
21  conduct. So their very appearance in the courtroom for trial
22  is uncharged.
23        So it is an effort by the government to go beyond what
24  they charged about flip, opus, SOS, and blips. In other words,
25  none of those three say a word about those charged
          SOUTHERN DISTRICT REPORTERS, P.C.
              (212) 805-0300

                                                  31

7580steA
transactions.
1
2        In order -- just one of the eight defendants who has
3  this 404(b) exposure, in order for Mr. Pfaff to deal with just
4  summer leasing, we're talking about the Sherman & Sterling,
5  we're talking about the taxpayer himself, because what they
6  have to say will go to whether what Salas says is credible.
7        Was this really just something that was put upon you?
8  Is that really going to be credible at the end of the day, or
9  was this transaction sufficiently disclosed to the
10  participants.
11        And I think you'll find the same is true about the
12  UMBA Sands transaction. In that case, you had Deloitte &
13  Touche serve as auditors. And Mr. Okula talks about Mike,
14  Grandinetti as if he is this corporation. What else was going

                    Page 15

EXHIBIT ___A___ PAGE __17__

758WsteC.txt

15  on in corporate HQ?  Who else vetted this Sands transaction,
16  which I understand, and it is in the papers, and I think
17  everybody accepts as true, was a corporate tax advantage
18  investment opportunity in the mid 1990s in disputably marketed
19  by Mr. Hand and others.
20       So, my goodness gracious, there is UMBA Sands who,
21  among all those people, was fooled and put Mike Grandinetti's
22  now proffered testimony, in context.
23       Then, ask yourself what does this corporate play have
24  to do with whether or not 18 defendants conspired to aid
25  wealthy US investors and defraud the IRS with the four charged

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

7580steA
1   vehicles.  And the other things -- I might as well mention it
2   now to save the revolving door to your Honor, is all of this
3   circles back from my client.  And I hear Mr. Okula is
4   withdrawing the Scandia transactions.  But just with respect to
5   his alleged fee from summer leasing and the like, which I think
6   he is going to say Mr. Salas is going to testify to in that
7   case, that's a question about whether we allow, and your Honor
8   in your discretion allow, a personal evasion case to be brought
9   within the context of the 18 defendant trial where there is not
10  any dispute, I don't believe, that all Pfaff moneys were paid
11  back or reported by 2001.
12       And there may be dispute about that.  But a question
13  about the timing.  And your Honor has read a lot about side
14  payments, and Mr. Pfaff not reporting.  I don't know whether
15  DeGiorgio reported his side payments.  Grandinetti reported
16  his.  And Salas reported his.  I just don't know from the
17  material yet.  But, you know, Mr. Pfaff, it's a question of
18  when he reported.  And the trial of Flip, Opus, SOS, and Blips,
19  should not evolve on the propriety of a reporting position
20  about whether liabilities matured on advance.  These were
21  indisputably made but, also, indisputably reported.
22       THE COURT:  All right.  Thank you.
23       Anybody else on Somer UMDA.
24       MS. HOFFINGER:  Susan Hoffinger, good afternoon, for
25  Mr. Ruble.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

7580steA
1        Judge, the allegation against Mr. Ruble in terms of
2   the Sands transaction seems to be the following:
3        That he wrote an opinion letter, which the government
4   claims contained a misrepresentation about business purpose.
5   What I didn't hear from Mr. Okula's offers of proof was any
6   information about whether Mr. Ruble already proved that Mr.
7   Ruble knew that this loan never in fact occurred.  Whether he
8   knew that, in fact, UMDA never wanted any of this low-cost
9   financing, despite the fact that there was a board resolution
10  from that company saying to the contrary.  I think what's
11  related to that, your Honor, also, is there is -- this is going
12  to open up an entire new separate area at the trial about
13  whether in fact it is sufficient business purpose for a company
14  to say it wants to have low-cost financing that it couldn't
15  otherwise have.  And that's an issue.  I don't understand
16  Mr. Okula's proof that there was anything illegal about that.
17  And I think, you know, as a matter of notice, just to begin
18  with, I don't --
19       THE COURT:  His position is if they didn't want the

Page 16

758WsteC.txt
20  loan in the first place, why did they take it out?
21      MS. HOFFINGER:  Well, I didn't hear anything from
22  Mr. Okula's description about Mr. Ruble being aware of that
23  when he wrote his opinion letter, not one thing.  It was a
24  lengthy description.  What I heard, was that Mr. Ruble wrote an
25  opinion letter on a transaction where he claimed that was
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    34

     7580steA
1   business purpose based on UMDA wants to go have low-cost
2   financing, that was it.
3       I don't see anything illegal in that.  And I think the
4   government is trying to get around that by saying, you know
5   what, at trial, all we're going to do is we're going to put up
6   a couple of guys from UMDA, one guy in particular, who is going
7   to say we didn't really want it and, therefore, it is going to
8   be a misrepresentation.  And that's really all we have to
9   PROVE.  But I don't think that is dispositive, Judge, because
10  to relate it, they are saying it is fraudulent for that reason,
11  that Mr. Ruble's opinion was fraudulent, and the transaction
12  was fraudulent.  And the defense is going to be required to
13  contest the issue of whether this was a legal transaction or an
14  illegal transaction as the government claims.
15      So I think, you know, they are skipping over quite a
16  few steps, Judge, in saying that, you know, it is sufficient
17  for them to come in and say, you know what, the corporation
18  didn't really want it, despite the fact that they voted on it,
19  a number of members voted and issued a board resolution to the
20  contrary.
21      I think, also, as Mr. Scheper has indicated, Judge,
22  this was a very different transaction.  I really don't see how
23  this relates to the four transactions at issue in the case.  It
24  was a corporate transaction entered into by some of the very
25  large corporations in the United States.  Along with, you know,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    35

     7580steA
1   all of the lawyers with them who vetted those transactions.  It
2   involved the different tax treatment from the other
3   transactions, a different code provision.  It is old.  And,
4   Judge, I think, you know, for the government to say that the
5   similarity is, well, it was a misrepresentation, we're going to
6   say it is illegal, is just unfair.  And, in the end, Judge, I
7   think this is just going to open up a whole new side show on
8   the Sands transaction
9       THE COURT:  I understand that.  All of the defendants
10  argue that.  Believe me, I do.  I'm trying to focus on what the
11  specific facts at issue are, and -- and the tax law here.
12      MS. HOFFINGER:  So far, I have not heard anything
13  about specific facts against Mr. Ruble that would make it --
14  his opinion, illegal or fraudulent.
15      THE COURT:  Okay.
16      MS. HOFFINGER:  Thank you.
17      THE COURT:  Thank you.
18      okay.  Anyone else on defense side on this?
19      All right, Mr. Okula.  Any parting shots on these two?
20      MR. OKULA:  Just very briefly, your Honor.
21      We concede that there was no direct conversation
22  between Grandinetti and Pfaff and Ruble that we can point to.
23  with respect to Ruble's involvement as the opinion letter
24  writer in Sands.  Our position, though, is the following: We

                            Page 17

                    EXHIBIT __A__ PAGE __19__

758WsteC.txt

25    will establish through the testimony of Grandinetti that there
              SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    36

     7580steA
1    was no legitimate business reason for entering into the
2    transaction.  And Grandinetti will also testify that his
3    supposed lawyer in the transaction, the person who has given
4    him his opinion, so he can use it for penalty protection and
5    use it for comfort of engaging in the transaction.  He never
6    spoke to or met Ruble ever.  So it is -- is it a fraud for
7    Ruble to write the opinion letter for this client while getting
8    business purpose from the person who is paying him a side fee.
9    That is our position, your Honor.  And combined with, I think
10   the other proof in the case, where you're going to -- where
11   you're going to see, with respect to --
12            THE COURT:  Upon whom is it a fraud?
13            MR. OKULA:  It is a fraud to IRS.  He is writing an
14   opinion for a transaction for a client and never speaks to the
15   client.  And the proof with respect to Blips and Flip and Opus
16   is going to be substantially similar to that, that he -- he
17   never met and spoke with clients in these transactions, he was
18   just an opinion letter mill in exchange for a fee and -- I
19   think with respect to UMDA, when he is getting a side payment
20   from the promoter of the transaction who is feeding him the
21   business purpose.
22            THE COURT:  But I can surely see that if the
23   government's argument was that there was a mail room wire fraud
24   here because the client was deprived of the honest services of
25   Ruble, in that Ruble was taking money from the counterparty and
              SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    37

     7580steA
1    that that was not disclosed to the client and there was a
2    breach of duty to the client, that is an easy case.  I think
3    that is -- isn't that Bronston?  I mean it is -- certainly fits
4    the mold, anyhow.  But maybe we're being more aggressive than
5    you can be in calling it a fraud on the IRS, no?
6             MR. OKULA:  Well, I think for someone who is writing
7    an opinion for a transaction for a specific client where it is
8    integral for the tax result to occur, to know all of the facets
9    of the transaction, and to never have met or spoken with a
10   client with respect to the transaction, yet taking a $250,000
11   fee and issuing an opinion --
12            THE COURT:  Well, doesn't it depend on what the
13   opinion says?
14            MR. OKULA:  It does.
15            THE COURT:  I mean lawyers write opinions all of the
16   time and say -- say, in essence, we are advised that A, B, C,
17   D, E aren't true.  Based on those assumptions which we have
18   made, no independent basis to verify, our opinion is X.
19            Isn't that perfectly appropriate legal practice?
20            MR. OKULA:  I'm not sure in the context of this case,
21   your Honor, when you're relying on the business purpose from
22   somebody who is paying you an illegal gratuity.  When Roy Hahn
23   is paying him a side fee, and he is not discharging -- he,
24   Ruble, is not discharging his duty about getting to the
25   bottom --
              SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    38

     7580steA

                        Page 18

758WsteC.txt
1      THE COURT:  But the duty, with respect to the -- the
2  duty that is being violated with respect to side payment, it is
3  the lawyer's fiduciary obligation of loyalty to the client,
4  isn't it?
5      MR. OKULA:  It is.  But I think in this situation,
6  your Honor, when you are taking a side fee, certainly there
7  should be some heightened awareness that, well, if somebody is
8  paying me a fee, a separate side fee for this, that is not
9  disclosed to my partners or the client, maybe I should get
10  behind a little bit, the representations that are being made,
11  in order to make this transaction go.
12      THE COURT:  Does the IRS have as a -- I seem to
13  remember maybe the SEC does, but maybe not, rules of practice
14  for people who practice before the Internal Revenue Service?
15      MR. OKULA:  I think there are rules of practice; yes,
16  your Honor.
17      THE COURT:  All right.
18      Now, do those rules address the question of what the
19  level of due diligence required by an attorney giving a tax
20  opinion to a taxpayer is?
21      MR. OKULA:  I can't stand here and say that I am
22  distinctly familiar with all of the provisions that require, or
23  say that you need, to how deeply you need to get into the
24  representations, your Honor.
25      THE COURT:  And what about prohibiting side payments
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                           39

7580steA
1  from conflicted parties?
2      MR. OKULA:  Well, I think there are other provisions
3  that, criminal law, that speak to that more directly,
4  obviously.  But I don't know about --
5      THE COURT:  But then they are not charged here with a
6  scheme to defraud the client.
7      MR. OKULA:  They are not, your Honor.  I'm not
8  familiar with those, your Honor.  I'll be happy to provide --
9  look tonight and provide you with authority in the wake of the
10  hearing.
11      If I may just make one more point with respect to Mr.
12  Scheper's observation that everything with respect to Mr. Pfaff
13  was reported or ultimately reported.  The facts would be, your
14  Honor, that once the IRS started its investigation --
15      THE COURT:  I'm sure you don't have to belabor that.
16  That is obvious.
17      MR. OKULA:  Just one last point, too, on Mr. Pfaff's
18  observation that we're going to have to prove everything with
19  respect to Sherman & Sterling, the United States taxpayer, and
20  everyone else.
21      Our position is quite simple.  If there is one aspect
22  of knowledge, aspect that is critical to the transaction that,
23  if fraudulent, would defeat the tax results, that would solve
24  the transaction.  And we're alleging the presence of Mr. Solas
25  as a pure puppet in the transaction.  That is all you need to
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                           40

7580steA
1  establish to make it fraudulent.  And that is all we would
2  intend to prove.  And I don't think it would create a big side
3  show.
4      THE COURT:  All right.  Thank you.
5      Well, from this model of clarity, let's move into the

                      Page 19

758WsteC.txt

6  Permian Mud.
7        Mr. Okula, I guess will opine on that, too, huh?
8        MR. OKULA:  Our position with respect to the Permian
9  Mud transaction is straightforward.  Carol Worley was
10 counseling a client that wanted to engage in a tax transaction.
11 She learned during her counseling of the client that with
12 respect to this specific tax results that the client was
13 seeking, that Washington National Tax, with respect to the
14 issues that were presented, could not get to a
15 more-likely-than-not opinion.
16       Notwithstanding that, she directed that an opinion be
17 prepared that was essentially a cut and paste from outside
18 lawyers' opinions who ultimately, themselves, refused to sign
19 off on the transaction, and told the client that the tax
20 results they were seeking in the transaction was more likely
21 than not.
22       Now, one thing that may be jumping out to your Honor
23 is that we do have to prove this whole transaction, and is the
24 tax law at place in the transaction critical, and will it
25 create a big side show.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          41

7580steA
1        I think the answer to that is, no, for the simple
2  reason that it is an act of misconduct by Carol Worley to give
3  an opinion in the transaction which he knows Washington
4  National Tax, the person that she says in other paperwork in
5  the case she relies on to give a specific tax advice, because
6  she is not into the particulars of the tax advice.  She
7  testified to that at the suppression hearing.  For her to go
8  forward and to give a more likely than not opinion in a case
9  where Washington National Tax said, as an entity, KPMG could
10 not get there.  And it is also for, keep in mind, that what she
11 did was in order to --
12       THE COURT:  You are overdrawing that a little bit,
13 aren't you, because KPMG's internal structure gave individual
14 partners the authority to give a more-likely-than-not opinion,
15 provided the fee didn't exceed a million dollars.
16       MR. OKULA:  Correct.
17       THE COURT:  So --
18       MR. OKULA:  And she purposely essentially structured
19 the fee in what otherwise would have been a fee that would have
20 warranted and required Washington National's tax review,
21 structured it in such a way to escape Washington National Tax
22 Review.
23       THE COURT:  So I can see that maybe you have a
24 persuasive argument here that she did something that was
25 inappropriate in light of her obligations to KPMG.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          42

7580steA
1        Now, if you just put aside, for the sake of discussion
2  for a minute, the suppression hearing testimony which puts this
3  in a different light, I acknowledge, if it was her honest
4  belief that this was a more-likely-than-not transaction
5  whatever Washington National Tax thought and, if out of loyalty
6  to the client and appropriate professional motives she thought
7  the right thing to do here was to quote a lower fee and give
8  the client the opinion the client needed because, in good
9  faith, she believed Washington National Tax was wrong, the best
10 you have got is an argument that she played it fast and loose

                        Page 20

758WsteC.txt
11  with KPMG rules, right, the very best.
12          MR. OKULA:  I concede that, your Honor.  I concede
13  that.  And this proof, I think separate and apart from some of
14  the other proof which I think should come in in our direct case
15  viewed through the lens of what occurred at the suppression
16  hearing and what we anticipated her position to be at trial,
17  that is that:  I was just a professional in the field that
18  relied for advice on Blips and all of these other transactions
19  on Washington National Tax, that if that is her defense, then
20  this is appropriate rebuttal proof by us that establishes or
21  belies her claim that I just relied on Washington National Tax.
22          THE COURT:  Now, let's suppose that that is her
23  position at trial.  And, on rebuttal, wants to use this.
24  Aren't you going to have to demonstrate some level of
25  comparability between Flips, Opus, SOS, and Blips on the one
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                                43

7580steA
1   hand, and the Permian Mud transaction on the other, in order to
2   make it credible that her disavowal of appropriate level of tax
3   knowledge to form a view as the Blips and so forth, is the
4   substantial equivalent of a disavowal of knowledge with respect
5   to Permian Mud?
6           MR. OKULA:  I think it would help to do that we would
7   be able to do that.  And we will be able to show that there was
8   a precise overlap of issues, the critical issue.  And I
9   apologize, your Honor, that we didn't get into more detail in
10  describing what one of the key tax plays was in Permian Mud.
11  But one of the tax plays -- in fact, one that was the subject
12  of the most debate, was the issue of 752 liabilities.  That
13  is -- is something that is contributed to a partnership.  In
14  this case, the client contributed an asset, had a partnership,
15  and was it a liability for 752 purposes which is the precisely
16  the size issue presented in the Blips transaction.
17          THE COURT:  Okay.  And if that is your view, doesn't
18  it mean that, in fact, you're going to have to prove the whole
19  Permian Mud saga in order to establish the comparability?
20          MR. OKULA:  NO.  I think we would just have to prove
21  that Permian Mud involved that issue that -- and this is from a
22  witness who is already scheduled to testify at trial.  A
23  manager who worked under Mr. Worley who is going to testify
24  that he was aware of the 752 being one of the critical, if not
25  the critical issue that outside lawyers could not get more
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                                44

7580steA
1   likely than not on it, that Washington National Tax could not
2   get more likely than not on it.  He could not get more likely
3   than not on it.  The reviewer of the transaction went looking
4   at it, said that he didn't find the writeup that this witness
5   did at Ms. Worely's urging on the 752 persuasive.  And that's
6   all we have to prove with respect to that issue in the
7   transaction.
8           THE COURT:  Is there a risk of unfair prejudice from
9   proof of this transaction in that the fact, if it be so, that
10  she played fast and loose, vis-a-vis KPMG, something which is
11  not necessarily very probative, if probative at all, of her
12  malefices with respect to Blips, Opus, and so forth.
13          MR. OKULA:  I'm not sure I follow, your Honor.
14          THE COURT:  What really arguably wreaks about this bit
15  of business is that she was misbehaving.  If your proof is what

                            Page 21

758WsteC.txt

16  you say it is, vis a vie KPMG, as much as if not more than
17  that, it tends to establish willfulness with respect to
18  transactions that are really at issue.
19       MR. OKULA:  I think that is right, but I don't think
20  that is unfair prejudice, because what she is doing is going
21  forward.  And this gets back to the issue that we think is most
22  probative on, is sort of rebuttal, is that she is going out
23  there on an issue where everybody is saying, no, we can't get
24  there.  And she is touting herself, or is willing to
25  essentially give an opinion that the whole firm is saying no,
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                45

7580steA
1   that others are saying no, and she wants to bring the fee in.
2   She wants to bring it.  And she does it through subterfuge.
3   Also, I think it is classic 404(b) with respect to -- with
4   respect to her knowledge and intent on the issues.
5        THE COURT:  All right.  Thank you.
6   Mr. Devita.
7        MR. DIVITA:  Thank you, your Honor.
8        Your Honor what Mr. Okula is essentially saying is if
9   Ms. Worley had an honest disagreement on a very highly
10  technical professional matter with the Washington National Tax
11  office, she can be guilty of a crime in this transaction.
12       THE COURT:  No, I thought what he said was exactly the
13  opposite.  I thought what he said was that if there was legally
14  an honest disagreement, that it wasn't the problem here, but
15  the problem here is that she made it perfectly clear from her
16  testimony at the suppression hearing, and in connection with
17  those issues, that she really didn't speak tax to the extent
18  relevant to having an honest opinion on this subject and,
19  therefore, the fact what she circumvented Washington National
20  Tax really demonstrates something corrupt.  I think that is
21  what he said.
22       MR. DIVITA:  Okay.  Well, your Honor, first, she
23  testified that in 1999 -- in 1998, when she was first coming
24  into this area and first pushed into this area by KPMG, she did
25  not have experience and technical knowledge with respect to
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                46

7580steA
1   these highly technical issues of partnership tax law, not that
2   she didn't speak tax.
3        THE COURT:  I was being --
4        MR. DIVITA:  I understand, your Honor.  But it is a
5   very important distinction, because we're now talking three
6   years later after she has been assigned to what is called the
7   innovative strategies section of KPMG.  She has had three years
8   of experience at regular meetings and discussions of these
9   various different technical issues.  And her level of knowledge
10  and level of sophistication in 2002 and 2003 is significantly
11  different.  And that is why the conduct in 2003 is not relevant
12  to her state of mind in 1998 and 1999.
13       Secondly, this is not as -- Mr. Okula is wrong when he
14  says nobody else could get to more likely than not on this
15  transaction, because there were other partners at KPMG
16  expressing the same view as Ms. Worely on this same subject.
17  There were two reviewers of this transaction, one of whom was a
18  former IRS and a former tax division lawyer who, if this
19  transaction was fraudulent, would never have signed off on it.
20  And she did.  This is -- I'm not talking about Mrs. Worely.

                           Page 22

# EXHIBIT A
# Part 2

758WsteC.txt

21    I'm talking about a former IRS and tax division lawyer who
22    reviewed the opinion letter and signed off on it and gave the
23    approval of it. And that is if this was a fraudulent
24    transaction, that would not have occurred. And she still works
25    for KPMG, that reviewer. So, Mr. Okula is simply not accurate
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    47

7580steA
1     when he says that nobody would go along with this.
2              In fact, the government's witness never says in his
3     3500 material that he believed this was a fraudulent
4     transaction. He disagreed on a technical issue. He did not
5     believe, more likely than not, in the -- and disagreed with
6     Ms. Worely on that, but did not say in his 3500 material, that
7     I saw, that it was a fraudulent transaction.
8              The specific -- if your Honor wants, I can get into
9     the technical aspects of this. But your Honor has indicated
10    some interest in that in the other transactions. In this one,
11    it is a very technical issue involving something called a
12    "prepaid variable share forward contract," similar to Delta
13    transaction that was talked about. But it is different. But
14    it does involve a taxpayer, or a company -- in this case,
15    again, it is a corporate as opposed to an individual
16    transaction -- that owns some shares that hedges the risk.
17             THE COURT: I think, on this transaction, it's not as
18    important as it is on the other.
19             MR. DIVITA: Fine. And, your Honor --
20             THE COURT: The government's position on this is very
21    simple.
22             MR. DIVITA: I understand that.
23             The other point, your Honor, is that I think it is
24    very unfair to say that she was deceiving Washington National
25    Tax, that she was somehow -- I mean the rule is that if the fee
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    48

7580steA
1     is under a million dollars, it does not require Washington
2     National Tax approval. It does not mean that anybody that --
3     that every fee has to be set above a million dollars. This was
4     a one-off transaction.
5              THE COURT: Let's be practical. If I were the
6     managing partner of KPMG and somebody quoted a fee of 995 in
7     order to get it under that rule because Washington National Tax
8     wouldn't bless the transaction, that person would probably have
9     a short career.
10             MR. DIVITA: Your Honor, I'm not convinced, as I
11    understand it, that Washington National Tax would not approve
12    an individual transaction of this nature. What Washington
13    National Tax -- and this was what was conveyed to the partners
14    if the field -- would not do, is agree that this transaction
15    could be adopted as a product that National -- that KPMG would
16    offer National. That does not mean that if the individual
17    transaction -- and, in fact, there were conversations with
18    people in Washington National Tax about aspects of this very
19    transaction. This went on for several months. And it was in
20    fact discussed both by the witness and by Ms. Worely with
21    people in Washington National Tax, certain aspects of this. So
22    this wasn't a renegade partner hiding in the wilds of Houston
23    doing something that nobody knew about. It was a transaction.
24    It was entered in their electronic filing system as a
25    transaction that was going to be taking place. It did not

                              Page 23

                    **EXHIBIT** ___A___ **PAGE** _25_

758WsteC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

7580steA
1   get -- the opinion letter did not get filed in a -- in the bank
2   of opinion letters because that would have violated -- that
3   would have destroyed the privilege that they were trying to
4   attach.  If you circulate -- in a COVEL arrangement, you
5   circulate the opinion beyond the people working on the actual
6   opinion, you can blow the privilege that way.  And that was --
7   that is the reason why it wasn't put in the data bank.  It is
8   not as though this was hidden from Washington National Tax,
9   your Honor.  That is just not accurate.
10            THE COURT:  Okay.  Thank you.
11            Let's go on to the quadruple bypass.
12            MR. OKULA:  Your Honor, may I just circle back to one
13  issue that you raised earlier.  And if -- I hate to cover all
14  ground, but I'm reminded by one of my colleagues of a provision
15  in Section 357 of the Code that basically says in Section B
16  that if there was not a bona fide business purpose in the
17  transaction, then 357(c) cannot be applied.  And you can not
18  employ the transaction, so --
19            THE COURT:  So that's the answer.
20            MR. OKULA:  Pardon me?
21            THE COURT:  I take it that is the answer to my
22  question.
23            MR. OKULA:  Yes.
24            THE COURT:  I Actually took that course in law school,
25  I want you to know that.  But I don't remember the first word.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

50

7580steA
1   There is one word I remember from that course.
2             MR. OKULA:  Baseless.
3             THE COURT:  Boot.
4             MR. OKULA:  If I may, your Honor, our position on
5   triple bypass is quite simple.  It was touted by David
6   Greenberg and sold by David Greenberg as a deferral mechanism.
7   And I think in the papers that the parties submitted there was
8   no doubt we're in agreement that it was depicted as a tax
9   deferral mechanism.  And it was pitched to the client who sold
10  and appreciated assets that there were otherwise taxes going to
11  be due.  Taxes were not paid because essentially asset was sent
12  through a series of transactions through a series of entities.
13  And what happened at the end of the day, is the consideration
14  that was received for the sale of the asset was held in an
15  entity and no taxes were paid because there was this promissory
16  note that was outstanding.  And we're in complete agreement
17  that at the expiration period of the note, taxes would be due.
18            Our position on this is quite simple, that this was
19  touted as a deferral.  But, in fact, the way it was employed,
20  the way David Greenberg talked to people about it and attempted
21  to sell it, was as a permanent mechanism to avoid paying taxes.
22  And what he would tell people is we're structuring it as a
23  deferral, but you can just create another note, and then
24  another note, and then another note, and not pay taxes at all
25  at the end of the day.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

51

7580steA
1             (Continued on next page)

Page 24

EXHIBIT __A__ PAGE _26_

758WsteC.txt

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

52

758wste3
1    THE COURT:  Explain to me how that was supposed to
2    work.
3        MR. OKULA:  If you start with the premise that the
4    note, for a stated term, at the end of the period of the note,
5    that the taxes would have to be paid --
6        THE COURT:  When the note is paid?
7        MR. OKULA:  When the note is paid, right.
8        But what Greenberg would talk to people about, and
9    what they would tell people, is that they would just create a
10   replacement note or extend the period of the note or alter the
11   note.
12       THE COURT:  Right.  So what?
13       MR. OKULA:  Well, taxes never get paid then.  At the
14   end, it just keeps going on and on and on.
15       THE COURT:  Look, sooner or later, something happens.
16   I take it that the taxpayer is not directly selling the asset.
17   Right?
18       MR. OKULA:  Right.
19       THE COURT:  The asset is owned by a controlled entity.
20       MR. OKULA:  Correct.
21       THE COURT:  And the controlled entity sells the asset
22   to a third party.
23       MR. OKULA:  Yes.
24       THE COURT:  And gets cash --
25       MR. OKULA:  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53

758wste3
1        THE COURT:  -- presumably.  And the controlled entity
2    gives a note to the taxpayer, right?
3        MR. OKULA:  Correct.
4        THE COURT:  And the taxpayer, through the control of
5    the controlled entity, has certainly a lot to say about what
6    happens to the cash in the interim.  True?

Page 25

758WsteC.txt

```
 7              MR. OKULA:  Yes.
 8              THE COURT:  So suppose the note starts out at six
 9    years and gets extended to 12 years, gets extended to 18 years.
10    You're saying that what they were going to do is just extend
11    the note forever?
12              MR. OKULA:  Yes.  There were discussions along those
13    lines, that you just keep rolling over the note.  In fact, with
14    respect to a witness --
15              THE COURT:  Let me ask you this.  What happens with
16    respect to the estate taxation upon the death of the taxpayer?
17              MR. OKULA:  I think it would pass --
18              THE COURT:  How is the note valued in the estate?
19              MR. OKULA:  I'm not sure, your Honor.
20              THE COURT:  Does it matter?
21              MR. OKULA:  I'm not sure we have to get into that.
22              THE COURT:  I think maybe we have to get into it
23    unless we're prepared to give the taxpayer eternal life.
24              MR. OKULA:  No, but I think what is important is
25    noting, I think, that David Greenberg, when he was selling the
```
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            54

758Wste3
```
 1    transaction, would just tell the people, just keep passing it
 2    along and along and not pay taxes, on the transaction, and so
 3    he's evincing his intent, I think -- I'm sorry if I'm not
 4    answering your question directly, your Honor.
 5              THE COURT:  You're not.  I understand that point.  But
 6    it just doesn't make any sense because everybody knows things
 7    don't go on forever, at least in this life.  So the taxpayer,
 8    sooner or later, is going to die.  And in his estate he's got a
 9    note which I think in this transaction is, what, a hundred and
10    some million dollars?
11              MR. OKULA:  That's correct.
12              THE COURT:  All right.  So certainly it is a matter of
13    relevance to the taxpayer as to what the treatment of the note
14    on death is, don't you think?
15              MR. OKULA:  Yes.
16              THE COURT:  So what is the treatment?
17              MR. OKULA:  I'm not sure, your Honor.  But --
18              THE COURT:  Now, aren't there circumstances that occur
19    all the time where, without any fraud, without any shenanigans,
20    people have assets, appreciated assets, where as long as they
21    don't sell or otherwise realize on the asset during life, they
22    die, the asset is then valued in the estate, estate tax is
23    paid, to the extent it's payable, and there's a step-up in the
24    basis of the appreciated asset and there's no capital gain ever
25    paid.  Right?
```
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            55

758Wste3
```
 1              MR. OKULA:  I think there are circumstances where that
 2    occurs, yes, your Honor.
 3              THE COURT:  Like any time anybody buys a house.
 4              MR. OKULA:  That's correct.  One of the fraudulent
 5    aspects of this transaction, though, what David Greenberg would
 6    tell to the people, is that you can use, and he knew that the
 7    taxpayer that he sold this transaction to, the California real
 8    estate investor who sold his business, that you can simply
 9    control and use the assets without recognizing the tax
10    liability.
11              THE COURT:  But you've got to be a little bit more
```

Page 26

EXHIBIT ___A___ PAGE 28

758WsteC.txt
```
12   critical, I think, of what that means in the context of the
13   transaction.  If the taxpayer is the decision maker for the
14   entity, surely he controls the assets.  Right?
15            MR. OKULA:  That's correct.
16            THE COURT:  Nothing wrong with that, right?
17            MR. OKULA:  That's correct.
18            THE COURT:  He can control it for the whole six years,
19   even if the note gets paid in year 6, but he's not paying tax.
20            MR. OKULA:  That's correct, but if he employs some of
21   the assets, some of the consideration that is received during
22   the existence of the note, tax is supposed to be recognized
23   during that period of time.
24            THE COURT:  Define "employs."
25            MR. OKULA:  If he uses for personal purposes.
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                               56

     758wste3
```
1            THE COURT:  Yes.
2            MR. OKULA:  Takes it out of the entity that he
3    controls, using it for personal purposes to pay living
4    expenses.
5            THE COURT:  If he takes it out of the entity.
6            MR. OKULA:  Yes.
7            THE COURT:  Isn't that a partial repayment of the
8    note?
9            MR. OKULA:  No.
10           THE COURT:  Why not?
11           MR. OKULA:  Because the note is structured in such a
12   way that the note payments have to be made to the entity.
13   Taking the money, the cash, out is not a repayment of the note.
14           THE COURT:  The note is from the taxpayer to the
15   entity?
16           MR. OKULA:  Yes.
17           THE COURT:  I thought the taxpayer sold assets to the
18   entity in exchange for a note, a note of the entity payable to
19   the taxpayer.
20           MR. OKULA:  I'm not sure that that's the way it goes,
21   your Honor.  I think that there is the existence of the note
22   which has to be repaid at the end, but taking the assets,
23   taking the appreciated assets, the cash, out of the entity
24   doesn't serve to repay the note.  That's a fundamental point.
25           THE COURT:  Don't we at least have to agree on who the
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                               57

     758wste3
```
1    maker and who the payee of the note is before we can even
2    approach that question?
3            MR. OKULA:  Yes, your Honor.
4            THE COURT:  And we don't know?  Is that what you're
5    telling me?
6            MR. OKULA:  I think your Honor had it right when your
7    Honor said, I think I misspoke with respect to the maker and
8    the payee.
9            THE COURT:  Okay.  So the entity, XYZ company, has a
10   note payable to the taxpayer for X million dollars, $120
11   million.  Now, certainly for the six years, I take it the
12   government agrees that if the intention all along was the note
13   gets paid in year 6, there is no problem, right?
14           MR. OKULA:  Correct.
15           THE COURT:  Okay.  Now, within that six-year period,
16   on that assumption, the taxpayer totally controls the money
```
                            Page 27

                    EXHIBIT ___A___ PAGE __29__

758WsteC.txt

17  because he controls the entity that has possession of the cash,
18  doesn't affect the tax treatment, right?
19           MR. OKULA:  That is correct.
20           THE COURT:  Now, within the six years, the taxpayer
21  decides he wants $10 million to buy a small apartment in
22  Manhattan.  And he wants to take the $10 million out.  Now, if
23  he simply writes a check on the entity, either to himself or
24  for his own benefit, to whoever is selling the condo, he's got
25  to have some kind of accounting treatment and tax treatment for
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    58

758wste3

1   that $10 million payment, right?
2            MR. OKULA:  Yes.
3            THE COURT:  All right.  Now, one way it can be done is
4   it can be a partial repayment of the note, right?
5            MR. OKULA:  I don't think so, your Honor.
6            THE COURT:  Why not?  If the entity owes him $120
7   million and pays him 10 million, why isn't one possible way to
8   do it to say the entity now owes him $110 million?  Maybe that
9   note's been hypothecated or something.  I don't know, but --
10           MR. OKULA:  I think that that's the answer, that it
11  has been hypothecated, but I know that -- well --
12           THE COURT:  I didn't see that in your discussion of
13  the transaction.
14           MR. OKULA:  No.  And I know that we did not get into a
15  lot of the particulars of all the different layers involved in
16  the transaction.  But it's my understanding, your Honor, that
17  any time the money is taken out from the entity that controls
18  the cash, and I can't give you the precise provision of the
19  loan agreement or the rationale why it's so, but it says so in
20  the opinion letter, and it says so in the documents that are
21  given to the taxpayer going forward entering into the
22  transaction, that if you take money out, beforehand, and you
23  get control of that money, it's a taxable event to you, before
24  the expiration of the period of the note.
25           THE COURT:  Regardless of how it comes out?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    59

758wste3

1            MR. OKULA:  Correct.
2            THE COURT:  If that's what it says in the opinion
3   letter, do we have a view as to whether it's right?
4            MR. OKULA:  I think we have to deal with whether it's
5   right, yes, your Honor.
6            THE COURT:  Is it right?
7            MR. OKULA:  I think it is right, what it says in the
8   opinion letter, that when the money comes out, it is a taxable
9   event to you.  And I don't think there's any disagreement that
10  if money in the entity that gets the cash upon the sale of the
11  appreciated asset goes to the taxpayer before the expiration of
12  the event is a taxable event to the taxpayer.
13           THE COURT:  Suppose the entity loans the 10 million to
14  the taxpayer?
15           MR. OKULA:  Well, I think if it's surrounded by
16  appropriate documentation indicating that it's a true bona fide
17  loan.
18           THE COURT:  He pledges his first born.
19           MR. OKULA:  I think if there's a bona fide, legitimate
20  loan.
21           THE COURT:  Maybe it's not a taxable event.

                             Page 28

758WsteC.txt
22       MR. OKULA:  Correct.  But it depends on how it's done,
23  and what is said to the taxpayer, and if it's the case, as I
24  believe it to be so, that if it's not a loan but you're simply
25  taking the money out to use it for your own purposes, personal
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                60
758Wste3
1   living purposes as this client of David Greenberg did, then
2   it's a taxable event.  And there was no --
3        THE COURT:  And presumably it's a taxable event to the
4   extent of whatever fraction of the $123 million the money
5   coming out bears to the total, right?
6        MR. OKULA:  Yes.
7        THE COURT:  So you don't lose the whole tax deferral;
8   you lose some proportion of it?
9        MR. OKULA:  That's correct.
10       THE COURT:  All right.  Now, that's what I would have
11  expected.  Now, if that's the case where everybody agrees it's
12  going to be paid in year 6, what's the problem if it goes to a
13  renewal note or an extension of the note?
14       MR. OKULA:  I think if you keep extending and
15  extending and extending and never intend to pay the taxes on
16  it, and it keeps going forward, then that's improper.
17       THE COURT:  Why?  What if you have a house that you
18  bought for half a million dollars and it's now worth two and a
19  half million dollars and you just keep not selling it, because
20  you don't want to pay the capital gains tax and you'd rather
21  the kids get it with a stepped-up basis when you go to the
22  great beyond.  Fraud?
23       MR. OKULA:  No.
24       THE COURT:  I didn't think so, at least I hope not.
25       If you're having this much trouble answering this
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                61
758Wste3
1   question to me in this hearing, what are we going to do with a
2   jury?  I'm really dead serious about that.
3        MR. OKULA:  I understand, your Honor.  I understand.
4   But our essential position is if it's pitched as a deferral and
5   if you understand implicit in the tax treatment is that you
6   cannot make personal use of the funds, David Greenberg tells
7   people you can make personal use of the funds, they make
8   personal use of the funds, do not pay taxes on it, if it's
9   pitched as a deferral, and he tells them don't worry about
10  taxes, they'll never have to be paid on this transaction, when
11  everybody knows that if it's a deferral, taxes have to be paid
12  on the transaction, then it's our position that that's fraud.
13       THE COURT:  What is the fraud exactly?
14       MR. OKULA:  Because they're making personal use of the
15  funds that are in the entity without recognizing that as
16  income.
17       THE COURT:  So you're saying the opinion letter says
18  that if you take money out, it's a taxable event to you, the
19  taxpayer, and that taxpayers are taking money out and making
20  personal use without declaring the income?  Is that what you're
21  saying?
22       MR. OKULA:  Yes.
23       THE COURT:  And maybe that is a fraud, but maybe it's
24  a fraud by the taxpayer, huh?
25       MR. OKULA:  Or as one urged by David Greenberg or
                SOUTHERN DISTRICT REPORTERS, P.C.

                       Page 29

EXHIBIT __A__ PAGE _31_

758WsteC.txt
(212) 805-0300

62

758Wste3

1  discussed with David Greenberg as a mechanism that they could
2  employ in this deferral shelter.
3           THE COURT:  So is it your position that there's really
4  nothing wrong with the shelter, the problem is that Greenberg
5  is urging that the taxpayers not report income which, under the
6  terms of the opinion letter, which presumably he procured, it
7  had to be reported and tax paid?
8           MR. OKULA:  Correct.
9           THE COURT:  And what's the evidence of that?
10          MR. OKULA:  That one of the taxpayers who discussed it
11  with David Greenberg, who was pitched this deferral tax
12  shelter, and who David Greenberg later sold an SOS tax shelter,
13  discussed the fact that money was coming out to pay this
14  person's personal living expenses, and David Greenberg then
15  referred him to use as an accountant the same accountant that
16  he and Mr. Goddard employed in preparing the tax returns for
17  the SOS tax shelters, and he knew that money was being used for
18  personal purposes and not reported.
19          THE COURT:  This is really not what your brief says,
20  unless I missed something.  I understood your brief to argue
21  that there was a fraud here because Greenberg told the clients
22  that the notes could be extended repeatedly through the
23  client's death and then it would pass to the heirs and the gain
24  would not be subject to income tax.
25          MR. OKULA:  That is part of it, yes, your Honor.
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

63

758Wste3

1           THE COURT:  Is it fraudulent to say the note could be
2  extended?
3           MR. OKULA:  I think it could be extended only for the
4  stated period at the beginning, that is set at the beginning of
5  the transaction.
6           THE COURT:  Why?
7           MR. OKULA:  It's my understanding that the tax
8  treatment relative to that required that, your Honor.
9           THE COURT:  Where does that come from?
10          MR. OKULA:  From my understanding of the documents and
11  the way that this was pitched and portrayed.
12          THE COURT:  Look, the tax consequences don't follow
13  from the way it was pitched and portrayed.  They follow from
14  the documents in the Internal Revenue Code.
15          MR. OKULA:  I understand that.
16          THE COURT:  I don't get it.
17          MR. OKULA:  Perhaps we could make a supplemental
18  submission on this, your Honor.
19          THE COURT:  I think you're going to have to.
20          Let me hear the defendants' side, because it should be
21  a lot more enlightening.
22          MR. CASSMAN:  Ted Cassman, appearing on behalf of
23  Mr. Ritchie.
24          One of the salient points that I think marks the
25  discussion that I just heard between the government and the
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

64

758Wste3

1  Court is that while they're talking about a triple bypass
2  transaction, they never once talked about the transaction that

Page 30

EXHIBIT ___A___ PAGE 32

758WsteC.txt

 3   Mr. Ritchie and his employer participated in. And they haven't
 4   described it to the Court. And, in fact, in their papers when
 5   they discussed this transaction, they discussed one that
 6   involves a living taxpayer, as the Court was discussing. That
 7   didn't exist in the Delta reorganization that we've submitted
 8   to the Court. And the fact of the matter is, the reason is
 9   this. Each of these transactions was a uniquely designed
10   transaction for individuals, by Mr. Greenberg and KPMG. You
11   heard no evidence, by the way, of how it was pitched to Mr.
12   Ritchie.
13           THE COURT: Is this Delta reorganization, is that not
14   the same thing as the Global Crossing transaction? Or is it
15   the same thing?
16           MR. CASSMAN: That is the Global Crossing transaction,
17   related transaction.
18           THE COURT: I thought so.
19           MR. CASSMAN: The government calls it a triple bypass,
20   and then they tried to, in their papers, through the back door,
21   bring in yet another transaction under 404(b), which they
22   didn't move to admit into evidence, and they talk about witness
23   No. 1, Mr. Sands, and his transaction. His transaction was
24   designed by Mr. Greenberg, apparently, and was a separate
25   transaction involving a live taxpayer.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              65

758Wste3

 1           In our case, we do have a redemption note between two
 2   entities, Delta One, and Pacific Capital Group. It was a real
 3   redemption note, a real loan. It acted like a loan, it walked
 4   like a loan, it was a loan. It was $138 million redemption
 5   note. It was properly documented on both the companies' books.
 6   It was carried on the books, it required that interest be
 7   EITHER paid annually or accrued annually, and in 2002 and 2003,
 8   Delta made the decision to accrue it annually.
 9           In December 2004, Delta One made a decision to make a
10   payment on the loan. It made a $104 million payment on the
11   loan. $80 million was principal, 24 million was interest. It
12   was reflected on both the books, and Pacific Capital Group
13   recognized the income on its books and paid a portion of it in
14   taxes. It was able to also write it off against other gains.
15           The important thing here, your Honor, is this, that
16   everything that Mr. Okula has said to the Court is a
17   hypothesis. It's his gloss on the evidence. It's not reality
18   based in the facts of the transaction that occurred.
19           They say that they intend to establish this
20   transaction with one hour of testimony, less than an hour of
21   testimony, and they said they're going to do it based on
22   statements, but the statements don't bear it out. They will be
23   intensely litigated. There will be extensive argument and
24   presentation of evidence on this matter. But the important
25   point is this: They cannot establish any invalidity to this
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              66

758Wste3

 1   transaction without the facts. And the facts are as I've
 2   described them to the Court, very simple and straightforward on
 3   that level. It was a loan, it was repaid, and income was
 4   recognized on the company's tax returns.
 5           THE COURT: I don't know if it was your brief or
 6   someone else's, but someone sought to defend, I believe, this
 7   transaction, by saying that it accomplished a series of

                          Page 31

758WsteC.txt

8   business purposes.  The first was that it locked in some
9   appreciation on the Global Crossing stock.  Secondly, that the
10  taxpayer obtained immediate liquidity.  Thirdly, there was a
11  retention of some of the upside.  Fourthly, Unified was
12  permitted to pay down some debt, and there was a risk in that
13  the transaction might have to be closed if Global Crossing were
14  delisted, which I suspect may have happened.  Right?
15           MR. CASSMAN:  That's correct.
16           THE COURT:  Explain to me what the upside was for the
17  taxpayer in this transaction.
18           MR. CASSMAN:  At the time this transaction was entered
19  into there was limited upside.
20           THE COURT:  Which means zero.
21           MR. CASSMAN:  Perhaps.
22           THE COURT:  I'm sorry.  It's not perhaps.  It's either
23  yes or no.
24           MR. CASSMAN:  It was November 2001.  It didn't look
25  good.  It was clear, in everybody's minds, that there was real
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              67

758Wste3
1   problems for Global Crossing.  It went bankrupt January 2002.
2           THE COURT:  Suppose they had discovered commercially
3   feasible nuclear fusion that month.  How in the structure of
4   this transaction was there an upside?
5           MR. CASSMAN:  The upside was this.  If Global Crossing
6   recovered, it was admittedly a patient on a potential death
7   bed, but if it recovered and if the value of stock exceeded
8   that in the VSF contract, if that occurred, there was a
9   potential upside.
10          THE COURT:  Yes.  You've just told me again that there
11  was an upside, and the question was how.
12          MR. CASSMAN:  If the value of Global Crossing stock
13  exceeded the value of the variable share forward contract,
14  there was an upside.
15          THE COURT:  Now, under the variable share forward
16  contract, Global was required to buy the stock three years
17  hence at $15 a share, correct?
18          MR. CASSMAN:  Correct.
19          THE COURT:  If the stock went up to 170, you think
20  Global would have done it?
21          MR. CASSMAN:  Correct.
22          THE COURT:  What sense does what you're saying make?
23          MR. CASSMAN:  Oh, I see the Court's point.  Oh.  The
24  potential upside was this, that, where there's five more
25  million shares, your Honor, that are still owned by the
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              68

758Wste3
1   taxpayer at that point, that are unencumbered.
2           THE COURT:  Which wasn't a part of this at all, right?
3           MR. CASSMAN:  It was --
4           THE COURT:  At the beginning.
5           MR. CASSMAN:  At the beginning, that's correct.
6           THE COURT:  So there was no upside in the transaction
7   as it started out.
8           MR. CASSMAN:  With the variable share forward
9   contract.
10          THE COURT:  Right.
11          MR. CASSMAN:  Right.
12          THE COURT:  And everything else that was said in

                     Page 32

EXHIBIT ___A___ PAGE _34_

758WsteC.txt

13  defense of the transaction as it started out was easily
14  achieved by selling the stock. Right? If you simply went out
15  and sold the stock, the appreciation is locked in, the
16  liquidity happens, there's no upside either way, and the money
17  was available to allow Unified to pay down debt.
18          MR. CASSMAN:  And its tax liability is immediately
19  recognized, correct.
20          THE COURT:  Right. So the only reason to do this as
21  it started out was to avoid the tax liability.
22          MR. CASSMAN:  With the Delta One transactions.
23          THE COURT:  Yes.
24          MR. CASSMAN:  There's a second reason, and that's
25  asset protection.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            69

758Wste3
1           THE COURT:  Asset protection, meaning what?
2           MR. CASSMAN:  Yes, sir. Meaning that it was
3   anticipatable that there would be claims made against PCG, and
4   this was an effort to protect those assets.
5           THE COURT:  PCG being?
6           MR. CASSMAN:  Pacific Capital. It's actually the
7   taxpayer.
8           THE COURT:  Right, the winning entity.
9           MR. CASSMAN:  That's correct.
10          THE COURT:  So there was a tax motive and a fraud on
11  creditors' motive, basically.
12          MR. CASSMAN:  That's not correct, your Honor. And
13  this transaction was fully vetted by attorneys both beforehand
14  and afterwards during the bankruptcy.
15          THE COURT:  I've held a couple of those unlawful up to
16  now, under fraudulent conveyance law.
17          MR. CASSMAN:  With regards to the Global Crossing
18  case?
19          THE COURT:  Not speaking of Global Crossing.
20          MR. CASSMAN:  I'm talking about this transaction, your
21  Honor. It was fully vetted.
22          THE COURT:  What I'm saying to you is lots of
23  transactions that have been fully vetted have been held to have
24  been fraudulent conveyances.
25          MR. CASSMAN:  It was fully vetted both beforehand and
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            70

758Wste3
1   afterhand, in the context of bankruptcy, and there was no
2   allegation by anyone that this was a fraudulent conveyance.
3           THE COURT:  All right. Anything else on this?
4           MR. CASSMAN:  No. I don't believe so.
5           THE COURT:  All right. Yes.
6           MR. DeVITA:  Your Honor, just one point of difference,
7   so your Honor is not left with a misimpression with respect to
8   the Permian Mud variable forward contract.
9           There was, in fact, both an upside and a, it was a
10  transaction that where the upside, the purchase price would be,
11  that the taxpayer retained part of the ability to share in the
12  appreciation before the end of the contract and also a small
13  part of the risk, but it limited the range.
14          THE COURT:  There was a contract.
15          MR. DeVITA:  A form of contract.
16          THE COURT:  I don't think a variable share forward
17  contract is a dirty word, necessarily.

                            Page 33

758WsteC.txt
18          Anybody else on this?
19          Okay.  Let me go back over my notes.
20          It's perfectly clear to me on the basis of what I have
21   up to now I can't even begin to express an intelligent opinion
22   about the so-called triple bypass because I don't know what the
23   proof the government wants to offer is, and I don't really know
24   why the government thinks that whatever that proof might be
25   establishes that anybody did anything wrong, let alone anything
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    71

     758Wste3
1    wrong that's relevant to this case.
2          Now, with respect to Permian Mud, I think I'm more or
3    less in the same place, although the facts are obviously a lot
4    simpler.  And I think the same is true for the Somer Leasing
5    transaction and, to a very limited extent, the UMDA
6    transaction.  So I'm going to give you all a chance to have at
7    this again.  I want to know exactly what the evidence is the
8    government relies on.  I want to see the documents.  And I want
9    the ABC of the tax law on it.  This doesn't make any sense to
10   me without that.
11          Two weeks enough time, Mr. Okula?
12          MR. OKULA:  Yes, your Honor.
13          THE COURT:  All right.  Then the defense will have two
14   weeks after that.  And we'll go back to square 1 on all of it.
15          In the last analysis, Mr. Okula, I think that I'm
16   bending over backwards to give the government a full
17   opportunity to make this clear, but it's the government's
18   burden, and at the end of the day, if it's not clear, you're
19   not going to get it in.
20          MR. OKULA:  I understand that fully, your Honor.
21          THE COURT:  Okay.  All right.  Now I'll hear whatever
22   anybody wants to say on the remaining issues, the personal tax
23   evasion and the side fee issues.  We'll start with the
24   government.
25          MR. OKULA:  Starting first with defendant Ruble, your
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    72

     758Wste3
1    Honor, he is charged with receiving side fees for a number of
2    years.  There is substantial proof that in the years '96 and
3    '97, just like in the years '98, '99, 2000, 2001, he received
4    secret payments from tax shelter promoters.  He did not report
5    them on his tax returns, at all, for the '96 to '97 years, and
6    they were not, they were hidden in the evasion that he carried
7    out from his partners at Brown & Wood, effectuating the evasion
8    scheme.  And I think that unless Mr. Ruble unequivocally
9    consents or indicates that intent and knowledge are not an
10   issue with respect to the willfulness element for the charged
11   years, then his proof of the unreported fees received during
12   those years, I think, speaks volumes about what his intent was
13   in the charged years.
14          The issue in the form of proof, your Honor, two
15   witnesses who are already slated to testify, we'll just produce
16   the additional proof with respect to the payments that went to
17   Mr. Ruble during the '96 and '97 years, those were categorized
18   by the entities as consultancy fees to him, and there were no
19   tax-reporting documents that were issued to him.  Some of the
20   payments that were made by the tax shelter boutique in New York
21   did not issue tax-reporting documents because the head of the
22   tax shelter boutique directed his controller not to issue 1099s

                            Page 34

758WsteC.txt
23    to Mr. Ruble, and we're going to be able to establish that this
24    person was a close confidant and friend of Mr. Ruble.  So I
25    think it's highly relevant to the issue of knowledge and intent
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

73

758Wste3
1     for the charged years where he's charged with failing to report
2     fee income.
3               THE COURT:  Okay.  Move on, because we have about
4     another 20 minutes or so, for everybody.
5               MR. OKULA:  With respect to Mr. Greenberg, the proof
6     is very straightforward, your Honor, that he did not report
7     tens of millions of dollars of income that he made pursuant to
8     the fee-splitting arrangement with Mr. Goddard.  It never hit
9     his personal returns.  We can present that proof in a
10    streamlined fashion in a significant measure by the documents
11    that he submitted in connection with the bail hearing, where he
12    acknowledged that this money --
13              THE COURT:  If that's a streamlined fashion, you're in
14    trouble.
15              MR. OKULA:  I agree.  It was not a streamlined bail
16    hearing, but I'm referring your Honor to a written analysis
17    that was presented to the Court by his accountant acknowledging
18    essentially his receipt for the garnering of those fees with
19    Mr. Goddard during the years.  Initially, Mr. Acosta will
20    testify with respect to the receipt of fees during those years
21    also.
22              There's also the very straightforward proof with
23    respect to how he did not report accurately his income from
24    Deloitte & Touche and KPMG in two years where he essentially
25    put nominee on his return and did not recognize it on his own
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

74

758Wste3
1     income tax return.  You can't assign your income.  I know that
2     principle of law, your Honor, and that's essentially what he
3     did.  He did not recognize it for two years on his return, and
4     for two other years when he got K1s from KPMG noting over $1.5
5     million in income, he essentially created phony losses that he
6     put on the return to offset the taxability of the income.  It's
7     very straightforward.  It speaks volumes about his knowledge
8     and intent, and I think it's highly relevant.
9               With respect to Mr. Hasting, your Honor, I want to
10    correct something we said in the brief with respect to evasion.
11    I think it could be more accurately categorized as a false
12    return, rather than evasion.  There was no tax due and owing,
13    we concede that point, as a result of how it was depicted or
14    reported to the IRS.  But this is what we'd be able to prove
15    with respect to Mr. Hasting.
16              Mr. Hasting was referring clients to a tax shelter
17    boutique called Gramercy.  Mr. Hasting himself engaged in a tax
18    shelter transaction with Gramercy and had an entity that he
19    created in order to effectuate that transaction with Gramercy.
20    Because Mr. Hasting referred clients to Gramercy, the principal
21    of Gramercy essentially gave a $75,000 thank you to
22    Mr. Hasting.  That $75,000 should have been reported as fee
23    income on Mr. Hasting's 1040; it was not.  Instead, and
24    Mr. Hasting knew this at the time, he knew it during 2002,
25    because he had discussions with the principals of Gramercy at
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

                                Page 35

EXHIBIT ___A___ PAGE 37

758WsteC.txt

75

758Wste3
1  the time, he knew that it was not going to be reported to him
2  in an individual way, and that in fact it was going to be
3  buried in the K1 that Gramercy issued to him in connection with
4  his own transaction.  So it's a false reporting issue with
5  respect to Mr. Hasting.  Very straightforward.  He should have
6  reported his kickback.  He didn't, by the way, report it to his
7  partners at KPMG, which he should have, which is one of the
8  methods by which he concealed it and carried out his false
9  depiction on his return.
10          I think that completes the personal evasion, except
11 with respect to Mr. Pfaff, your Honor.  We will be able to
12 prove, your Honor, through Mr. Romero Salas, through
13 Mr. Grandinetti, and through Mr. Moisen that between 1996 and
14 19 -- well, it was a little bit earlier.  In fact, it started
15 around '94, '95, but continuing to the year 2000, that
16 Mr. Pfaff received over $2.5 million in unreported fees, much
17 of which he hid from his partners at KPMG, did not report to
18 them, and it was paid to Mr. Pfaff as a result of tax shelter
19 transactions that he, Moisen, and others set up.  It was
20 filtered to him through Mr. Salas in the Philippines, that is
21 when the transactions, which were largely domestic, there were
22 some that occurred off-shore, but these largely domestic tax
23 shelter transactions would result in a payment to the promoters
24 which was sent to Mr. Romero Salas in the Philippines.  Then
25 Mr. Romero Salas, upon request by Mr. Pfaff and Moisen and
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

76

758Wste3
1  Grandinetti, would distribute the fees to the promoters,
2  including Mr. Pfaff.
3          Mr. Pfaff did not report it contemporaneously.  It was
4  used for all of his personal purposes, to buy houses, to buy
5  cars, and he attempted to paper over his receipt of the fees
6  when the IRS investigations start.  That is, he went to
7  Mr. Grandinetti, and he got together with Mr. Salas too, really
8  through Grandinetti, and they create a series of phony loan
9  documents to make it appear as if the money that he had
10 previously received as fees and which was not reported on his
11 returns was part of a lending relationship.
12         There's also coconspirator statements that we intend
13 to elicit that Mr. Pfaff told people during these years, that
14 if the IRS ever came knocking at his door, what he was going to
15 do was reach down, pull out the note and say it's not income to
16 me, it's just all part of a big lending relationship.  And
17 Mr. Salas, Mr. Grandinetti, and Mr. Moisen will all testify
18 that they received significant amounts of income from this
19 agreement that they had with Pfaff, and we'll be able to prove
20 that Mr. Pfaff got the same thing also.
21         In fact, the proof with respect to Mr. Pfaff, he's not
22 contesting the fact that he received all this income, or
23 received all this money.  What he's contesting and what will be
24 the sole dispute, I think, with respect to his receipt of the
25 fees is, was it income or was it a loan.  And the witnesses
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

77

758Wste3
1  will say it was demonstrably not a loan.
2          Unless the Court has any additional questions, we'll
3  rest on our papers.

                         Page 36

EXHIBIT ___A___ PAGE 38

758WsteC.txt

```
 4          THE COURT:  Thank you.
 5          Defendants.
 6          MR. PITOFSKY:  I'll try to be brief.
 7          First of all, I would assume that if the Court permits
 8   further briefing on these topics from the government, it will
 9   make a similar request that the government explain exactly what
10   provisions of the tax code prohibit the treatment that
11   Mr. Greenberg and the others gave to their personal returns.
12   There are assertions made that it's unlawful, but, again,
13   there's no clear statement by the government about what makes
14   it unlawful.  So it's hard to join issue with them on whether
15   this was lawful or not.
16          My second point, and I know the Court doesn't want to
17   get --
18          THE COURT:  I suspect in this case it deals with
19   Section 61 of the code.
20          MR. PITOFSKY:  Well, we'd like some clarification on
21   it so we can join issue with it.  I know the Court.
22          THE COURT:  Is that right, Mr. Okula?
23          MR. OKULA:  Yes, it is, your Honor.
24          MR. PITOFSKY:  I know the Court doesn't want to get
25   into the case law too much, and I won't, but having looked at
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

78

758Wste3

```
 1   the cases about the admissibility of a failure to file or
 2   underreporting of personal returns as 404(b) evidence, what we
 3   see is cases in which taxpayers are on trial for that kind of
 4   violation, they're charged with failing to report or failing to
 5   file.  They make some defense in the nature of it was a
 6   mistake, it was an accident, it was inadvertent, and then the
 7   prior failure to file is admitted to show or at least to give
 8   the inference that that's not really right, that you can
 9   conclude that this was a pattern and not just a mistake.
10          The problem in this case is the government's
11   articulated no reason, and it's elicited no cases to justify
12   why the personal tax evasion would be admissible in this
13   complicated tax shelter case.
14          THE COURT:  Because if somebody's chiseling on his own
15   returns, it makes it marginally more likely that he's chiseling
16   on somebody else's.  It's not that hard, Mr. Pitofsky.
17          MR. PITOFSKY:  I think that starts to lean just toward
18   propensity evidence.  The cases are fairly clear.
19          THE COURT:  It tends to suggest chiseling in the sense
20   of willfully doing it, intending to do it.
21          MR. PITOFSKY:  I understand.  But, again, it seems to
22   smack of propensity to cheat one's taxes.  The cases are fairly
23   clear that that's not enough.  There's no case that stands for
24   that broad proposition.  In fact, the cases the government
25   cites require that there be some sort of clear connection
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

79

758Wste3

```
 1   between the two, or at least some logical connection so some
 2   issue that the jury is trying to decide in the present case is
 3   illustrated or helped by the prior tax evasion.  And we see
 4   nothing other than an appeal to you can believe that
 5   Mr. Greenberg willfully engaged in this conduct because he has
 6   a pattern of being a tax scofflaw.  That seems to be the
 7   argument, and that just seems to be propensity evidence and
 8   doesn't seem to be supported by the cases.
```

Page 37

758WsteC.txt
```
 9              THE COURT:  Thank you.
10              Mr. Wing.
11              MR. WING:  Judge, I represent Larry Delap.
12              Mr. Delap is opposing an introduction of all of the
13    404(b) evidence against everybody, for a couple of reasons.
14    The first one is that none of the conduct that's alleged in any
15    of these 404(b) applications is conduct that he was involved in
16    or even knew about.  I think the same is true of nine of the
17    other codefendants in this case.  And the fact of the matter is
18    that even though the government is arguing here today as
19    404(b), they're also saying that most of this is part of
20    evidence, part of the general conspiracy, part of res gestae,
21    part of background, so there may be a fight at trial as to
22    whether we get a limiting instruction.  But a limiting
23    instruction is simply not going to do it.
24              In the reply brief, the government cited Wright & K.
25    Graham Federal Practice and Procedure, citing Oshatz for the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                  80

758Wste3
```
 1    proposition, and I quote, "that three prior tax scams are
 2    enough to show the unlikelihood that the defendant had entered
 3    into the charged one innocently."
 4              Well, we have more than three here.  We have four that
 5    are charged in the indictment.  Actually, I think we have more
 6    than four because my understanding is SOS is not just one, it's
 7    many.  And the big problem that every single defense lawyer has
 8    in this case, whether they're charged with 404(b) or not, is
 9    that in this six-, to eight-month trial, how is a jury going to
10    be able to somehow comprehend, retain, understand, and have in
11    their heads at the time they deliberate the evidence about each
12    one of these 18 individuals?  It's a monumental task for the
13    lawyers who have been spending years on this case to understand
14    these facts.
15              The Court, I think, in the colloquy with Mr. Okula,
16    made it clear to everybody that these are complicated
17    transactions and that it isn't easy to understand, and to add
18    in one more thing simply exacerbates what's already an
19    extraordinary problem for every defendant in this case, if they
20    expect to get a fair verdict from a competent jury.  And we
21    want the jurors to be able to understand the facts here.
22              I wasn't in the case in the beginning.  It's my
23    understanding that when the first indictment came down, your
24    Honor advised the government that if they were going to
25    supersede, they should do it by a certain date and that would
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                  81

758Wste3
```
 1    be it.  I see all this 404(b) stuff as getting around that
 2    request of the Court, if not order of the Court.  It's all
 3    these other crimes, many crimes, many people charged, and the
 4    prejudice is substantial to everybody.  It's particularly
 5    substantial to the people who had nothing to do with this, and
 6    there are many defendants in this case in that particular
 7    position.
 8              So what I would ask the Court to take what I think is
 9    a fair and absolutely simple route here and deny the
10    government's motion across the board.  Thanks.
11              THE COURT:  Thank you.
12              MR. SCHEPER:  David Scheper for Robert Pfaff.
13              Your Honor, very briefly, when we next write, the
```
                                Page 38

758WsteC.txt
14  government's going to write something in a couple of weeks and
15  then we'll have a couple weeks thereafter.  I guess what I
16  wanted to seek leave from the Court, I heard Mr. Okula a few
17  moments ago seem to retreat from what he had said earlier about
18  Scandia and we're not going to involve the Scandia entity
19  because when he outlined what he anticipates --
20          THE COURT:  He could prove the in limine motion
21  insofar as it related to the Scandia evidence.
22          MR. SCHEPER:  I think from his utterances of a few
23  moments ago, what I'm left with is there's going to be a side
24  fee allegation from Somer Leasing, maybe from Sands, but then
25  he talked about numbers of other what he called fraudulent tax
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              82
       758Wste3
 1  shelters that add up to a certain amount and that he says were
 2  reported untimely and only as a reaction to an IRS
 3  investigation.
 4          I'll deal with what I think is an incorrect spin on
 5  the facts about a reaction to an IRS investigation, but I do
 6  appreciate Mr. Okula outlined it pretty clearly here, so I
 7  don't think so I need him to write anything in a couple of
 8  weeks.  What troubles me though is I don't know what these
 9  other transactions are about, and it's going to be very
10  difficult to address in the 404(b) setting what kinds of proofs
11  there are going to be about other unnamed or unmentioned
12  so-called fraudulent tax shelters.  So I guess that would be
13  the one thing I'd ask the Court to direct Mr. Okula to write up
14  in two weeks.  If we're not talking about Scandia, what are we
15  talking about, in addition to Sands and Somer Leasing, and to
16  put us on a little better notice as to what that fight is
17  about.  And then we'll react to that two weeks hence.
18          THE COURT:  Thank you.
19          MR. SCHEPER:  Okay.
20          THE COURT:  Anybody else?
21          MS. HOFFINGER:  Hello again, for Mr. Ruble.
22          Judge, the government wants to put in some payments by
23  Chenery to Mr. Ruble in 1996 and 1997.  According to them, they
24  are connected with Sands, so we would argue that those should
25  go out with Sands.  But putting that aside, we're really asking
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              83
       758Wste3
 1  the Court to defer a ruling on the admissibility of any of the
 2  1996 and 1997 payments until all of the evidence in this case
 3  is in, consistent with what we believe is well-settled Second
 4  Circuit law.
 5          To be very clear, what we're saying is the following.
 6  We have no intention of saying anything in our opening
 7  statement to contest the elements of intent or knowledge with
 8  respect to Mr. Ruble's personal tax counts.  Also, we don't
 9  intend to cross-examine any government witnesses to contest the
10  elements of intent or knowledge with respect to Mr. Ruble's tax
11  counts.  Therefore, since it is not apparent that that's going
12  to be an issue, we ask that it be put off until the end of all
13  the evidence.  We don't think the government will be prejudiced
14  by this, Judge.  By their own admission, this is going to be
15  quite simple for them to put in, in terms of timing.  I think
16  they have actually one additional witness, just to, I think, be
17  clear.
18          THE COURT:  They'll be so exhausted by then, they

                            Page 39

EXHIBIT ___A___ PAGE 41

```
                         758WsteC.txt
19   won't even think about it.
20          MS. HOFFINGER:  Okay.
21          THE COURT:  If that happens.
22          MS. HOFFINGER:  That's where we are.  We believe that
23   the case law supports us on this.  We've made a clear
24   statement, and we think it should await all the evidence.
25          THE COURT:  Thank you.
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              84

     758Wste3
1           MR. GIOIELLA:  Just briefly on Mr. Hasting.
2           As I understand it, the government has now conceded
3    that there was no tax evasion, so what they're saying is that
4    there was some kind of side payment that was included in a K1.
5    He accurately reported the K1 as the tax code and the
6    regulations require him to do.  It had no effect on his taxes
7    whatsoever, and apparently the complaint is that he should have
8    taken the $75,000 commission out of the K1 and put it on a
9    separate line item.  If I understand it, that's all it's about.
10   And for the life of me, A, I don't think that's a bad act,
11   because the code requires you to report in accordance with your
12   K1, and, B, it certainly has nothing to do with this case.
13          THE COURT:  Okay.  Thank you.
14          MR. NIESPOLO:  Your Honor, if I might, on a different
15   matter, I'm speaking to behalf of the defendants, and I've met
16   and conferred, as have others, with the government, and I would
17   ask if the Court would allow me to speak to the possibility of
18   moving both the date due for witness and exhibit lists from the
19   defense in light of what the government is now making available
20   to us, and also possibly moving the trial date.
21          THE COURT:  Not now.
22          MR. NIESPOLO:  Your Honor, with regard to witnesses
23   and exhibits, it's due on Monday.  And I would just put forth
24   to the Court that, for me, and I think for most everybody here,
25   our case is in those documents.  And for me and for others, the
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              85

     758Wste3
1    benefit that's being provided by this database is something
2    that we haven't had in terms of being able to search and find
3    these documents.
4           THE COURT:  I understand all that.  But I'm simply not
5    at this point prepared to do that.  If you file your lists on
6    Monday and later on it turns out that you come up with
7    something else in a timely way, and you have a good explanation
8    for why you haven't come up with it before and there isn't any
9    significant prejudice to the government, I think you'd have a
10   reasonable expectation you'd be allowed to supplement.  But I'm
11   not moving it now.
12          MR. NIESPOLO:  Okay.  I would just, in closing, your
13   Honor --
14          THE COURT:  Believe me, I wake up every morning
15   wondering about the trial date.
16          MR. NIESPOLO:  I would just observe to the Court that
17   for a number of us, we are going to have access to databases
18   that we have not had access to.
19          THE COURT:  I understand.
20          MR. NIESPOLO:  Okay.
21          THE COURT:  Thank you.
22          MR. DeVITA:  Your Honor, I made an application which I
23   believe is unopposed with respect to an order allowing
```

                              Page 40

758WsteC.txt
```
24   Ms. Warley to disclose information relating to clients.  I can
25   provide a witness list.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    86

758Wste3
```
1            THE COURT:  Is that unopposed, Mr. Hillebrecht?
2            MR. HILLEBRECHT:  Yes, your Honor.  I think we put in
3    a brief letter.
4            THE COURT:  I'm going to grant it.
5            MR. DeVITA:  Thank you, your Honor.
6            THE COURT:  I was just allowing the time to run.
7            Anything else?
8            MR. OKULA:  May I just make one or two very quick
9    points from here, your Honor.
10            With respect to Mr. Pitofsky's argument that there is
11   insufficient similarity between his acts and the underlying
12   charges, I think the Bach case speaks plainly to that.  In that
13   case, the personal evasion and false returns were charged, the
14   court upheld the admission of failures to file from previous
15   years, and I think the language that's important from Bach is
16   that the prior failures to file spoke of an intent to evade the
17   tax system.  And I think that that's a leading case, or one of
18   the leading cases in the circuit on that issue.
19            Finally, with respect to Mr. Ruble, saying that you're
20   not going to cross-examine, or you're not going to open on it
21   is not unequivocally taking knowledge and intent out of the
22   case sufficiently as called for by the case law.  I think that
23   they have to demonstrate unequivocally, because we have to
24   prove knowledge and intent, and because this other proof really
25   speaks to what his knowledge and intent was, that they have to
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    87

758Wste3
```
1    make clear one way or the other.
2            THE COURT:  If the evidence was delayed to rebuttal,
3    and they hadn't opened the door to it by then, and you've got a
4    clear ruling prohibiting them from summing up on willfulness
5    then you would be fully protected.  Right?
6            MR. OKULA:  I agree with that, your Honor.
7            THE COURT:  All right.  Anyone else?
8            MR. HILLEBRECHT:  Yes, your Honor.  A scheduling
9    issue.  The government's in limine motions are due on June 12.
10   And in our motions, we had anticipated making certain arguments
11   about the admissibility of certain categories of documents
12   pursuant to the coconspirator exception, business records
13   exception, and various others.  In the defendants' motions in
14   limine, they have lodged objections to certain subsets of types
15   of documents admissible in the government's view pursuant to
16   those same rules.
17            As opposed to briefing it in two separate briefs and
18   having your Honor look at our position on the hearsay rules two
19   different times, what we would request permission to do is
20   address all our hearsay positions as well as the objections
21   raised to the certain subsets of those types of documents in
22   the June 12 submission, so we only submit one brief on the
23   hearsay issues.
24            THE COURT:  In effect, you're delaying your
25   submission?
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    88

                            Page 41

758WsteC.txt

758Wste3

```
 1          MR. HILLEBRECHT:  You could look at it that way.
 2          THE COURT:  Mr. Hillebrecht, no.  I'll address them
 3   now, sooner.  What you're really doing here, not that you set
 4   out to do it, is you basically appropriated to yourself my
 5   vacation time to be devoted to dealing with your late arguments
 6   on this, and we're not going there.
 7          MR. HILLEBRECHT:  Then, your Honor, yes, we will
 8   address.  My point is simply --
 9          THE COURT:  I agree with you, it should be addressed
10   once.  Sooner, not later.
11          MR. HILLEBRECHT:  Your Honor, I don't think that's
12   fair, given the scheduling previously set.
13          THE COURT:  Look, they've moved against some of your
14   stuff in their in limine motions so you have to respond it.
15          MR. HILLEBRECHT:  Very well.
16          THE COURT:  On this further briefing on the 404(b), in
17   terms of memoranda, 35 pages on each side, no more, and unless
18   you've got a Second Circuit case squarely on point on a precise
19   factual issue, I basically don't want to hear the rhetoric
20   about 404(b) all over again.  I've got it.  What I want to
21   understand is the facts and the tax law to the extent it is
22   relevant to these transactions that we're talking about.
23          Thank you very much.
24          (Adjourned)
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT __A__ PAGE __44__

# EXHIBIT B

# IN THE SUPERIOR COURT
## FOR THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

UNITED MICRONESIA DEVELOPMENT
ASSOCIATION, INC., and UMDA LAOLAO LLC,
         Plaintiff(s),

    -against-

ROBERT PFAFF, et al.,
         Defendant(s).

CIVIL ACTION NO. 07-0152

AFFIDAVIT OF SERVICE

STATE OF NEW YORK   )
                   S.S.
COUNTY OF NEW YORK)

        NELSON CARVAJAL, being duly sworn, deposes and says that he is over the age of eighteen years, is employed by the attorney service, DLS, INC., and is not a party to this action.

        That on the 7th day of July 2008, at approximately the time of 8:20 p.m., deponent served a true copy of the **SUBPOENA DUCES TECUM AND SUBPOENA TO TESTIFY AT DEPOSITION** upon Dominick M. Degeorgio at 9 Jennings Meadow Road, Cold Spring Harbor, NY 11724, by personally delivering and leaving the same with his wife, Terry Degeorgio, a person of suitable age and discretion at that address, the actual place of residence. At the time of service, a witness fee in the sum of $25.00 was tendered.

        Terry Degeorgio is a white female, approximately 43 years of age, stands approximately 5 feet 6 inches tall and weighs approximately 140 pounds with blonde hair and brow eyes. She has freckles.

        That on the 8th day of July 2008, deponent served another copy of the foregoing upon Dominick M. Degeorgio at 9 Jennings Meadow Road, Cold Spring Harbor, NY 11724, by first class mail, by enclosing a true copy thereof in a securely sealed and postpaid wrapper with the words "PERSONAL AND CONFIDENTIAL" written on the same envelope, and not indicating on the outside that it is from an attorney or

concerns an action against the person to be served, and depositing the same into an

official depository maintained by the Government of the United States, City and State of

New York.

_____
NELSON CARVAJAL #965441

Sworn to before me this
8th day of July 2008

_____
NOTARY PUBLIC

**JONATHAN T. RIPPS**
**NOTARY PUBLIC - STATE OF NEW YORK**
**NO. 01RI6109718**
**QUALIFIED IN NEW YORK COUNTY**
**COMMISSION EXPIRES MAY 17, 2012**

# EXHIBIT C

6-12-03 irs pfaff
Interview ROBERT PFAFF - VOLUME I 6/12/2003
Page 1
1 INTERVIEW OF ROBERT PFAFF
2 VOLUME I
3 June 12, 2003
4
5
The within proceedings were held at 1244 Speer
6 Boulevard, Suite 500, Denver, Colorado, at 8:40 a.m.,
before Debbie Zoetewey, Registered Merit Reporter and
7 Notary Public within Colorado.
8
9 APPEARANCES
10 For the Government: ROBERT E. CUDLIP, ESQ.
Department of the Treasury
11 Internal Revenue Service
Office of Chief Counsel
12 701 B Street
Suite 901
13 San Diego, California 92101
14 GEORGE J. TERPAK
Internal Revenue Agent
15 LMSB
455 South 4th Street
16 P.O. Box 1116
Coos Bay, Oregon 97420
17
VICTORIA REX
18 Internal Revenue Agent
Team 1236
19 450 Golden Gate Avenue SF6107
San Francisco, California 94102
20
For Mr. Pfaff: McGEE GRIGSBY, ESQ.
21 Latham & Watkins, LLP
555 Eleventh Street, N.W.
22 Suite 1000
Washington, D.C. 20004-1304
23
24
25
depo@huntergeist.com HUNTER & GEIST, INC. 303.832.5966 / 800.525.8490
Interview ROBERT PFAFF - VOLUME 1 6/12/2003
Page 2
1 PROCEEDINGS
2 * * * * * * * * * * * *
3 MR. TERPACK: For the record, today is June 12,
4 2003. It.s approximately 8:40 a.m. We.re at the office
5 of chief counsel, 1244 Speer Boulevard, Denver, Colorado.
6 We are here to interview Mr. Robert Pfaff
7 regarding his personal federal income tax returns for
8 1998, 1999, 2000 and 2001; the federal income tax returns
9 of RP Investment Trust for 1998, 1999, 2000 and 2001; and
10 the federal income tax returns of RP Capital Trust from
11 1999, 2000, and 2001.
12 Before we go any further, for the record, why
13 don.t we go around and introduce ourselves, and I will
14 also show my credentials at this time. My name is George
15 Terpack and I am an Internal Revenue agent. Here are my
16 credentials. Victoria.
17 MS. REX: I am Victoria Rex, and I.m a revenue
18 agent.
19 MR. CUDLIP: I.m Robert Cudlip, and I.m with the
Page 1

EXHIBIT ___C___ PAGE _47_

6-12-03 irs pfaff

20 IRS counsel office.
21 MR. GRIGSBY: I.m McGee Grigsby from Latham &
22 Watkins, here representing Mr. Pfaff.
23 THE WITNESS: And I am Robert Pfaff.
24
25
depo@huntergeist.com HUNTER & GEIST, INC. 303.832.5966 / 800.525.8490
Interview ROBERT PFAFF - VOLUME I 6/12/2003
Page 3
1 ROBERT PFAFF,
2 being called as a witness by the Internal Revenue Service,
3 testified as follows:
4 EXAMINATION
5 BY MR. TERPACK:
6 Q. Mr. Pfaff, I.ve prepared a list that will list
7 the different entities and where you.d find them, and here
8 are the tax returns that you need to look at.
9 A. Okay.
10 Q. So why don.t we get started. Basically, the
11 first question I like to ask is: Do you have any
12 questions about the examination process or the Privacy Act
13 notification?
14 A. I do not.
15 Q. Briefly, the taxpayer.s appeal rights, you don.t
16 have to agree with any findings I may come up with during
17 the examination. You have your full administrative appeal
18 rights and also your legal appeal rights, and I wanted to
19 make you aware of those. I think I.ve sent you Pub 1 at
20 least one time, probably many more. So if there.s any
21 questions at this time, we would take them.
22 What is your current address?
23 A. Actually, I did have a question.
24 Q. Okay. Go ahead.
25 A. Mr. Grigsby told me that our 2001 return was
depohuntergeist.com HUNTER & GEIST, INC. 303.832.5966 / 800.525.8490
Interview ROBERT PFAFF - VOLUME I 6/12/2003
Page 4
1 under exam, but I don.t believe we got the actual notice.
2 I prepared for it and for - -
3 Q. You didn.t get it?
4 A. I don.t think so. I couldn.t -- but that.s
5 okay.
6 Q. You will have it immediately. You should have
7 it, and I think Mr. Grigsby got it. Right?
8 MR. GRIGSBY: I did receive it. I received a
9 letter that said -- actually, yeah, I have got a copy.
10 THE WITNESS: Okay.
11 MR. TERPACK: And I thought I.d given it to you
12 first because I didn.t have a power of attorney, and then
13 later the power of attorney came.
14 THE WITNESS: I.m not objecting, just found out.
15 MR. TERPACK: No problem. I will make sure you
16 have a copy of it, those.
17 Q. (BY MR. TERPACK) what is your current address?
18 A. It.s 93 Glenmore Drive, Englewood, Colorado,
19 80110, ZIP code. That ZIP code is changing and I think
20 it.s 80113. I.ll have to get back.
21 Q. And what is the current address for
22 RP Investment Trust?
23 A. That would be my office, 1735 19th Street,
24 Denver, Colorado, ZIP code 80202.
25 Q. what is the current address for RP Capital
depo@huntergeist.com HUNTER & GEIST, INC. 303.832.5966 I 800.525.8490
Page 2

EXHIBIT  C  PAGE  48

6-13-05 irs pfaff

4 Interview ROBERT PFAFF - VOLUME II 6/13/2003
Page 164
1 INTERVIEW OF ROBERT PFAFF
2 VOLUME II
3 June 13, 2003
4
5
The within proceedings were continued at
6 1244 Speer Boulevard, Suite 500, Denver, Colorado, at
8:21 a.m., before Debbie Zoetewey, Registered Merit
7 Reporter and Notary Public within Colorado.
8
9 APPEARANCES
10 For the Government: ROBERT E. CUDLIP, ESQ.
Department of the Treasury
11 Internal Revenue Service
Office of Chief Counsel
12 701 B Street
Suite 901
13 San Diego, California 92101
14 GEORGE J. TERPAK
Internal Revenue Agent
15 LMSB
455 South 4th Street
16 P.O. Box 1116
Coos Bay, Oregon 97420
17
VICTORIA REX
18 Internal Revenue Agent
Team 1236
19 450 Golden Gate Avenue SF6107
San Francisco, California 94102
20
For Mr. Pfaff: MCGEE GRIGSBY, ESQ.
21 Latham & Watkins, LLP
555 Eleventh Street, N.W.
22 Suite 1000
Washington, D.C. 20004-1304
23
24
25
depohuntergeist.com HUNTER & GEIST, NC. 303.832.5966 / 800.525.8490
Interview ROBERT PFAFF - VOLUME II 6/13/2003
Page 165
1 PROCEEDINGS
2 * * * * * * * * * * *
3 MS. REX: Today is June 13, 2003. And we are at
4 the office of chief counsel, 1244 Speer Boulevard in
5 Denver, Colorado. We are continuing the interview of
6 Robert Pfaff which we began on June 12 in the matter of
7 his personal federal income tax examination for the years
8 1998 through 2001.
9 Present, my name is Victoria Rex. I.m a revenue
10 agent with the Internal Revenue Service. And also with us
11 today is -- do you want to introduce yourself.
12 MR. TERPACK: My name is George Terpack. I.m a
13 revenue agent with the Internal Revenue Service.
14 MR. CUDLIP: Robert Cudlip from IRS counsel.
15 MR. GRIGSBY: McGee Grigsby from Latham &
16 Watkins. I represent Mr. Pfaff.
17 THE WITNESS: And I.m Mr. Pfaff.
18 EXAMINATION
19 BY MS. REX:
Page 1

EXHIBIT __C__ PAGE _49_