UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>         -against-<br><br>ROBERT PFAFF,<br><br>                    Defendant. | CASE NO. 08 CR 239 RMB<br><br>**DEFENDANT ROBERT PFAFF'S SENTENCING MEMORANDUM; DECLARATION OF DAVID C. SCHEPER; EXHIBITS**<br><br>Hearing Date:  February 9, 2010<br>Time:               2:30 p.m. |

I.     INTRODUCTION

Pursuant to a plea agreement, Robert Pfaff stands before this Court for sentencing on the charge of conspiring to defraud the IRS and to impede the IRS in the due administration of the tax laws. Mr. Pfaff, who will turn 60 in May of this year, has served less than ten months of a sentence of 97 months' imprisonment that he received on April 1, 2009 from Judge Lewis Kaplan of this Court in connection with the KPMG tax shelter case.

We respectfully request that Your Honor sentence Mr. Pfaff to the low end of the stipulated Guidelines range of 51-60 months. More importantly, we ask the Court to run the entirety of Mr. Pfaff's sentence concurrently with his sentence of 97 months from Judge Kaplan. We base the latter request on the severity of the sentence he is already serving, the personal characteristics of Mr. Pfaff, the nature of the offense conduct in this case, the steps Mr. Pfaff has taken to restore the identified victim to its status quo, and the extent to which Mr. Pfaff has already suffered as a result of the instant offense. Stated in simplest terms, the interests of the government, the victims and the public in the second prosecution, under the circumstances present here, are adequately taken into account by a sentence that is wholly concurrent.

1

## II.     THE PRESENTENCE REPORT AND MR. PFAFF'S OFFENSE CONDUCT

The Presentence Report ("PSR") was initially disclosed on December 9, 2009 and then disclosed a second time on December 28, 2009.  The bodies of the two respective reports are identical.  The only difference between the two documents concerns the recommended sentence.  In the first PSR, the Probation Officer who met with Mr. Pfaff, interacted with the prosecutors and received their description of the offense conduct, and received correspondence from the sole victim identified by the prosecutors recommended, with her supervisor's written concurrence, that Mr. Pfaff's sentence in this case be at the low end of the stipulated Guidelines range and wholly concurrent with his 97-month sentence from Judge Kaplan.

In the second PSR, the Probation Office, in the person of the supervisor who had previously signed off on the original report and recommendation, changed its recommended sentence from wholly concurrent to only partially concurrent despite having received no new information from the government.  Instead, the supervisor had a telephone call with one of the prosecutors expressing the government's disagreement with the original recommendation.  Based upon the telephone conversation that the supervisor had with one of the prosecutors, and without consultation with the defense, the supervisor's recommendation changed.  After the prosecutor's conversation with the supervisor, and after the supervisor had decided that the recommendation would change, the prosecutor wrote a letter to the assigned Probation Officer stating his objection to her recommendation of December 9.  The government's letter of December 23, 2009, with its enclosed description of Mr. Pfaff's offense conduct, is attached to the accompanying Declaration of David C. Scheper as Exhibit A.   By its express terms, the letter makes clear that the description of the offense conduct was unchanged (see last sentence of letter "Attached is our description of the offense conduct, which we provided you earlier").  We also attach a transcription of a voicemail message that defense counsel received on December 30, 2009 from the Probation Office supervisor

2

explaining his change in recommendation and directing defense counsel to submit objections to and comments regarding the PSR to Your Honor, not to the Probation Office. See Declaration of David C. Scheper, Exhibit B.[1]

### A. Objections to Specific Paragraphs

Paragraph 11: Mr. Pfaff stands by his guilty plea, but to the extent this paragraph suggests that KPMG was a financial victim of Mr. Pfaff's offense conduct before the time he left KPMG in approximately July 1997, we object. KPMG had multiple partnership agreements during the years that Mr. Pfaff was a partner. We believe that it was not until the partnership agreement adopted in approximately August 1997 (after Mr. Pfaff left the firm, but retroactive to July 1, 1997) that partners were required by the express terms of the partnership agreement to report all sources of income to the firm as opposed to fees received on account of tax or accounting work. Regardless of the contents of the Partnership Agreements, and regardless whether Mr. Pfaff was entitled to receive profits from the transactions in question, we do not believe that KPMG would have been entitled to or permitted to receive those sums. In either event, we agree that it would have been the better course for Mr. Pfaff to have disclosed his sources of income.

Paragraph 12: In the first line of this paragraph, the word "and" should be replaced by the word "or."

Paragraphs 19 and 20, for example: We do not know what is intended by the PSR's frequent use of the term "tax shelter transactions" (perhaps the author is just quoting or paraphrasing the Indictment), but "tax shelter" is a defined term in the Internal Revenue Code and

---

[1] Defense counsel stresses his awareness that the Probation Office only makes a recommendation to the Court, and that this Court especially will make an independent assessment of whether Mr. Pfaff deserves a wholly, as opposed to partially, concurrent sentence. But the government obviously cared enough about what the Probation Office recommended to take the steps it took to try to effectuate a change in the recommendation, so we believe the Court deserves to know the history involved.

Regulations. The transactions at issue in this case were not, to our knowledge, tax shelters as defined by the Internal Revenue Code at the time of implementation. That does not excuse Mr. Pfaff for the conduct to which he pleaded guilty and he fully accepts responsibility for that, but the use of this term should not aggravate his sentence in any fashion. Put differently, Mr. Pfaff is not being prosecuted in this case for engaging in or promoting tax shelter transactions – the gist of his offense is in failing timely to report to the IRS income that he earned during the relevant time period, pursuant to a conspiracy with others.

Paragraphs 21 b and c: While Mr. Pfaff has no reason to believe that Domenick DeGiorgio reported his receipt of fee income to the bank where he worked, Mr. Pfaff has no knowledge of whether he did or did not report his income. Similarly, while Mr. Pfaff has no knowledge of whether the Saipan co-conspirators concealed their receipt of fees from the Saipan company, he does not dispute this fact.

Paragraph 22: This paragraph contains errors and omissions. First, Mr. Pfaff did not file tax returns in 2001 and 2002 for himself and his spouse -- he filed individual returns in those years. Second, while Mr. Pfaff wrongly reported his receipt of consulting fee income in 2001 relating to moneys allegedly received from co-conspirator Jaime Romero-Salas and his company Sussex Contracting, and wrongly claimed an investment interest expense deduction, the fact is that he over-reported his income in that year, and paid taxes on the overstated amount. In addition, while he should not have claimed the interest expense as a deduction, he was in fact out of pocket in those amounts. The net effect is that Mr. Pfaff over-reported in a later year (2001) in an effort to offset amounts received from Romero-Salas/Sussex that he had not reported or paid taxes on in previous years.

Paragraph 23: Mr. Pfaff never provided, nor asked anyone else to provide, the promissory notes referred to in this paragraph to the IRS in connection with any audit.

Paragraphs 63 and 66: The government has claimed that over a ten-year period, Mr. Pfaff received in excess of approximately $3.7 million in fee income. That is correct. But of that total amount, $2,124,541 was received by two entities affiliated with Mr. Pfaff, as stated in paragraph 63. One of these entities, called Norvest, received and accounted for the receipt of approximately $1,124,000 on its corporate tax return. Then, Norvest transferred $1,024,000 of the $1,124,000 that it had received to co-conspirators Moisen and Grandinetti, as set forth in paragraph 66. Grandinetti and Moisen acknowledge their receipt of this money. The end result is that Pfaff realized only $2.6 million of the $3.7 million charged in the indictment for his own use.[2]

Paragraph 67: The amounts omitted from the income figure on Mr. Pfaff's 1997 tax return were among the amounts Mr. Pfaff over-reported on his 2001 return (see comment to paragraph 22 for context).

Paragraph 78: This paragraph should be read in tandem with paragraph 66 above.

Paragraphs 80-81: We expect the government will concede that by 2001, Mr. Pfaff and Moisen were no longer co-conspirators. In fact, by that point, as the government knows, Moisen was attempting to extort Mr. Pfaff for money in exchange for not reporting Mr. Pfaff's conduct to taxing authorities. Moisen's extortion continued through 2003. As these paragraphs make clear, Moisen and DeGiorgio had their own financial arrangement that in no way involved Mr. Pfaff.

Paragraphs 90 and 94: As set forth in the comment to paragraph 22, Mr. Pfaff did not file joint tax returns for himself and his spouse for 2001 or 2002.

Paragraphs 96-98: These three paragraphs arise under the heading "Victim Impact." The government brought these charges in March 2008, having commenced its investigation of Mr. Pfaff in February 2004 or earlier. To date, despite repeated requests, the government has not stated a

---

[2]  This does not excuse Mr. Pfaff's deceptive conduct with respect to the timely reporting of his income. It is mentioned only for the Court to understand the flow of the money and where the money eventually rested.

position, either to Mr. Pfaff or to the Probation Office, concerning the loss to the IRS from Mr. Pfaff's offense conduct (see paragraph 96). We believe that the government has not done so because it has difficulty articulating an out of pocket loss to the IRS traceable to Mr. Pfaff's offense conduct, due to Mr. Pfaff's over-reporting of his tax obligations for certain years, the government's forfeiture of almost $2 million from Jaime Romero-Salas, and possible recoveries from co-conspirators.

Throughout this case, the only victim whose interests the government advanced to the Court or the Probation Office was United Micronesia Development Association, Inc. ("UMDA"). As the Court may recall, the government fought hard for UMDA during initial motion practice in this case concerning the protective order. Then, when Mr. Pfaff sought to have trial in this case postponed until after the Second Circuit rules on Mr. Pfaff's appeal in Judge Kaplan's case, the government presented the Court with the written objection of UMDA, and Mr. Pfaff's motion was denied.

At paragraphs 97 and 98, the PSR makes clear that Mr. Pfaff has continued to cooperate with UMDA since entering his plea in this case, and has made UMDA whole. What's more, since the time the PSR was written, Mr. Pfaff met for several hours with UMDA's counsel and answered all of their questions to their satisfaction concerning ongoing civil litigation, and has agreed to be deposed by UMDA's lawyers in the civil case.

On the eve of sentencing, in a letter to the Probation Office, the government for the first time asserted that KPMG is also a victim.[3] As set forth above in our discussion of paragraph 11, we do not believe, nor do we expect the government could prove, that KPMG was a victim of Mr.

---

[3] The 11th hour nature of this assertion is demonstrated, for example, by the colloquy at Mr. Pfaff's change of plea hearing. There, at pages 10-12 of the transcript (attached to the Declaration of David C. Scheper as Exhibit C), the prosecutor described what the government would prove, the defendant offered his allocution, and the prosecutor then supplemented his presentation to mention the victimization of UMDA. There is no hint of KPMG being a victim of Mr. Pfaff's offense.

Pfaff's wrongdoing, as that term is used in sentencing litigation. The body of the PSR appears to recognize this fact; however, as noted above, the Probation Office explicitly pointed to an alleged loss to KPMG as the basis for its revised recommendation of a significantly more severe sentence. Mr. Pfaff submits that it is inappropriate, as well as factually and legally erroneous, for the Probation Office or the government to offer this previously unasserted claim as justification for its sentencing recommendation.

Paragraph 101: Mr. Pfaff believes the first sentence should read: "Pfaff does not believe, but cannot completely recall, that his offense conduct violated the operative partnership agreement at KPMG in the manner alleged in the indictment, but agrees that he did not disclose to the KPMG Board his receipt of the fee income alleged, and that the better course would have been to do so." The second sentence of the paragraph should be revised to state that he has had no contact with Domenick DeGiorgio since approximately 2003, but that he had frequent contact with him in the 1990's.

Paragraph 119: Mr. Pfaff timely paid the $3 million fine.

Paragraph 151: This paragraph was written last winter in connection with Mr. Pfaff's April 1, 2009 sentencing by Judge Kaplan. Given the payment of the $3 million fine, taxes, and legal fees, Mr. Pfaff no longer has anticipated assets in nearly the amount stated in this paragraph.

Paragraph 153: With respect to item 4 of this paragraph, since the time it was written last winter, Global Leader's fair market value has diminished considerably due to payment of legal fees and living expenses.

Paragraph 155: As stated above in the comment to paragraph 119, Mr. Pfaff has paid the $3 million fine. He will need to pay income taxes in 2010 based upon his withdrawal of money from his profit sharing plan to pay the fine.

### III.     ARGUMENT

####    A.     Legal Standard

Title 18, United States Code, section 3584(a) provides that, in imposing sentence on a defendant who already is subject to an undischarged term of imprisonment, a court may order the sentence to be served consecutively or concurrently.  Subsection (b) provides that, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, a court must consider the factors set forth in 18 U.S.C. § 3553(a).  Sentencing Guideline § 5G1.3(c) instructs the court to make this determination "to achieve a reasonable punishment for the instant offense." Application Note 3(A) to that provision sets forth the following factors to be considered by the Court:

>    (i) the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));
>
>    (ii) the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;
>
>    (iii) the time served on the undischarged sentence and the time likely to be served before release;
>
>    (iv) the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and
>
>    (v) any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

####    B.     There are Mitigating Factors Concerning the Offense Conduct that Warrant a Wholly Concurrent Sentence

Mr. Pfaff stands by his guilty plea and reiterates his deep remorse over his criminal conduct. But there are mitigating factors about the offense conduct that the Court should take into account in

assessing the appropriate punishment in this case, in particular whether Mr. Pfaff's imprisonment should be lengthened beyond the 97 months he is serving.

The first mitigating factor has to do with the harm in fact suffered by the victims. First, with respect to the IRS (about whose loss the government remains mum), the indictment states that Mr. Pfaff received approximately $3.7 million in fee income that he failed timely to report to taxing authorities. But while it in no way excuses the conduct or provides a defense to the indictment, it is a fact that he did not cause a tax loss to the IRS on a $3.7 million income amount. As set forth above in our discussion of paragraphs 63 and 66 of the PSR, of the gross amount received by Mr. Pfaff or affiliated entities, more than $1 million was transferred as fee income to co-conspirators Moisen and Grandinetti. To the extent that these individuals failed properly to report that income to the IRS, they have been prosecuted for it.[4] Accordingly, while it is not a defense to the charge, Mr. Pfaff in fact only realized $2.6 million of the $3.7 million charged in the indictment for his own use, and the obligation to report the other $1.1 million in income rested elsewhere (see footnote 4 herein).

With respect to the $2.6 million that he realized for his own potential use, it is a mitigating factor that the government has recovered through a forfeiture action (not contested by Mr. Pfaff) $1.9 million that Mr. Pfaff sent to co-conspirator Jaime Romero-Salas in 2000 and 2001. Those payments reduced to $700,000 the amount he realized in his pocket of the $3.7 million at issue. And yet, on his 2001 tax return, Pfaff wrongly *over-reported* his income from Jaime Romero-Salas' company, Sussex Contracting, as $1.45 million when in fact he had received nothing from Romero-Salas that year in any amount.

---

[4] We have no information as to whether and if so how much Moisen and Grandinetti have paid to the IRS in the years since they received this money. Norvest timely reported both the incoming and outgoing payments on its 1998 return.

9

We stress that the lack of financial harm to the government flowing from Mr. Pfaff's receipt and reporting of fee income does not excuse the conduct. As Mr. Pfaff explains, he should have timely reported the fees he received to the IRS and to KPMG and also should have timely reported Moisen's various extortions as they occurred. Instead, he sent almost $2 million back to Romero-Salas (permanently as it turned out) and over-reported an income amount that he believed, misguidedly, would help to square things with the IRS. And for engaging in such conduct, Mr. Pfaff pleaded guilty to a felony and faces the prospect of sentencing by Your Honor.

As set forth above, while we remain in the dark as to whether, and if so to what degree, the government claims that the IRS is a financial victim, with respect to identified victim UMDA, the record is both clear and favorable to Mr. Pfaff. We have nothing substantial to add to the letter that its counsel, Edward Swanson, wrote to the Probation Officer. For the Court's convenience, a copy is attached to the Declaration of David C. Scheper as Exhibit D. To summarize, with respect to the only victim the government has ever identified as seeking redress, Mr. Pfaff has fully repaid any amounts even arguably owing to UMDA, including amounts that in no way relate to the conduct alleged in the indictment. And three months after entering his guilty plea in this case, Mr. Pfaff met with attorneys for UMDA for an extensive debriefing, and at the time of this writing, is scheduled to have his deposition taken by UMDA's lawyers.

With respect to any alleged victimization of KPMG, until December 23, 2009, the government never asserted that KPMG was a victim of a federal crime or was an entity deserving of restitution. Even now, the government has not clearly articulated the basis for its Christmas Eve assertion. Rather than shoot at air, we will reserve commentary for our reply in the event the government puts forth a theory in its sentencing papers. We do note, however, that the revised Probation Office recommendation (recommending partially consecutive imprisonment) bases its change of heart from its original recommendation of wholly concurrent time on the alleged harm

allegedly suffered by KPMG thirteen years ago. Notably, however, KPMG is not seeking the recovery of any of this money, nor has any representative of KPMG ever made such a claim of financial harm in any submission to the Probation Office, as witnessed by the Victim Impact portions of both versions of the PSR. The reason, we submit, is obvious: both the government and KPMG know that KPMG has no claim to any money in restitution, and is in no meaningful way a victim of the offense for which Mr. Pfaff stands convicted.

Lastly, as alluded to with respect to the KPMG component of this case, the offense conduct is old and is coextensive with the conduct that gave rise to Mr. Pfaff's conviction and sentence before Judge Kaplan. As even the Probation Office's revised recommendation acknowledges, had this case been charged along with the case tried in 2008 and for which Mr. Pfaff faces imprisonment for many more years, it would not have resulted in a greater sentence. The government alleged in the case before Judge Kaplan that Mr. Pfaff, and others, participated in a conspiracy to deprive the IRS of hundreds of millions of dollars in taxes during the period 1996 to 2005. The government urged, and Judge Kaplan found, that the applicable tax loss was more than $111 million, resulting in a base offense level of 32. Given that the base offense level would not change unless the tax loss exceeded $200 million, it is beyond dispute that the incremental tax loss caused by Mr. Pfaff's failure timely to report income during the same time period would not affect the Guidelines analysis at all. For that reason alone, fully concurrent time is warranted.

      **C.**      **The Offense Conduct Has Already Resulted in Adequate Separate Punishment**

Based upon the government's communications with the Probation Office (see Exhibits A and B hereto), we understand its basic argument in support of a partially consecutive sentence to be that unless Mr. Pfaff receives some amount of time consecutive to his sentence of 97 months, the government will not have been vindicated and the instant prosecution will have been a waste of time. Respectfully, we believe the government is wrong for two reasons.

11

First, while the government is no doubt confident of its position on appeal in the case tried before Judge Kaplan, this prosecution ensures a felony conviction and lengthy term of imprisonment for Mr. Pfaff, even if his conviction and sentence in the case before Judge Kaplan are overturned.  That alone is a victory for the government, and adequately vindicates the bringing of these charges.

But more importantly, it cannot be disputed that as a direct result of the indictment and guilty plea in this case, Robert Pfaff has suffered and will continue to suffer from conditions of confinement that simply would not have obtained but for this case.  When he sentenced Mr. Pfaff on April 1, 2009, Judge Kaplan sentenced a first-time offender who had an entirely non-violent past, a loving and supportive family, and a legion of friends.  Without government objection, Judge Kaplan recommended that Mr. Pfaff be sentenced to a camp near his home in Denver.  But because of this case, that did not happen.  Instead, based in part upon the existence of this case and the pendency of these charges, Judge Kaplan ordered Mr. Pfaff to be remanded immediately to the custody of the United States Marshals Service pending designation by the Bureau of Prisons.  Then, after Mr. Pfaff had served six weeks at the Brooklyn MDC, the Bureau of Prisons designated Mr. Pfaff to a prison, not a camp, at Fort Dix, New Jersey.  Mr. Pfaff reported to Fort Dix Correctional Institute on June 2, 2009.

In mid-September, 2009, Mr. Pfaff was transferred to the Brooklyn MDC for his guilty plea and sentencing.  He remains there to this day.  According to the government, Mr. Pfaff may be housed at the Brooklyn MDC for several weeks beyond the February 9 sentencing date, and faces arduous travel and living conditions even after his transportation towards his designated institution, wherever it might be, commences.  Thus, almost a year after Judge Kaplan, with the government's acquiescence, recommended that Mr. Pfaff serve his sentence at a camp near his family home in Colorado, Mr. Pfaff continues to be housed under substantially more restrictive and odious

conditions than those contemplated by Judge Kaplan or the government, thousands of miles away from his loved ones. This circumstance, and the resulting punitive impact on Mr. Pfaff, are direct consequences of the instant prosecution, and cannot be overlooked in assessing the statutory sentencing factors in this case.

The adverse circumstances Mr. Pfaff has faced since his incarceration commenced last spring are documented in his letter to the Court and in the letters of his wife and other family members, which we know Your Honor will read and reflect on. As Mr. Pfaff attests, the greatest adversity is not the lack of exposure to direct sunlight or the crowded conditions. The greatest adversity comes from geography and length of time. With respect to geography, we request of the Court, and the government does not oppose, that you recommend, as Judge Kaplan did, that Mr. Pfaff be designated to the camp in Englewood, Colorado or secondarily to the camp in Sheridan, Oregon. That way, the people who will love and support Mr. Pfaff for the rest of his life--who happen to be the same people who crave his continued love and support--will be able to visit him meaningfully and frequently.

The other factor about Mr. Pfaff's existing sentence that is most adverse involves the length of time he has to serve for justice to be done. Or, put differently, how much incarceration for Robert Pfaff is enough? In answering this question, we ask Your Honor to take into account the judgment of Judge Kaplan. While acknowledging that a sentence of 97 months was both lengthy and deserved, Judge Kaplan made it clear on April 1 of last year that he did not believe that Mr. Pfaff should receive a sentence tantamount to a life sentence for a fraud that he found involved $111 million in tax loss. And the government is defending that assessment of Mr. Pfaff to the Second Circuit. In a brief defending Mr. Pfaff's convictions and sentence, the prosecutors wrote:

"Given the acknowledged difference in ages [between Mr. Pfaff and a codefendant], the Court imposed a lower sentence on Pfaff in part in order to ensure that Pfaff's term of imprisonment would not constitute, in effect, a life sentence. A district court's desire to avoid the unnecessary imposition of effective life sentences is hardly novel (citation omitted), and plainly cannot constitute an abuse of discretion." (See Declaration of David C. Scheper at Exhibit E, p. 204).

The factors that led Judge Kaplan to impose a 97-month sentence, in the face of a government recommendation of 292 months (based on a claimed adjusted offense level of 40) remain compelling. Mr. Pfaff has committed a serious offense against the United States, but not one that requires him to spend the rest of his life behind bars. Notwithstanding the enormity of the tax loss in the case before him, Judge Kaplan determined that Mr. Pfaff should have a meaningful opportunity for life after prison. We submit, Your Honor, that this Court should view Mr. Pfaff in the same light.

The letters from Mr. Pfaff and his family attest that this man has a lot to live for, and that he will have a home and a place in the world. Those same letters, and the remarkable letter of my remarkable partner, Diann Kim, drive home the fact that this man has too much good to offer this world to keep him incarcerated beyond the age of 66.

## IV.   CONCLUSION

In summary, the combination of two concurrent sentences, one of which is impervious to appeal, followed by three years of supervised release for a non-violent man nearing 60, more than adequately vindicates the interests of the government and more than adequately balances the interests of the victims, Mr. Pfaff, his family, and our society. Accordingly, we ask that Your Honor sentence Mr. Pfaff to the low end of the Guidelines range, 51 months, that you make his sentence wholly concurrent with his present sentence of 97 months, that you take into account in

setting a fine or ordering restitution his documented inability to pay, and that you recommend his prompt designation to a camp near his home.

DATED: January 26, 2010                               SCHEPER KIM & OVERLAND LLP


                                                      By:  _____s/_____
                                                           David C. Scheper
                                                           601 West Fifth Street, 12th Floor
                                                           Los Angeles, CA  90071-2025
                                                           (213) 613-4655

                                                           Attorneys for Defendant Robert Pfaff

15